CUNEO GILBERT & LADUCA LLP
Jon Tostrud (SB No. 199502)
1901 Avenue of the Stars, 2nd Floor
Los Angeles, California 90067
Telephone: (310) 461-1620
tostrud@yahoo.com

GREENFIELD & GOODMAN, LLC
Richard D. Greenfield
250 Hudson Street-8th Floor
New York, NY 10013
Telephone: (917) 495-4446
whitehatrdg@earthlink.net

(Additional Counsel on Signature Page)

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

**BUTTONWOOD TREE VALUE PARTNERS, LP and JOHN SORRELLS** on Behalf of Themselves and all Others Similarly Situated,

Plaintiffs,

vs.

**JACK A. SWEENEY, STEVEN J. SWEENEY, MARILYN J. SWEENEY, GARY M. HORGAN, H. ANTHONY GARTSHORE, F. DAVID HARE, ELIZABETH THOMPSON, FRED M. EDWARDS, DOROTHEA MONTOYA, THOMAS E. McCULLOUGH, RICHARD SCHREIBER, and LAWRENCE J. SHERMAN.**

Defendants.

Civil Action No.

SACV10-00537 CJC MLGx

**CLASS ACTION**

**COMPLAINT**

**JURY TRIAL DEMANDED**

## COMPLAINT

Buttonwood Tree Value Partners, LP ("Buttonwood") and John Sorrells, on behalf of themselves and all others similarly situated, by their

undersigned counsel, allege the following based upon the investigation of counsel, except as to the allegations specifically pertaining to their own acts, which are based upon personal knowledge.  The investigation of[1] counsel included, among other things, a review of the public filings of First Regional Bancorp ("FRB" or the "Company") with the United States Securities and Exchange Commission ("SEC"), press releases issued by the Company, media and news reports about the Company, and publicly available trading data for FRB's securities and reviews of minutes of the Boards of Directors of FRB and its wholly-owned subsidiary, First Regional Bank (the "Bank").

## NATURE OF THE ACTION

1.     This is a class action brought by plaintiffs on behalf of a class consisting of all persons who purchased securities of FRB stock during the period of approximately January 1, 2007 to January 29, 2010, inclusive ("Class Period").  Those named as defendants in this action were all officers and/or directors of FRB and/or of its subsidiary, First Regional Bank (the "Bank") during at least part of the Class Period. FRB common stock is now virtually worthless, having sold as recently as April 27, 2010 at approximately $0.03 per share.  Trading in FRB's stock was suspended on January 29, 2010, and resumed on February 10, 2010. The NASDAQ Stock Market announced on February 25, 2010 that it would delist the common stock of FRB, and it has since traded on the OTC Bulletin Board (better known as the "pink sheets" where "penny stocks" are traded).   It is anticipated that the Company will shortly file for protection from creditors under the bankruptcy laws since it has now lost its principal asset, the Bank, and is obligated for the repayment for trust preferred debt that remains

---

[1] The exact parameters of the Class Period will be determined upon the conclusion of discovery with respect thereto.

2

outstanding as well as other debt.

2.     This action involves a fraudulent scheme perpetuated by the defendants that concealed from plaintiffs and the investing public the true financial and operating condition of FRB and the Bank, all of which resulted in the closing of the Bank by the California Commissioner of Financial Institutions ("CFI") on Friday, January 29, 2010. The Federal Deposit Insurance Corporation ("FDIC") was appointed as receiver for the Bank. At the crux of the defendants' fraudulent scheme was a practice whereby they intentionally concealed the true state of affairs at FRB and the Bank, FRB's only significant asset, which had, in the past, accounted for virtually all its reported earnings and cash flow.

3.     Defendants' manipulation of --- and, in particular, the publicly-described financial and operating condition of FRB and the Bank---the reported earnings, assets and shareholders' equity of FRB, was well-concealed through most of the Class Period. Such deception, carried on by the defendants while they held their respective positions with FRB and/or the Bank, was the linchpin of a broader fraudulent scheme to profit from such conduct and to misrepresent and withhold truthful material information from the public about this scheme.  In furtherance of this fraudulent scheme, defendants engaged in, *inter alia*, the following misconduct:

      (a)      throughout the Class Period, the defendants intentionally failed to make adequate provisions for the Bank's known or reasonably likely loan losses while knowing that, *inter alia*, such loans were excessively concentrated in a few borrowers and in the over-heated and highly volatile commercial real estate industry in Southern California

and/or that the borrowers were not able to re-finance or honor their commitments to the Bank;

(b)   throughout the Class Period, the defendants concealed the fact that the Bank had expanded the scope of its lending activities that its loan files, particularly, real estate-based loan files, were in a serious state of disarray making collection of such loans very difficult;

(c)   throughout the Class Period, the defendants intentionally filed with the SEC and otherwise disseminated to the investing public financial statements and other documents that falsely reported FRB's earnings when, had the truth been disclosed, the defendants would have revealed that FRB and the Bank was losing money;

(d)   through most of the Class Period, in press releases and otherwise, the defendants proclaimed that FRB and the Bank were "well capitalized" when, in fact, the Bank was so woefully capital deficient that its survival was in doubt;

(e)   throughout the Class Period, defendants failed to disclose publicly that they had not complied with material provisions of the Company's Audit Committee Charter, which had been adopted March 20, 2007 including the requirements that the Audit Committee "monitor the integrity of the Company's financial reporting process and systems of internal controls regarding finance, accounting and legal compliance;...monitor the performance of the Bank's Chief Risk Officer and the internal audit function;...monitor the Company's systems of disclosure

4

controls and procedures, internal controls over financial reporting..."

(f)    through part of the Class Period, defendants failed to disclose publicly that they had not complied with material provisions of the Company's Code of Business Conduct and Ethics, which had been adopted May 19, 2009 including the requirement that they and their subordinates "comply with all applicable laws, rules and regulations related to the disclosures the Company makes to the SEC and to ensure that such disclosures are made fairly, accurately and timely."

(g)    through most of the Class Period, defendants failed to disclose publicly and in a timely manner significant actions taken by banking regulators including, in particular, that the California Department of Financial Institutions (" DFI") and/or the FDIC had warned the Boards of FRB and the Bank of, *inter alia*, their seriously deficient controls, lending concentrations, improper banking practices and underlying risks to the Bank's survival; and through at least part of the Class Period, defendants failed to disclose publicly and in a timely manner that the FDIC had issued to the Bank and the Officer Defendants a Report of Examination dated April 23, 2007 in which they were informed, formally, of unsafe and unsound banking practices and violations of law and/or regulation; that on February 28, 2008, the Board of the Bank had consented to the entry by the FDIC of a Cease and Desist Order (issued

March 3, 2008) and that on February 17, 2009, the members of the Bank's Board of Directors  had been required to physically come to the offices of the DFI to meet with its representatives and those of the FDIC and enter into a further "cease and desist" order related to the defendants' conduct as described herein and otherwise and requiring the Bank to take corrective steps to address the foregoing issues, as more specifically set forth below.

4.    This extensive fraud injured plaintiffs and others who purchased FRB securities during the Class Period in an amount which cannot presently be determined.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78aa, and 28 U.S.C. §1331.   The claims asserted herein arise under Sections 10(b), 20(a) and 20A of the Exchange Act and Rule 10b-5 promulgated by the SEC, 17 C.F.R. §240.10b-5.

6.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) and (c).  FRB's principal executive offices were located in this District, defendants transacted business in this District and many of the acts and transactions constituting the violations of law alleged herein, including the preparation, issuance and dissemination of materially false and misleading statements to the investing public, occurred in this District.

7.    In connection with the acts, conduct and other wrongs alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails,

interstate telephone communications and national securities markets.

## THE PARTIES

### A.   THE PLAINTIFFS

8.     Plaintiff Buttonwood is an investment partnership which purchased 90,601 shares of FRB common stock between May 28, 2008 and February 6, 2009, as set forth in the Certification filed with this Complaint, and suffered damages as a result of the wrongful acts of defendants alleged herein.

9.     Plaintiff John Sorrells is an individual who purchased 28,000 shares of FRB common stock on May 30, 2008, as set forth in the Certification filed with this Complaint, and suffered damages as a result of the wrongful acts of defendants alleged herein.

### B.   THE DEFENDANTS

10.     Defendants Jack A. Sweeney (as Chairman of the Board and Chief Executive Officer of FRB), Lawrence Sherman (as Vice Chairman of the Board of FRB), H. Anthony Gartshore (as President and Chief Executive Officer of the Bank), F. David Hare (as Executive Vice President), Steven J. Sweeney (as General Counsel and Executive Vice President of the Bank), Gary M. Horgan (as Chairman of the Board), Elizabeth H. Thompson (as Chief Financial Officer), Thomas E. McCullough (as a Director, Executive Vice-President, Chief Operating Officer and Secretary) and Dorothea Montoya (as Senior Vice President and Chief Compliance Officer of the Bank)  are collectively referred to hereinafter as the "Officer Defendants."  By virtue of their high-level positions with the Company and/or the Bank, each of the Officer Defendants directly participated in the management thereof, was directly involved in the day-to-day operations of the Company and the Bank at the

highest levels and was privy to confidential proprietary information concerning FRB and the Bank and their business, operations, growth, financial statements and financial condition.

11.     As senior officers of FRB and/or the Bank, defendants Jack A. Sweeney, Sherman, Gartshore, Steven J. Sweeney, Horgan, Thompson, McCullough and Montoya had extensive duties to ensure the accuracy of information disseminated to investors:

(a)     As noted in American Institute of Certified Public Accountants ("AICPA") auditing standard, Section 110.03, a public company's management is responsible for preparing financial statements in accordance with GAAP:

> The financial statements are management's responsibility.... Management is responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management.  The auditor's knowledge of these matters and internal controls is limited to that acquired through the audit. Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

(b)     In Accounting Series Release 173 (July 2, 1975), the SEC reiterated the duty of management to present a true representation of a company's operations:

> [I]t is important that the overall impression created by the financial statements be consistent with the business realities of the company's financial position and operations.

(c)     Pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") and SEC rules promulgated thereunder, the chief executive officer and chief financial officer of reporting corporations are required to certify as to the accuracy and completeness of a company's financial statements. As such, defendants Jack A. Sweeney, Gartshore and Thompson are liable to

8

1  plaintiffs and others similarly situated as a result of their false certifications
2  as described herein.

3      12.   Defendants Jack A. Sweeney, Sherman, Gartshore, Hare,
4  Horgan, McCullough, Marilyn J. Sweeney (as a Director of FRB), Fred M.
5  Edwards (as a Director of FRB) and Richard Schreiber (as a Director of
6  FRB), are collectively referred hereinafter as the "Director Defendants."
7  During the Class Period, FRB's Board of Directors was responsible for the
8  oversight and monitoring of (a) the integrity of its financial statements and
9  those of the Bank; (b) the Company's and the Bank's compliance with legal
10 and regulatory requirements; (c) the independent auditor's qualifications,
11 independence and performance; and (d) the Company's and the Bank's
12 internal accounting and financial controls.   The FRB Board had final
13 decision-making authority regarding the public disclosure of the financial
14 and operating condition of FRB and the Bank. In addition to its
15 responsibilities to FRB and the Bank, the FRB Board had fiduciary
16 responsibilities to FRB stockholders, potential stockholders and the
17 investment community.

18     13.   Because of the defendants' positions within the Company
19 and/or the Bank, they all had access to adverse undisclosed material
20 information about the true financial condition, earnings and expenses of
21 FRB and the Bank and, most significantly, the adequacy of the Bank's
22 capitalization. They were each were privy to such undisclosed information
23 from internal corporate documents, communications among themselves and
24 with other officers and employees of the Company and the Bank and
25 attendance at, and documents received during, meetings of management,
26 the Boards of Directors of FRB and the Bank. In the case of the Sweeney
27 Defendants, they also possessed such knowledge through intra-familial

28

9

discussions. They each knew or were deliberately reckless in not knowing of the adverse material facts which rendered the statements alleged herein false and misleading.

14.    The defendants, as officers and/or directors of the Company, had a duty to disseminate complete, accurate and truthful information about the financial condition, earnings and expenses and capitalization of FRB and the Bank. The defendants had a duty to promptly correct any public statements issued by FRB and/or the Bank that had become false and misleading. The defendants, together with their legal counsel, were involved in the drafting, producing, reviewing and/or dissemination of the false and misleading statements alleged herein.

15.    Because of their positions, their ability to exercise power and influence with respect to FRB's course of conduct and their access to material inside information about FRB and the Bank, the defendants were, at the time of the wrongs alleged herein, controlling persons of FRB within the meaning of Section 20(a) of the Exchange Act.

16.    It is appropriate to treat the defendants as a group for pleading purposes and to presume that the false, misleading and/or incomplete information conveyed in the public filings, press releases and other publications of FRB and the Bank as alleged herein are the collective action of all the defendants identified above.

## CLASS ACTION ALLEGATIONS

17.     Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and entities who purchased FRB securities during the Class Period and were damaged thereby ("Class").  Excluded from the Class are defendants herein, officers and directors of FRB and/or the Bank, members of their immediate families and the heirs, successors or assigns of any of the foregoing.

18.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, they believe there are, at a minimum, more than 500 members of the Class. FRB common stock traded in an open and efficient market.

19.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.   The following are questions of law and fact common to the Class:

- whether defendants engaged in acts or conduct in violation of federal securities laws as alleged herein;
- whether defendants' made misrepresentations and/or omissions of material facts regarding FRB and/or the Bank;
- whether such misrepresentations and/or omissions of material facts were essentially linked to the damages sustained by plaintiffs and the members of the Class;
- whether defendants acted knowingly or with deliberate recklessness in issuing false and misleading financial statements and information about the financial and operating

11

condition of FRB and the Bank;

- whether the prices of FRB securities during the Class Period were artificially inflated because of defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

20.    Plaintiffs' claims are typical of the claims of the other members of the Class and the other members of the Class sustained damages arising out of defendants' wrongful conduct in violation of federal law as complained of herein.

21.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions and securities litigation.   Plaintiffs have no interests antagonistic to, or in conflict with, those of the Class.

22.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all the members of the Class is impracticable.   Furthermore, because the damages suffered by most of the individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

23.    Plaintiffs will rely, at least in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations and omissions during the Class Period;

- the omissions and misrepresentations were material;

- the Company's securities are traded in an efficient and open

12

marketplace;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and the other members of the Class purchased their FRB securities between the time defendants failed to disclose or misrepresented material facts and the time the truth condition of FRB and the Bank were disclosed, without knowledge of the omitted or misrepresented facts.

24. Based upon the foregoing, all purchasers of FRB securities during the Class Period suffered similar injury, including injury through their purchase of the securities at artificially inflated prices, and a presumption of reliance applies.

25. In the years 2002, through the beginning of the Class Period, the Bank had grown very rapidly beyond its core functions. In the process, its assets grew to more than $2 billion and its lending and other banking activities skyrocketed. However, as determined by the Bank's regulators, such growth was not accompanied by "management with appropriate qualifications and experience commensurate with their responsibilities within the Bank."

26. In that regard, the Bank was recklessly lending money in too concentrated a manner to too few borrowers in a too concentrated industry, primarily commercial real estate in Southern California, some of which was generated through improper arrangements with loan originators. This was carried out with inadequate documentation and loan files necessary to protect the Bank and, generally, the absence of reasonable controls and risk management, all of which was known by each of the defendants.

13

27.    During this period, the Bank had taken on substantial fiduciary responsibilities through its Trust Administrative Services ("TAS") Division and through the handling of IRA accounts administered by third parties, none of which activities the Bank was able to handle competently or prudently.

28.    Further, either as a result of the lack of oversight by the Director Defendants, the lack of controls or otherwise, the Bank became a vehicle for money laundering and otherwise facilitated criminal activity.

29.    Throughout virtually the entirety of the Class Period, during the times that they held their respective positions with FRB and/or the Bank, the defendants had knowledge of the foregoing while concurrently proclaiming the health of their financial condition as well as falsely proclaiming that the Bank was "well capitalized" when they knew or should have known that it was not.

## SUBSTANTIVE ALLEGATIONS

30.    Defendants violated the federal securities laws in several ways. First, defendants issued false and misleading statements and controlled persons who issued false and misleading statements in violation of Sections 10(b) and 20(a) of the Exchange Act.

### Defendants' False And Misleading Statements

31.    During the Class Period, defendants issued a series of false and misleading statements in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5. These statements fall within several categories, discussed more fully below. First, defendants issued false and misleading statements regarding the financial statements of FRB and the Bank. Second, defendants issued false and misleading statements regarding the prospects for FRB and

14

the Bank. Third, defendants failed to make timely public disclosure of the fact that the Bank's regulators had warned the defendants on multiple occasions that the Bank was not being operated properly as indicated above and the impact thereof on FRB.

32.    Throughout 2007, Defendants caused the Company to report favorable earnings results, notwithstanding the fact that they knew that there were increasing risks to the Company's loan portfolio. On or about April 17, 2007, Defendants caused the Company to announce quarterly net profits of approximately $9 million.  At the time, Defendant Jack A. Sweeney falsely stated that "[i]t is gratifying to report another strong and profitable quarter as we made further progress toward our key objectives of sound growth, increased profitability and financial strength."  He further boasted without justification that "our team of experienced banking professionals continues to secure quality lending opportunities, and in line with our conservative philosophy, we are keeping prime emphasis on maintaining our excellent credit quality."  The Defendants further represented falsely that the Company had a "strong and liquid capital and liquid financial position" and remained "optimistic" based on the Company's "continued momentum":

> We remain alert and vigilant, and are prepared to take the steps necessary to meet whatever economic challenges may emerge. In this regard, we benefit greatly from our strong capital and liquid financial position, giving us the flexibility to react quickly to changing conditions. We remain optimistic based on our continued momentum, our portfolio of high-quality earning assets, our financial strength and our solid market position. As always, our primary objective remains clear – to maintain profitable growth on a prudent basis and, thereby, build further value for our shareholders.
>
> ...
>
> We remain alert and vigilant, and are prepared to take

15

the steps necessary to meet whatever economic challenges may emerge.

33. Barely six days later, on April 23, 2007, the FDIC issued a "Report of Examination" in which it found serious internal control deficiencies. The report found the following unsafe and unsound banking practices and violations of law and/or regulation:

(a) operating in violation of section 326.8 of the FDIC's Rules and Regulations, 12 C.F.R. § 326.8, regarding a satisfactory Bank Secrecy Act ("BSA") and Anti-Money Laundering ("AML") compliance program with respect to Individual Retirement Accounts administered by third parties;

(b) operating in violation of section 353.3 of the FDIC's Rules and Regulations, 12 C.F.R. § 353.3, regarding Suspicious Activity Report ("SAR") procedures to identify, monitor, and report suspicious activities with respect to Individual Retirement Accounts administered by third parties;

(c) operating without adequate customer due diligence with respect to Individual Retirement Accounts administered by third parties;

(d) operating with a board of directors which has failed to provide adequate supervision over and direction to the active management of the Bank; and

(e) operating with inadequate internal routine and controls policies.

34. On or about July 18, 2007, the Company announced net income of $8.3 million for the quarter ending June 30, 2007. In a press release issued with the Company's financial results, Defendant Jack A. Sweeney stated deceptively that "First Regional continues to achieve solid profitability despite a challenging environment...While we continue to outperform others in the industry, we are not immune from these pressures."

16

35.     On or about October 23, 2007, Defendants caused the Company to announce net income of $8.1 million for the quarter ending September 30, 2007.   In a press release Defendant Jack A. Sweeney stated deceptively that "[i]n view of the current challenging environment for financial institutions, we believe that First Regional continues to demonstrate strong performance."   He further represented that the Company "registered substantial profits and growth in our assets, deposits and net loans."

36.     On February 6, 2008, Defendants caused the Company to issue a press release reporting its financial results for the year ending December 31, 2007.   The Company reported net income of $33.6 million, and $2.77 per share.   The annual income as reported by Defendants for 2007, as well as the quarterly results previously announced during 2007, were grossly inflated due to the Defendants' failure to adequately reserve for the Bank's loan losses and to mark down underperforming or impaired assets.   The Company would later write down amounts that far exceeded all of its announced income for 2007.

37.     Defendant Jack A. Sweeney stated falsely that the Company's "prudent reserves and strong capital base give us the financial strength to weather adverse conditions and respond to opportunities that emerge."   In the Company's annual report, Defendants caused the Company to report that it "continued [its]consistent record of profitability, including new year-end highs in total assets, net loans and total deposits."

38.     The Company reported total loans of $2.05 billion, and allowances for loan losses of $22.7 million, or approximately 1.11% of its loan portfolio.   The Company did not increase its loan loss reserve ratio over the prior year (ending December 31, 2006), in which it had maintained a substantially identical ratio of 1.12%, notwithstanding the fact that, by

17

March 2008, it was well known to the Defendants, and the general public, that default rates were substantially increasing, particularly in the Company's geographic area of operations. Defendants misrepresented, in FRB's 10-K, that the Company's underwriting practices were prudent and sufficient to minimize the risk of loss to the Company:

> We have adopted underwriting and credit monitoring procedures and credit policies, including the establishment and review of the loan loss reserve, that management believes are appropriate to minimize this risk by assessing the likelihood of nonperformance, tracking loan performance and diversifying our credit portfolio.

The reality was, as the Defendants were aware, that the Company's underwriting practices were woefully insufficient to minimize the risk of loss, as FRB would, belatedly, take write-downs and increase its loan loss reserves in amounts that would dwarf the false profits announced for 2007.

39.   On March 3, 2008, the FDIC issued a Cease and Desist Order to the Bank which required it to cease and desist from the various unsafe and unsound banking practices and violations of law and/or regulation set forth in the FDIC's Report of Examination dated April 23, 2007, described above. Among other things, the March 3, 2008 Cease and Desist Order required that the Bank's Directors operate the Bank in a safe and sound manner; comply with applicable laws and regulations; and restore all aspects of the Bank to a safe and sound condition, including asset quality, capital adequacy, earnings, management effectiveness, liquidity, and sensitivity to market risk.

40.   Defendants continued to make false and misleading statements about the Company's prospects throughout 2008, notwithstanding the fact that the Bank's loan portfolio was becoming increasingly impaired. In a press release containing the Company's purported financial results for the quarter ending March 31, 2008, issued on or about April 28, 2008, the

18

Company announced net income of $4.8 million per share, when it should have been reporting substantial losses. Defendant Gartshore represented that "we are being even more selective on loan transactions, and will continue to make loan loss provisions as necessary based on our ongoing analysis of First Regional's loan portfolio performance and economic conditions in general." This representation was false, as the Bank's officers were not sufficiently selective in making and documenting the Bank's loans, and had failed to reserve adequately for its potential and likely loan losses. Additionally, Defendant Gartshore stated that "we look to the future with a sense of confidence and determination," when there was, in fact, no basis for confidence or optimism."

41.    On July 24, 2008, the Company issued its purported financial results for the quarter ending June 30, 2008. Although the Company reported net losses and did increase the Bank's loan loss reserves to 1.90% of outstanding loans, Defendants misrepresented that they "anticipate[d a] quick return to profitability" and that the Bank remained "highly capitalized." The Company's 1.90% loan loss reserves were, as Defendants knew, still grossly inadequate to account for the substantial impairment of the Bank's loan portfolio, in light of the particular sub-standard nature of the loans as well as the prevailing and well-known catastrophic macroeconomic conditions, particularly in Southern California. In an accompanying press release, Defendants stated:

> Our second quarter loan loss provision followed an exhaustive review of our loan portfolio, and reflects our realistic assessment of the economic environment and its impact on collateral values and borrower performance. It should be emphasized that the loan loss provisions we have made *relate to only a small number of land and real estate development loans*; the *vast majority of our loan portfolio*

*continues to be well-secured and to perform as agreed.* First Regional's approach has always been to confront challenges fully, directly, and realistically, and we believe we have accomplished this in the second quarter. Consistent with the conservative and prudent basis on which First Regional has always operated, and especially in light of current economic conditions, we remain highly selective on loan transactions. While we believe *we have dealt effectively with our loan problems*, the economic future remains unclear, and additional loan loss provisions will be made if called for by our ongoing analysis of First Regional's loan portfolio performance and economic conditions in general. (emphasis added)

The representations that, *inter alia*, the Company had "dealt effectively with [its] loan problems" and that the "vast majority of its loan portfolio" was "well-secured" and "perform[ing] as agreed" were simply false and known to be false or made in reckless disregarded the truth by the Defendants, as the Company's loan portfolio was substantially impaired well in advance of July 2008.

42.    On October 30, 2008, the Company issued its purported financial results for the quarter ending September 30, 2008, reporting net income of $1.2 million.    At the time, Defendants caused the Company to misrepresent that    "First Regional's approach has always been to confront challenges fully, directly, and realistically" and that the Defendants "perform ongoing analyses of our loan portfolio and economic conditions, and make loan loss provisions as necessary."    In reality, the Company and the Defendants had not adequately assessed the catastrophic impairment of the Bank's loan portfolio, and had dramatically underreserved for underperforming and nonperforming assets.

43.    On February 17, 2009, the Directors of the Bank consented to

20

a further Cease and Desist Order requiring the Bank to:

(a)  Retain qualified management, and continue the active involvement of its board of directors in managing the Bank's activities;

(b)  Increase its capital ratios based on a pre-determined schedule, and develop a comprehensive capital plan to assure compliance with that schedule;

(c)  Eliminate from its books any assets classified loss and a portion of any assets classified doubtful that have not already been charged-off or collected, and develop a comprehensive plan to reduce classified assets based on a pre-determined schedule;

(d)  Create and implement a plan to increase the diversification of the Bank's lending activities;

(e).  Create and implement a comprehensive profit plan to improve the Bank's earnings performance;  and

(f).  Update or revise the Bank's written policies in the areas of credit administration and liquidity management.

44.  Although the Defendants who were Directors of the Bank provided written assurances to both the FDIC and the CFI that the Bank would comply with the requirements of the foregoing Cease and Desist Orders and the guidance provided to them following the regulators' examinations of the Bank, they merely paid "lip service" thereto. Further, their and the Bank's practices were so well-entrenched and its financial condition so precarious that these Directors could not extract the Bank from its predicament, ultimately leading to the CFI's closing of the Bank on January 29, 2010.

45.  On February 24, 2009, the Company disclosed that it had entered into an agreement with the FDIC and DFI, consenting to the

21

issuance of an Order to cease-and-desist certain practices set forth therein and outlining certain "areas the Bank agrees to address." Defendants caused the Company to misrepresent that this development represented nothing more than an agreement that merely "formalize[d] many of the initiatives which the Bank has already adopted, and provide[d] useful milestones for measuring the Bank's progress as it moves forward." Defendants further misrepresented that "First Regional Bank continues to maintain "'well capitalized' ratios, the highest standards established by banking regulators," when, in fact, the Bank was insufficiently capitalized. The truth was that the agreement with the FDIC and DFI reflected the fact that FRB was seriously undercapitalized and that there were major operational deficiencies that required correction. In fact, the regulatory Order called specifically for the Bank to increase its Tier 1 leverage ratio to 10% by September 30, 2009.

46. On March 16, 2009, Defendants filed with the SEC FRB's Report on Form 10-K for the period ending December 31, 2008. The Company announced losses of $10.2 million, and that it had increased its provisions for loan losses, increasing the loan loss ratio over that of prior years. FRB's losses for 2008 were grossly understated and its loan loss reserves were still grossly inadequate, however, in light of the catastrophic impairment of the Company's assets that was well known to the Defendants well in advance of March 2009. The loan loss reserves were not increased sufficiently to reflect a growing percentage of the Bank's underperforming assets, as its loan loss reserves were increased at a much lower level than the increase in underperforming assets.

22

47.    On or about April 30, 2009, Defendants caused the Company to report its purported financial results for the quarter ending March 31, 2009. Defendants caused the Company to report an operating loss of $3.2 million.    Defendants caused the Company to misrepresent that its "risk of loss" was adequately protected by collateral and that it had properly reserved for the risk of future losses:

> Most of our nonperforming assets are secured by real estate, and thus our risk of loss is mitigated by the value of the underlying collateral even in the present soft market. As required by applicable accounting standards, we have already made loan loss provisions to reflect our updated estimates of such potential losses, and we will continue to make loan loss provisions as necessary based on our ongoing analysis of First Regional's loan portfolio performance and economic conditions in general.

The foregoing statements were misrepresentations, in that the Defendants had not caused the Bank to reserve adequately for losses and, as Defendants knew or should have known, due to the prevailing market conditions, the collateral securing the Bank's loans was inadequate to prevent substantial losses.

48.    In the Company's Report on Form 10-Q for the quarter (filed on or about May 15, 2009), Defendants represented that FRB's quarterly loss "was substantially reduced from the immediately preceding fourth quarter of 2008," and which, more importantly, they represented "reflect[ed] the company's progress in mitigating the credit problems arising from the current deep economic recession." The reality was that the Defendants and the Company had not come close to mitigating the Bank's credit problems arising from the recession and from their own imprudent lending and

23

documentation practices. In fact, the Bank's loan portfolio was catastrophically impaired, and the Company and the Bank were undercapitalized and on the verge of collapse.

49.   As of June 30, 2009, the Company and the Bank remained significantly undercapitalized, and the Defendants had failed to comply with the earlier FDIC Order requiring the Bank to increase its Tier 1 leverage ratio to 10%.

50.   By July 13, 2009, the FDIC and DFI had commenced a regulatory examination of the Bank that would be completed in September 2009. The investigation would ultimately reveal that FRB and the Bank remained severely undercapitalized, that the Defendants had failed to adequately reserve for the Bank's loan losses, and that its announced financial results were, accordingly, woefully inaccurate.

51.   On or about July 30, 2009, the Defendants reported FRB's purported financial results for the quarter ending June 30, 2009.   In reporting operating losses on July 30, 2009 for the second quarter and first half of 2009, Defendant Gartshore, with the collaboration of other Defendants, blamed the Company's operating losses for the first six months of 2009 primarily as follows: "Operating results continue to be adversely impacted by historic lows in interest rates resulting from the Federal Reserve's aggressive actions directed at reviving the economy during the past twelve months. These actions have significantly impacted the yield on First Regional's loan portfolio, which consists almost entirely of variable-rate notes that adjust immediately upon any change in interest rates." Concurrently, in the same News Release, FRB maintained the Defendants long-proclaimed fiction that the Bank "Exceeds all financial ratio

requirements for 'Well Capitalized' status.[2]  As each of the Defendants knew, the Bank was continuing to under-reserve for bad and questionable loans which, while impacted by lower interest rates, in fact had badly deteriorated in collectability due to, *inter alia*, their excessively high loan-to-equity ratios, excessive concentration and inadequate documentation.

52.    Additionally, Defendants caused the Company to make misleading statements about FRB's prospects, suggesting that it would overcome the ongoing difficult economic conditions.  In the accompanying News Release, Defendants stated that "we continue to make steady progress confronting our challenges."  Defendant Gartshore falsely represented that "we are confident that [] totals [of underperforming assets] will decline as we complete the asset resolution transactions which we have in process." He further represented unjustifiably that " we look to the future with continued confidence and resolve" and falsely that the Bank's "strong capital base provides the solid foundation which enables us to offer customers and prospects creative solutions to their loan and deposit needs, and an unmatched level of personal service which has long been our hallmark."

53.    Defendants caused the Company to further report that "[a]s required by applicable accounting standards, we have made loan loss provisions to reflect our latest estimates of such potential losses, so the anticipated impact of such losses is already reflected in our financial results."  This statement was false, as the Bank's loan loss reserves did not

---

[2] A bank is "well capitalized" if it has a total risk-based capital ratio of 10.0% or more, has a Tier 1 risk-based capital ratio of 6.0% or more, has a leverage capital ratio of 5.0% or more. As a result of the material overstatement of the value of the Bank's loan portfolio, although it appeared to be well capitalized, it was not.

accurately reflect potential losses associated with its outstanding loans. The Company also failed to contemporaneously disclose that it and the Bank remained severely undercapitalized, and that the Bank was not in compliance with the earlier FDIC Order to improve its leverage ratio.

54.    The July 30, 2009 News Release continued to "sugar-coat" the Company's continuing decline in its operations. Defendant Gartshore was quoted as stating: "As reported earlier, most of our nonperforming assets are secured by real estate, meaning that our risk of loss is limited by the value of the underlying collateral even in the present soft market." Such statement was wholly unjustified since he and the other Defendants knew, in fact,  that the Bank's security was woefully inadequate to secure its outstanding loans, even after the Defendants had made additional provisions for loan losses.

55.    On August 5, 2009, the SEC informed the Defendants and Company that it had very serious questions about FRB's financial reporting practices and the contents of certain previous filings by the Company with the SEC.  Although the comments were specifically directed to the Company's Report on Form 10-K for the period ending December 31, 2008 and Report on Form 10-Q for the period ending March 31, 2009, they apply, in substance, in equal force to all of the Company's financial reporting during the Class Period. The SEC, among other things: (1) demanded that the Company "provide an expanded description of the specific actions [it was] taking to comply with the provisions of the" Cease and Desist Order issued by the FDIC and DFI, and to specifically (a) "disclose whether there were any changes made to [its] allowance for loan loss methodology, and (b) "disclose the extent of any financial statement

impact of complying with any of the requirements of the order"; (2) questioned why non-performing loans were still represented to be accruing interest; and (3) noted that the Company's loan loss reserves had not grown at a rate commensurate with the percentage of underperforming loans (citing the "continued deterioration" of the Company's loan portfolio), and requested an explanation; and (4) demanded that the Company revise its future filings to "disclose the fact that the cease and desist order entered into in February require[d the Company] to maintain and bolster [its] capital due to the finding that [it was] operating with insufficient capital given the level of risk present in [its] loan portfolio"; and (5) instructed the Company to "revise future filings to provide a discussion of [its] underwriting policies and procedures for all major loan products in each lending category"; (6) demanded clarification as to how the Company defined "sub-prime" and to what extent its portfolio consisted of interest-only and/or other alternative mortgages; and (7) explain why reserves for loan losses (on an annualized basis) were lower in the first quarter of 2009 than in 2008.

56.   On November 17, 2009, the Company issued its Report on Form 10-Q for the quarter ending September 30, 2009, and restated its financial results as set forth in its Report on Form 10-Q for the period ending June 30, 2009. The Company disclosed for the first time that it and the Bank were dramatically undercapitalized, and that the Bank's loan loss reserves had previously been inadequate, increasing its loan loss reserves, as of June 30, 2009, by a staggering $69.9 million.   Specifically, the Company determined that "the allowance for loan losses as of June 30, 2009 should be increased by $69,889,000," and announced "an additional $50,587,000 in

loan charge-offs, $1,279,000 in interest reversal on impaired loans, $1,161,000 million in losses on foreclosed properties that were deemed to have existed as of June 30, 2009 and a $20,670,000 cost of establishing a valuation allowance for deferred tax assets."

57.    The charge-offs and increases to loan loss reserves announced in November 17, 2009 far exceeded the previously announced net earnings for 2007 ($33.6 million), and also far exceeded the previously announced net loss for 2008 (a mere $10.2 million).  Although these charges were ascribed to the quarter ending June 30, 2009, it cannot seriously be suggested that all of these charges, and the necessity of doubling the loan loss reserves, suddenly became necessary in or around June 2009.  The massive scope of these adjustments made it perfectly clear that the Defendants had not previously devalued the assets of FRB and the Bank on in their balance sheets, nor adequately increased their loan loss reserves, during 2007 and 2008.57.    After having de-accentuated the increasing deterioration and continued uncollectability of the Bank's outstanding loans, under pressure from regulators, the Defendants were finally forced to acknowledge how badly they had managed FRB and the Bank. Nevertheless, they still failed to own up to the fact that the Bank and FRB were on the brink of collapse. Once again, they falsely represented that "most of our nonperforming assets are secured by real estate, and thus our risk of loss is mitigated by the value of the underlying collateral even in today's distressed market." In making such deceptive statement, Defendants knew but did not disclose what they have known throughout the Class Period; namely, that such collateral was grossly insufficient to secure the Bank's loans and protect it against loss, particularly in a deteriorating real estate market, which had been prevalent throughout the Class Period.

58.   On Friday, January 29, 2010, the California Commissioner of Financial Institutions closed the Bank, and appointed the FDIC as its receiver.  With the assistance of the FDIC, substantially all of the assets and liabilities of the Bank were assumed by First Citizens Bank of Raleigh, North Carolina.

**Defendants' Concealment of the Dire Financial Condition of FRB and the Bank and their Failure to Make Timely and Complete Public Disclosure of Actions Taken by Regulators**

59.   Throughout the Class Period, the financial condition of the Bank was materially overstated, all of which was reflected on FRB's statements. As alleged more fully below, these financial statements grossly overstated the Bank's earnings, assets and net worth and, in particular, the capital ratios upon which were based the Officer Defendants' oft-repeated claims that the Bank was "well capitalized." Concurrently, they concealed the fact that they had dramatically underreserved for the Bank's likely and potential loan losses, as they were legally required to do.

60.   FRB's financial statements issued and disseminated during the Class Period, including the reported earnings, assets and capital of it and the Bank, also contained misrepresentations regarding compliance with Generally Accepted Accounting Principles ("GAAP"), SEC regulations and Sarbanes-Oxley ("SOX") and thus were materially false and misleading.

61.   According to SEC regulations, public companies must prepare their financial statements in accordance with GAAP.  GAAP are the principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time.  GAAP is also a term used to broadly describe the body of principles that governs the accounting for financial transactions underlying

the preparation of a set of financial statements.  GAAP are derived from a variety of sources, including promulgations of the Financial Accounting Standards Board and its predecessor, the APB, and AICPA.  Other sources include the general body of accounting literature consisting of textbooks, articles, papers, etc.  GAAP standards are the official standards accepted by the SEC.  By failing to comply with GAAP, FRB's financial statements were and are presumptively in violation of those regulations.[3]

62.    The Defendants also deceived the investing public in the Management Discussion and Analysis Section of FRB's financial statements failed to disclose that the financial statements of FRB and the Bank were not prepared in compliance with GAAP.

63.    The financial statements' Item 7 of Form 10-K and Item 2 of Form 10-Q, MD&A of Financial Condition and Results of Operations, required issuers such as FRB to furnish information required by Item 303 of Regulation S-K (17 C.F.R. §229.303).  On May 18, 1989, the SEC issued an interpretive release, Securities Act release No. 6835, 54 Fed. Reg. 22427 (May 18, 1989), which stated in part:

> The MD&A requirements are intended to provide, in one section of a filing, material historical and prospective textual disclosure enabling investors and other users to assess the financial condition and results of operations of the registrant, with particular emphasis on the registrant's prospects for the future.  As the Concept Release states:
>
> The Commission has long recognized the need for

---

[3] SEC Rule 4-01(a) of SEC regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate, despite footnote or other disclosures, unless the Commission has otherwise provided." 17 C.F.R. §210.4-01(a)(1). Regulation S-X requires that interim financial statements must also comply with GAAP.  17 C.F.R. §210.10-01(a).    The SEC also regulates statements by registrants "that can reasonably be expected to reach investors and the trading markets, whoever the intended primary audience."   Public Statements by Corporate Representatives, SEC Release Nos. 33-6504, 34-20560, 3 Fed. Sec. L. Rep. (CCH) ¶23,120B, at 17,096, 1984 SEC LEXIS 2559, at *2 (Jan. 13, 1984).

a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company. The Item asks management to discuss the dynamics of the business and to analyze the financials.

(Footnotes omitted.)

64.     Securities Act Release No. 6349, 23 S.E.C Docket 962 (Sept. 28, 1981) provides that:

It is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company.

65.     Under SEC regulations, the management of a public company such as FRB has a duty "to make full and prompt announcements of material facts regarding the company's financial condition."[4]  The Defendants violated this regulation throughout the Class Period by deliberately and/or recklessly misrepresenting the true financial and operating condition of the Bank and FRB, concealing the material shortcomings in the Bank's management and controls and making timely disclosure of the regulators' warnings and requirements of remedial steps that the Bank and its Directors had been required to take, but were not adequately taking.

66.     Defendants failed to explain in the MD&A sections of FRB's annual and quarterly SEC filings that they had caused FRB's financial statements as publicly disseminated to not be in compliance with GAAP.

---

[4] Timely Disclosure of Material Corporate Developments, Exchange Act Release No. 34-8995, 3 Fed. Sec. L. Rep. (CCH) ¶23,120A, at 17,095, 17 C.F.R. §241.8995, 1970 WL 10576 (Oct. 15, 1970).

Moreover, Defendants violated the basic precepts noted above by (a) concealing from the public a complete understanding of material facts relating to FRB's financial and operating condition and, most significantly, that the Bank's condition had deteriorated to the point of being subject to being closed.

67.    Due to all these accounting improprieties set forth above, the Defendants presented FRB's financial results and statements in a manner which violated GAAP including the following fundamental accounting principles:

(a)    The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. 28).

(b)    The principle that financial reporting should provide information that is useful to present and potential investors, creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Financial Accounting Concepts No. 1).

(c)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources and effects of transactions, events and circumstances that change resources and claims to those resources (FASB Statement of Financial Accounting Concepts No. 1)

(d)    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB

Statement of Financial Accounting Concepts No. 1).

       (e)    The principle that financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Financial Accounting Concepts No. 1).

       (f)    The principle that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Financial Accounting Concepts No. 2).

       (g)    The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Financial Accounting Concepts No. 2).

       (h)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Financial Accounting Concepts No. 2).

       68.    While the Defendants in office became acutely aware by early 2008, if not much earlier, that the Bank was an operational "basket case" it was not until after substantial regulatory intervention from the FDIC, DFI and SEC that they took any action to restate FRB's reported financial

results. Even when they did so, they attempted to characterize their actions as charges taken solely in a single quarter in 2009, when they should have caused FRB to fully restate its financial results for the Class Period, so as to properly reflect FRB's and the Bank's true financial and operating condition during at least the previous two years. Pursuant to GAAP, as set forth in APB Opinion No. 20,[5] restatements are required to correct material accounting errors that existed at the time the financial statements were issued and are permitted for the purpose of correcting improper accounting only when it results in material misstatements. Had the Defendants caused such a restatement to have taken place, they would have admitted (and informed the investing public) that each document issued by FRB or the Bank publishing the original financial statements for the restated periods contained untrue statements and/or omissions of material fact. The Defendants failed to cause such a restatement to take place, thereby continuing their deception of the investing public.

69.    The Defendants also caused the Bank and FRB to make false and misleading statements regarding the absence of effective internal controls.

70.    In their Form 10-Q certifications issued during the Class Period, defendants Jack A. Sweeney, Thompson and Gartshore each variously certified that FRB had in place functioning disclosure controls and procedures to ensure that material information relating to it and the Bank was accurate and that they had disclosed to FRB's auditors and the Audit Committee of FRB's Board all significant deficiencies in the design

---

[5] As of December 2005, APB Opinion No. 20 was superseded by SFAS No. 154, "Accounting Changes and Error Corrections a replacement of APB Opinion No. 20 and FASB Statement No. 3," which carried forward without change the guidance contained in APB Opinion No. 20 for reporting the correction of an error in previously issued financial statements.

or operation of internal controls which could adversely affect FRB's ability to record, process, summarize and report financial data and have identified for FRB's auditors any material weaknesses in internal controls and any fraud, whether or not material, that involves management or other employees who had a significant role in the internal controls or FRB and/or the Bank. Such certifications were wholly unjustified and falsely made by such Defendants.[6] Indeed, throughout the Class Period, each of them, as well as the other Director Defendants knew that the internal controls at FRB and the Bank were grossly inadequate, a fact pointed out to the Board of the Bank and other of the Defendants as early as the FDIC's examination of the Bank in early 2007. Similar false certifications were made by such Defendants in the Forms 10-K filed with the SEC during the Class Period.

71.    The foregoing certifications were false and misleading because (a) FRB's SEC filings did not identify deficiencies or material weaknesses in its and the Bank's internal controls relating to, *inter alia*, real estate lending and the accounting therefore; money laundering, loan origination and concentration and risk management generally; (b) FRB's SEC filings did not disclose the fraudulent scheme alleged herein; (c) no proper evaluation and report were ever conducted by the certifying officers for the purpose of identifying and eliminating the Company's and the Bank's internal control problems; and (d) Defendants wholly failed to maintain

---

[6] Disclosure Controls are controls and procedures designed to reasonably assure that information required to be disclosed in reports filed under the Exchange Act, is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms.  Disclosure Controls are also designed to reasonably assure that such information is accumulated and communicated to management to allow timely decisions regarding required disclosure.

effective internal controls over financial reporting designed to provide reasonable assurance regarding the reliability of the financial reporting of FRB and the Bank and the preparation of financial statements for external purposes in accordance with GAAP as required by Public Company Accounting Oversight Board Auditing Standard No. 2.

## DEFENDANTS ENGAGED IN A SCHEME TO DEFRAUD

72.    The conduct alleged above also gives rise to liability under Rule 10b-5(a) and (c). Defendants are liable as participants in a scheme, plan and course of conduct to conceal the true operating and financial condition of FRB and the Bank from approximately January 1, 2007 and continued throughout the Class Period. Such scheme operated as a fraud and deceit on Plaintiffs and members of the Class by failing to disclose material facts and misleading them regarding (a) the Company's and the Bank's financial results; (b) their compliance with their own internal policies and procedures; and (c) their compliance with the guidance and conditions placed on the Bank's operations as a result of its regulators' guidance and the Cease and Desist Orders referred to above.

73.    As detailed below, Defendants each knowingly or with deliberate recklessness committed manipulative or deceptive acts in furtherance of the scheme including (a) causing and/or permitting the dissemination of false and misleading news releases and other communications to the investing public; (b) preparing, approving and signing SEC filings that overstated the operating and financial results of FRB and the Bank and understated their exposure to losses on the Bank's outstanding loans in its financial results; (c) preparing, approving and signing SEC filings that overstated and misrepresented the assets, earnings and net worth of FRB and the Bank; (d) failing to take steps to correct the

36

lack of sound internal controls and the deficiencies and material weaknesses therein; and (e) failing to make timely and adequate disclosure of the Cease and Desist Orders and the likely consequences thereof given the circumstances of FRB and the Bank.

## LOSS CAUSATION

74.    Defendants' scheme operated as a fraud or deceit on Plaintiffs and the members of the Class because the false and misleading statements artificially inflated  the prices of FRB's securities throughout the Class Period, even after the Defendants began to publicly reveal some of the problems being encountered by FRB and the Bank in late 2009.  Indeed, the Defendants' false and misleading representations concerning the financial and operating results of FRB and the Bank plus the non-disclosures of material facts concerning the Defendants' violation of bank regulators' and SEC policies and accounting regulations caused and maintained the artificial inflation in FRB securities prices throughout the Class Period and until the truth was slowly revealed to the market.

75.    When Defendants' prior misrepresentations and fraudulent conduct began to be disclosed and started to become apparent to the market, FRB's securities prices declined as the prior artificial inflation evaporated.

76.    The totality of the circumstances around the declines in the trading prices of FRB securities combine to negate any inference that the economic loss suffered by Plaintiffs and the other members of the Class was caused by changed market conditions, macroeconomic or industry factors (i.e. the sub-prime debacle and the related impact upon the real estate sector) or FRB-specific facts unrelated to Defendants' fraudulent conduct as described above.

77.    As a result of their purchases of FRB securities during the

Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws. The economic loss was a direct result of the Defendants' fraudulent scheme to artificially inflate the prices of FRB's securities and the subsequent significant decline in the value of FRB's securities when the truth was revealed.

78.    The resulting decline in the market prices of FRB securities was foreseeable at the time of Defendants' misrepresentations. Indeed, despite being aware of the consequences of their fraudulent conduct, Defendants nevertheless knowingly engaged in the alleged misconduct, which, when the truth finally emerged and the Bank was closed, caused the FRB securities' market values to collapse and become near worthless.

## PRESUMPTION OF RELIANCE

79.    At all relevant times, the market for FRB's publicly traded securities was an efficient market for the following reasons, among others:

(a)    Until it was suspended from trading thereupon (and trading moved to the OTC Bulletin Board), the Company's common stock met the requirements for public listing and was listed and traded on the NASDAQ, a highly efficient market.

(b)    As a regulated issuer, the Company filed reports with the SEC.

(c)    The Company regularly issued press releases, which were carried by national news wires. Each of these releases was publicly available and entered the public marketplace.

80.    As a result, the market for the Company's publicly traded securities promptly digested current information with respect to FRB from all publicly available sources and reflected such information in the price of the Company's securities. Under these circumstances, all purchasers of the

38

FRB's publicly traded securities during the Class Period suffered similar injury through their purchase thereof at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

81. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. None of the specific statements or the practices underlying them as alleged herein are forward looking. Many of the specific statements alleged herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statement, these statements are actionable because, at the time any forward-looking statement was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of FRB and/or the Bank who knew that those statements were false when made.

## CLAIMS FOR RELIEF

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

82. Plaintiffs repeat and restate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

83. During the Class Period, during the time periods when they

39

were directors and/or officers of FRB and/or the Bank, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiffs and the other members of the Class, as alleged herein; (b) artificially inflate the market price of FRB's securities; and (c) cause Plaintiffs and the other members of the Class to purchase FRB securities at artificially inflated prices.

84.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, individually and jointly, took the actions set forth herein. Indeed, Defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of conduct which operated as a fraud and deceit upon the purchasers of FRB securities in an effort to create and maintain artificially high market prices for such securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Each of the Defendants was a direct, necessary and substantial participant in the common course of conduct alleged herein.

85.   In addition to the duties of full disclosure imposed on Defendants as a result of their making affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §210.1-01, *et seq.*) and Regulation S-K (17 C.F.R. §229.10, *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's financial condition, earnings and expenses and management integrity so that the market prices of the

Company's securities would be based on truthful, complete and accurate information.

86.    Defendants, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to misrepresent and to not disclose, *inter alia*, adverse material information about the financial and operating condition of FRB and the Bank, the quality of and problems within the Bank's loan portfolio, the lack of internal controls and effective risk management at FRB and the Bank  and management integrity as detailed herein.

87.    Defendants employed devices, schemes and artifices to defraud while in possession of material adverse non-public information and engaged in acts, practices and a course of conduct as alleged herein in an effort to deceive and/or mislead concerning, *inter alia*, the operating and financial condition of FRB and the Bank, the deteriorated circumstances of the Bank's real estate loan portfolio, and management competence and integrity.  Said schemes, devices, acts and artifices included: (a) the making of or participation in the making of untrue statements; (b) the omitting of material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in transactions, practices and a course of conduct which operated as a fraud and deceit upon the purchasers of FRB's securities during the Class Period.

88.    Defendants' material misrepresentations, omissions and acts in furtherance of the fraud were done knowingly or with deliberate recklessness and for the purpose and effect of misrepresenting, *inter alia,* the operating and financial condition of FRB and the Bank, as well as the

other material problems referred to herein, to the investing public and thereby artificially inflating the price of FRB's securities.

89.     As a result of the above alleged fraudulent scheme and dissemination of the materially false and misleading information regarding the foregoing issues, the market prices of FRB's securities were artificially inflated prior to and during the Class Period.  In ignorance of the fact that market prices of these securities were artificially inflated and relying, directly or indirectly, on the false and misleading statements made by Defendants or upon the integrity of the market in which the securities traded and/or on the absence of material adverse information, Plaintiffs and the other members of the Class acquired FRB securities during the Class Period at artificially high prices and were damaged thereby.

90.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

91.     At the time of said misrepresentations and omissions, Plaintiffs and the other members of the Class were ignorant of their falsity and had no reason to believe that the Defendants' public representations regarding FRB and the Bank were not true.  Had Plaintiffs and the other members of the Class and the marketplace known of the true operating and financial condition of the Company and of its other problems as referred to herein, issues, Plaintiffs and the other members of the Class would not have purchased or otherwise acquired FRB securities or, if they had purchased and/or otherwise acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

92.     As the truth about the extent and severity of the deterioration of the financial and operating condition of FRB and the Bank started to be released and become apparent to the public, the market prices of FRB

42

securities plummeted. This price decline occurred as the markets continued to digest the impact and meaning of Defendants' schemes and their impact on FRB and the Bank.  All or a significant portion of the decrease in the market prices of FRB securities stock was due to the disclosure, revelation and/or leakage of information inconsistent with Defendants' prior financial disclosures and other public filings and releases.

93.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

94.    Plaintiffs repeat and restate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

95.    The Defendants acted as controlling persons of FRB within the meaning of §20(a) of the Exchange Act.  By reason of their high-level positions with the Company, their ownership of FRB stock, their participation in and/or awareness of the actual condition of FRB and the Bank during the Class Period and/or their intimate knowledge of the fraudulent scheme described herein, the false financial statements and other deceptive documents filed with the SEC and disseminated to the investing public and their participation in the fraudulent acts and/or awareness of such acts, these Defendants had the power and authority to control and cause FRB and its employees to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Defendants named herein are liable to Plaintiffs and the members of the Class pursuant to

43

§20(a) of the Exchange Act.

96.    As set forth above, Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of FRB, the Defendants are liable to Plaintiffs and the members of the Class for their damages pursuant to Section 20(a) of the Exchange Act.

97.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of FRB securities during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action, certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and appointing their counsel as Class Counsel;

B.    Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against Defendants for all damages sustained as a result of Defendants' wrongdoing in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

C.    Awarding Plaintiffs and the other members of the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

1

## <u>Demand For Trial By Jury</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand trial by jury of all issues that may be so tried.

DATED: May 3, 2010

CUNEO GILBERT & LADUCA LLP

Jon Tostrud (SB No. 199502)
1901 Avenue of the Stars, 2nd Floor
Los Angeles, California 90067
Telephone: (310) 461-1620
tostrud@yahoo.com

OF COUNSEL:

Richard D. Greenfield (RG4046)
GREENFIELD & GOODMAN, LLC
250 Hudson Street, 8th Floor
New York, N.Y.  10013
(917) 495-4446

Jonathan W. Cuneo
Matthew E. Miller
CUNEO GILBERT & LaDUCA, LLP
507 C Street, N.E.
Washington, DC 20002
(202) 789-3960

COUNSEL FOR PLAINTIFFS AND THE CLASS

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

BUTTONWOOD TREE VALUE
PARTNERS, LP et al

Plaintiffs,

vs.

JACK A. SWEENEY et al

Defendants.

Civil Action No.

**CLASS ACTION**

**JURY TRIAL DEMANDED**

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF

I, John Norberg, on behalf of plaintiff Buttonwood Tree Value Partners, LP, ("Buttonwood") hereby certify that:

1. I have reviewed the attached Complaint and hereby authorize Richard D. Greenfield and such other counsel designated therein to act on Buttonwood's behalf in this matter in applying for Lead Plaintiff status and for all other purposes.

2. Buttonwood did not acquire the securities that are the subject of this action at the direction of its counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Buttonwood is willing to serve as a Lead Plaintiff either individually, with a co-plaintiff or as part of a group. A Lead Plaintiff is a representative party who acts on behalf of other Class members in directing the action, and whose duties may include providing testimony at deposition and trial, if necessary.

4. I represent and warrant that I am authorized to execute this Certification for Buttonwood on behalf of certain purchasers of the securities of First Regional Bancorp ("FRB") (including, as the case may be, Buttonwood, any co-owners, any corporations or other entities, and/or any beneficial owners).

5. Buttonwood will not accept any payments for serving as a representative party on behalf of the Class beyond its *pro rata* share of any recovery, except such reasonable costs and expenses directly relating to the representation of the Class as ordered or approved by the Court.

6. I understand that this is not a claim form, and that Buttonwood's ability to share in any recovery as a member of the Class is unaffected by its decision to serve as a representative party or Lead Plaintiff.

7. During the Class Period as set forth in the Complaint, Buttonwood purchased 90,000 shares of FRB common stock at a cost of $ 449,020.21, net of sales proceeds. These shares were owned by Buttonwood beneficially and all of the remaining shares, following such sales, became virtually worthless.

8. During the three years prior to the date of this Certification, Buttonwood has not sought to serve and Buttonwood has not served as a representative party for a class in an action filed under the federal securities laws.

I declare under penalty of perjury, under the laws of the United States, that the information set forth herein is accurate.

Executed this _____15ᵗʰ_____ day of April, 2010.

Buttonwood Tree Value Partners, LP
By: _John H. Norberg_____ Signature _Managing Partner_ Title

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

BUTTONWOOD TREE VALUE
PARTNERS, LP et al

Plaintiffs,

vs.

JACK A. SWEENEY et al

Defendants.

Civil Action No.

CLASS ACTION

JURY TRIAL DEMANDED

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF

I, John H. Sorrells, hereby certify that:

1. I have reviewed the attached Complaint and hereby authorize Richard D. Greenfield and such other counsel designated therein to act on my behalf in this matter in applying for Lead Plaintiff status and for all other purposes.

2. I did not acquire the securities that are the subject of this action at the direction of my counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. I am willing to serve as a Lead Plaintiff either individually or as part of a group. A Lead Plaintiff is a representative party who acts on behalf of other Class members in directing the action, and whose duties may include providing testimony at deposition and trial, if necessary.

4. I represent and warrant that I am authorized to execute this Certification on behalf of certain purchasers of the securities of First Regional Bancorp ("FRB") (including, as the case may be, myself, any co-owners, any corporations or other entities, and/or any beneficial owners).

5. I will not accept any payments for serving as a representative party on behalf of the Class beyond my *pro rata* share of any recovery, except such reasonable

costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

6. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the Class is unaffected by my decision to serve as a representative party or Lead Plaintiff.

7. During the Class Period as set forth in the Complaint, I purchased 28,000 shares of FRB common stock at a cost of $99,630.91. These shares were owned by me beneficially and all of them became virtually worthless.

8. During the three years prior to the date of this Certification, I have not sought to serve and I have not served as a representative party for a class in an action filed under the federal securities laws.

I declare under penalty of perjury, under the laws of the United States, that the information set forth herein is accurate.

Executed this ___13th___ day of April, 2010.

_John H Sorrells_____ Signature
John H. Sorrells

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
BUTTONWOOD TREE VALUE PARTNERS, LP and JOHN SORRELLS on Behalf of Themselves and all Others Similarly Situated

**DEFENDANTS**
Jack A., Steven J., and Marilyn J. Sweeney; Gary M. Horgan, H. Anthony Gartshore, F. David Hare, Elizabeth Thompson, Fred M. Edwards, Dorothea Montoya, Thos. E. Mccullough, Richard Schreiber, and Lawrence J. Sherman

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

Jon Tostrud (SB No. 199502), CUNEO GILBERT & LADUCA LLP
1901 Avenue of the Stars, 2nd Floor, Los Angeles, California 90067, (310) 461-1620

**Attorneys (If Known)**

Unknown

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff    ☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant    ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☑ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☑ Yes ☐ No    ☐ **MONEY DEMANDED IN COMPLAINT: $** N/A

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Securities Fraud, under 15 U.S.C. §§ 78j(b) and 78t, and Rule 10b-5, 17 C.F.R. § 240.10b-5

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | | ☐ 340 Marine | | ☐ 540 Mandamus/Other | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | | ☐ 345 Marine Product Liability | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | | ☐ 350 Motor Vehicle | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | | ☐ 355 Motor Vehicle Product Liability | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE/PENALTY | ☐ 820 Copyrights |
| ☐ 810 Selective Service | | | ☐ 360 Other Personal Injury | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 830 Patent |
| ☑ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 443 Housing/Accommodations | | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | | IMMIGRATION | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | REAL PROPERTY | | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | | ☐ 465 Other Immigration Actions | | ☐ 690 Other | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determination Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 245 Tort Product Liability | | | | | |
| | ☐ 290 All Other Real Property | | | | | |

**SACV10-00537**

**FOR OFFICE USE ONLY:** Case Number: _____

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply)    ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐  Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County (Buttonwood Tree Value Partners, LP has its principal place of business in Orange County) | Virginia (John Sorrells) |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐  Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County (upon information and belief, all defendants reside in Los Angeles County) | |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | N/A |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____    Date  May 5, 2010

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Cormac J. Carney  and the assigned discovery Magistrate Judge is Marc Goldman.

The case number on all documents filed with the Court should read as follows:

## SACV10- 537 CJC (MLGx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=========================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division** | [X] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

Name & Address:
CUNEO GILBERT & LADUCA LLP
Jon Tostrud (SB No. 199502)
1901 Avenue of the Stars, 2nd Floor
Los Angeles, California 90067
Telephone: (310) 461-1620

**FOR OFFICE USE ONLY**

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| BUTTONWOOD TREE VALUE PARTNERS, LP and JOHN SORRELLS on Behalf of Themselves and all Others Similarly Situated, <br><br> PLAINTIFF(S) <br><br> v. <br><br> JACK A. SWEENEY, <br> *See Attached* <br><br> DEFENDANT(S). | CASE NUMBER <br><br> **SACV10-00537** *CJC* *MLGx* <br><br><br> **SUMMONS** |

TO:   DEFENDANT(S): _____
_____

A lawsuit has been filed against you.

Within **21** days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, Jon Tostrud_____, whose address is 1901 Avenue of the Stars, 2nd Floor, Los Angeles, CA 90067_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

**CHRISTOPHER POWERS**

Dated: May 5, 2010_____   By: _____
                                      Deputy Clerk

                                      *(Seal of the Court)*   **SEAL**

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

CUNEO GILBERT & LADUCA LLP
Jon Tostrud (SB No. 199502)
1901 Avenue of the Stars, 2nd Floor
Los Angeles, California 90067
Telephone: (310) 461-1620
tostrud@yahoo.com

GREENFIELD & GOODMAN, LLC
Richard D. Greenfield
250 Hudson Street-8th Floor
New York, NY 10013
Telephone: (917) 495-4446
whitehatrdg@earthlink.net

(Additional Counsel on Signature Page)

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **BUTTONWOOD TREE VALUE PARTNERS, LP** and **JOHN SORRELLS** on Behalf of Themselves and all Others Similarly Situated, | Civil Action No. |
| Plaintiffs, | |
| vs. | **CLASS ACTION COMPLAINT** |
| **JACK A. SWEENEY, STEVEN J. SWEENEY, MARILYN J. SWEENEY, GARY M. HORGAN, H. ANTHONY GARTSHORE, F. DAVID HARE, ELIZABETH THOMPSON, FRED M. EDWARDS, DOROTHEA MONTOYA, THOMAS E. McCULLOUGH, RICHARD SCHREIBER, and LAWRENCE J. SHERMAN.** | **JURY TRIAL DEMANDED** |
| Defendants. | |

## COMPLAINT

Buttonwood Tree Value Partners, LP ("Buttonwood") and John

Sorrells, on behalf of themselves and all others similarly situated, by their