GREENFIELD & GOODMAN, LLC
Richard D. Greenfield
250 Hudson Street-8th Floor
New York, NY 10013
Telephone: (917) 495-4446
whitehatrdg@earthlink.net

CUNEO GILBERT & LADUCA LLP
Jon Tostrud (SB No. 199502)
1901 Avenue of the Stars, 2nd Floor
Los Angeles, California 90067
Telephone:  (310) 461-1620
tostrud@yahoo.com

(Additional Counsel on Signature Page)

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| **BUTTONWOOD TREE VALUE PARTNERS, LP** and **JOHN SORRELLS** on Behalf of Themselves and  all Others Similarly Situated,<br><br>    Plaintiffs,<br><br>    vs.<br><br>**JACK A. SWEENEY, STEVEN J. SWEENEY, MARILYN J. SWEENEY, GARY M. HORGAN, H. ANTHONY GARTSHORE, ELIZABETH THOMPSON, FRED M. EDWARDS, THOMAS E. McCULLOUGH, RICHARD SCHREIBER,** and **LAWRENCE J. SHERMAN.**<br><br>    Defendants. | **Civil Action No.**<br>**CV 10-537 CJC MLG**<br><br><br>**AMENDED COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

FILED
2010 OCT 28  PM 3: 22

Buttonwood Tree Value Partners, LP ("Buttonwood") and John Sorrells, on behalf of themselves and all others similarly situated, by their undersigned counsel, allege the following based upon the investigation of counsel, except as to the allegations specifically pertaining to their own acts, which are based upon personal knowledge. The investigation of counsel included, among other things, a review of the public filings of First Regional Bancorp ("FRB" or the "Company") with the United States Securities and Exchange Commission ("SEC"), filings with federal and state banking regulators, press releases issued by the Company, media and news reports about the Company, publicly available trading data for FRB's securities, minutes of the Boards of Directors of FRB and its wholly-owned subsidiary, First Regional Bank (the "Bank"), and interviews with former employees of the Bank. Plaintiffs have, as well, retained a forensic accountant as a consultant to evaluate the compliance of the Bank and FRB with Generally Accepted Accounting Provisions ("GAAP") in connection with the preparation of their financial statements filed with the SEC, provided to banking regulators and disseminated to the investing public.

## NATURE OF THE ACTION

1.     This is a class action brought by Plaintiffs on behalf of a class consisting of all persons who purchased securities of FRB stock during the period of approximately January 1, 2007 to January 29, 2010, inclusive ("Class Period" [1]). Those named as Defendants in this action were all officers and/or directors of FRB and/or of the Bank, its subsidiary, during at least part of the Class Period.

2.     FRB common stock is now virtually worthless. Trading in FRB's stock was suspended on January 29, 2010, and resumed on February 10, 2010. The NASDAQ Stock Market announced on February 25, 2010 that it would delist the

---

[1] The exact parameters of the Class Period will be determined upon the conclusion of discovery with respect thereto.

2

1   common stock of FRB, and it has since traded on the OTC Bulletin Board (better
2   known as the "pink sheets" where "penny stocks" are traded). As of October 8,
3   2010, FRB shares, when they traded at all, traded at 1 cent/share. The Bank was
4   closed by the California Commissioner of Financial Institutions ("CFI") on Friday,
5   January 29, 2010. The Federal Deposit Insurance Corporation ("FDIC") was
6   appointed as receiver for the Bank. It is anticipated that the Company will shortly file
7   for protection from creditors under the bankruptcy laws since it has now lost its
8   principal asset, the Bank, and is obligated for the repayment for trust-preferred debt,
9   as well as other debt, that remains outstanding.

10          3.      This action involves a fraudulent scheme perpetrated by the Defendants
11  to deceive the investing public by making materially false and misleading statements
12  regarding the true financial and operating condition of FRB and the Bank, and by
13  intentionally concealing material facts concerning FRB and the Bank's violations of
14  SEC policies and accounting regulations, banking regulator warnings and Cease and
15  Desist Orders, lack of compliance with the Bank's internal policies and procedures,
16  and imprudent lending practices throughout the Class Period.

17          4.      Such plan and scheme, carried on by the Defendants while they held
18  their respective positions with FRB and/or the Bank, was effectuated for the purposes
19  of, *inter alia*, retaining the Defendants' substantial compensation packages and,
20  keeping FRB and the Bank "afloat" while they sought infusions of capital which, had
21  the truth been disclosed, would have been nearly impossible to obtain or, if available
22  at all, would have been available only after substantial dilution of the Defendants'
23  personal equity interests in the Company.

24          5.      In furtherance of this fraudulent scheme, Defendants engaged in, *inter*
25  *alia*, the following misconduct:

26  (a)      throughout the Class Period, the Defendants intentionally filed with the
27           SEC and otherwise disseminated to the investing public financial

28

statements[2] and other documents that grossly inflated FRB's earnings, assets, net worth and capital ratios, and materially understated its exposure to loan losses when, had the truth been disclosed, the Defendants would have revealed that FRB and the Bank were, throughout the Class Period, proceeding to the brink of collapse;

(b)     throughout the Class Period, the Defendants intentionally concealed the extent of the Bank's exposure to rapidly declining asset values related to hundreds of millions of dollars worth of impaired and risky real estate loans; the Defendants intentionally failed to make adequate provisions for the Bank's known or reasonably likely loan losses while knowing, *inter alia*, that many of such loans were excessively concentrated in a few borrowers and in the over-heated and highly volatile commercial real estate industry in Southern California, and were highly speculative raw land loans, that many of the Bank's riskiest loans were made far afield from Los Angeles, Ventura and Orange Counties, the tri-county area where FRB's public documents misrepresented the Bank's loans were being made and/or that many of the borrowers were not able to re-finance or honor their commitments to the Bank which the Defendants later acknowledged in FRB's November 12, 2009 Restatement that the Bank's provision for loan losses had been understated by over $90 million;

(c)     throughout the Class Period, the Defendants concealed the fact that the Bank had expanded the scope of its lending activities and, in connection therewith, its loan files, particularly, real estate-based loan files, were in a serious state of disarray making collection of such loans very difficult[3];

---

[2] At all relevant times, the financial statements of the Bank were incorporated into the consolidated financial statements of FRB. As such, all improprieties in connection with the Bank's financial statements as identified herein apply with equal force to those of FRB.

[3] As used herein, such "disarray" included not having documents signed by the

(d)     through most of the Class Period, in press releases and otherwise, the Defendants Jack A. Sweeney and Gartshore, among others, proclaimed that FRB and the Bank were "well capitalized" when, in fact, they knew the Bank was so woefully capital deficient that its survival was in doubt;

(e)     throughout the Class Period, the Defendants failed to disclose publicly that they had not complied with material provisions of the Company's Audit Committee Charter, which had been adopted March 20, 2007, including the requirements that the Audit Committee

> "monitor the integrity of the Company's financial reporting process and systems of internal controls regarding finance, accounting and legal compliance;…monitor the performance of the Bank's Chief Risk Officer and the internal audit function;…monitor the Company's systems of disclosure controls and procedures, internal controls over financial reporting…"

(f)     through part of the Class Period, Defendants failed to disclose publicly that they had not complied with material provisions of the Company's Code of Business Conduct and Ethics, which had been adopted May 19, 2009, including the requirement that they and their subordinates "comply with all applicable laws, rules and regulations related to the disclosures the Company makes to the SEC and to ensure that such disclosures are made fairly, accurately and timely."

(g)     through most of the Class Period, the Defendants failed to disclose publicly and in a timely manner significant actions taken by banking regulators including, in particular, that the California Department of

---

borrowers, insufficient support in documentary form to justify the loans and the absence of material documents identifying the means by which the loan would be repaid. As observed in The New York Times of October 24, 2010: "It's a longstanding requirement---going back to William the Conqueror---that banks prove their ownership of the mortgage….Some suspect that the banks cannot validate the accuracy of their foreclosure documents because the paperwork on the original mortgages was missing or never submitted. If that's the case, the courts may not look kindly on the omission, and that glitch could turn into a nightmare."

Financial Institutions ("DFI") and/or the FDIC had repeatedly warned the Boards of FRB and the Bank of, *inter alia*, their seriously deficient controls, lending concentrations, sub-standard asset quality, capital inadequacy, improper banking practices and underlying risks to the Bank's survival; and through at least part of the Class Period, the Defendants failed to disclose publicly and in a timely manner that the FDIC had issued to the Bank, its Board and the Officer Defendants a Report of Examination dated April 23, 2007 in which each such defendant was personally informed, formally, of unsafe and unsound banking practices and violations of law and/or regulation; that on February 28, 2008, the Bank's Board of Directors, including all the Director Defendants, had consented to the entry by the FDIC of a Cease and Desist Order (issued March 3, 2008) and that on February 17, 2009, the members of the Bank's Board of Directors, including the Director Defendants, had been required to physically come to the offices of the DFI to meet with its representatives and those of the FDIC and enter into a further "cease and desist" order related to the Defendants' conduct as described herein, and otherwise, and requiring the Bank to take corrective steps to address the foregoing issues, as more specifically set forth below.[4]

(h)     Throughout most of the Class Period, Defendants Jack A. Sweeney, Thompson, and Gartshore each issued materially false and misleading Sarbanes-Oxley Act of 2002 ("SOX") certifications regarding the purported adequacy of the Bank's internal controls and oversight risk management;

(i)      throughout the Class Period, Defendant Jack A. Sweeney, who served as

---

[4] Upon information and belief, the Bank's regulators informally warned the Defendants of these issues on several occasions during 2006 and in early 2007.

the Bank's Chief Executive Officer and *de facto* one-man Loan Committee, was suffering from Alzheimer's Disease and dementia, and was approving numerous loans without having sufficient mental capability to evaluate the quality, security or other material factors bearing upon whether loans should be made or not.[5] Despite the fact that each of the other Defendants knew of Defendant Jack A. Sweeney's diminished mental capacity and discussed them frequently among themselves and with other employees of the Bank, they permitted his continuing to make and/or approve irrational, high-risk loans, frequently unsecured and to long-time "cronies."[6] In addition, during such period of incapacity, certain loan officers, at the Bank intentionally took advantage of Mr. Sweeney's incapacity to induce him to approve loans of questionable quality which, nevertheless, generated for them substantial personal compensation.[7] The other Defendants, a majority of the Board of Directors of both FRB and the Bank, refrained from taking action to remove Mr. Sweeney from control over lending because he had been the Chairman of the Board and Founder of FRB and the Bank and, together

---

[5] According to Dr. Ernie Prudente, Defendant Sweeney's treating physician, "Mr. Sweeney [currently] suffers from advanced Alzheimer's Disease and Dementia [which] diagnosis has been confirmed by two independent neurologists."

[6] In one notorious incident during the Class Period, well-known throughout the Bank, two lending officers approached Defendant Sweeney with respect to a proposed loan they were prepared to have the Bank make. Defendant Sweeney invited the loan officers into his office and said to them, without even reviewing the proposed loan documents, that if they would undress and run around his desk naked, he would approve the loan. This incident was reported promptly by the loan officers to Defendant Gartshore, who did nothing about it. During the Class Period, Defendant Sweeney was also reported to have gone around the offices of the Bank on multiple occasions using a "whoopee cushion" To amuse himself. Mr. Sweeney's condition had deteriorated so badly by the date of FRB's 2008 Annual Meeting of Shareholders that he had to be escorted from the room after he began making irrational comments to the audience.

[7] Upon information and belief, these loan officers include Ralph Downing and Carolyn Zaro.

with family members, Defendants Steven J. Sweeney and Marilyn J. Sweeney, collectively controlled a major block of FRB stock. While these Defendants, particularly Defendants Gartshore, Horgan and McCullough, talked among themselves and with others about "what to do about Jack," they did not force him to relinquish his roles as Chief Executive Officer of FRB and the Bank until the end of 2007 (effective January 2, 2008), when they unilaterally threw him a retirement party. Notwithstanding such change of position, Defendant Jack A. Sweeney continued to play a significant role in the Bank's lending practices and received total compensation of more than $1,028,113 in 2008 and unspecified compensation in 2009.

6.     The extensive fraud described throughout this Complaint caused and maintained the artificial inflation in FRB's securities prices throughout the Class Period until the truth was slowly revealed to the market culminating in the seizing of the Bank by its regulators on January 29, 2010.   When Defendants' prior misrepresentations, omissions, and fraudulent conduct began to be disclosed and started to become apparent to the market in the latter half of 2009, FRB's securities prices declined precipitously, eventually becoming near-worthless. Plaintiffs and others who purchased FRB securities during the Class Period were injured in an amount which cannot presently be determined.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78aa, and 28 U.S.C. §1331.  The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, Rule 10b-5 promulgated by the SEC, 17 C.F.R. §240.10b-5.

8.     Venue is proper in this District pursuant to Section 27 of the Exchange

Act and 28 U.S.C. §1391(b) and (c). FRB's principal executive offices are located in this District the Bank was located in this District, all Defendants transacted business in this District, and most of the acts and transactions constituting the violations of law alleged herein, including the preparation, issuance and dissemination of materially false and misleading statements to the investing public, occurred in this District.

9. In connection with the acts, conduct and other wrongs alleged herein, each of the Defendants, directly and/or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and national securities markets.

## THE PARTIES

### A.   THE PLAINTIFFS

10. Plaintiff Buttonwood ("Buttonwood") is an investment partnership that purchased 90,601 shares of FRB common stock between May 28, 2008 and February 6, 2009, as set forth in the Certification filed with the original Complaint, and suffered damages as a result of the wrongful acts of the Defendants alleged herein. Plaintiff Buttonwood's Certification is incorporated herein by reference.

11. Plaintiff John Sorrells is an individual who purchased 28,000 shares of FRB common stock on May 30, 2008, as set forth in the Certification filed with the original Complaint, except that his purchases continued through February 6, 2009, and suffered damages as a result of the wrongful acts of the Defendants alleged herein. Plaintiff Sorrells' Certification is incorporated herein by reference.

### B.   THE DEFENDANTS

12. Defendants Jack A. Sweeney (as Chairman of the Board and Chief Executive Officer of FRB), Lawrence Sherman (as Vice Chairman of the Board of FRB), H. Anthony Gartshore (as President and Chief Executive Officer of the Bank), Steven J. Sweeney (as General Counsel and Executive Vice President of the Bank), Gary M. Horgan (as Chairman of the Board), Elizabeth H. Thompson (as Chief

Financial Officer) and Thomas E. McCullough (as a Director, Executive Vice-President, Chief Operating Officer and Secretary) are collectively referred to hereinafter as the "Officer Defendants." By virtue of their high-level positions with the Company and/or the Bank, each of the Officer Defendants directly participated in the management thereof, was directly involved in the day-to-day operations of the Company and the Bank at the highest levels and was privy to confidential proprietary information concerning FRB and the Bank and their business, operations, growth, financial statements and financial condition. In connection with such conduct, they were aided and abetted by Dorothea Montoya (as Senior Vice President and Chief Compliance Officer of the Bank) and F. David Hare (as Executive Vice-President of the Bank), former Defendants, who have entered into agreements with Plaintiffs tolling applicable statutes of limitation running to Plaintiffs and the members of the Class.

13.   As senior officers of FRB and/or the Bank, each of the Officer Defendants   had extensive duties to ensure the accuracy and completeness of financial information disseminated to investors:

(a)   As noted in American Institute of Certified Public Accountants ("AICPA") auditing standard, Section 110.03, a public company's management is responsible for preparing financial statements in accordance with GAAP:

> The financial statements are management's responsibility.... Management is responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. The auditor's knowledge of these matters and internal controls is limited to that acquired through the audit. Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

(b)   In Accounting Series Release 173 (July 2, 1975), the SEC reiterated the

duty of management to present a true representation of a company's operations:

> [I]t is important that the overall impression created by the financial statements be consistent with the business realities of the company's financial position and operations.

(c) Pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") and SEC rules promulgated thereunder, the chief executive officer and chief financial officer of reporting corporations such as FRB are required to certify as to the accuracy and completeness of a company's financial statements. As such, Defendants Jack A. Sweeney, Gartshore and Thompson are liable to Plaintiffs and others similarly situated as a result of their false certifications as described herein.

14.     Upon information and belief, Defendant Steven Sweeney, as executive vice president and general counsel to the Bank and FRB, attended all Board meetings and was intimately knowledgeable with respect to the lack of competence of his father as Chief Executive Officer and *de facto* head of the Bank's Loan Committee. He also was aware from prior to the commencement of the Class Period that the Bank's loan files in general, and the documentation supporting outstanding loans were materially deficient, were is disarray and likely to have a material adverse impact upon the Bank's ability to recover collateral and/or otherwise collect amounts outstanding.

15.     Defendants Jack A. Sweeney, Sherman, Gartshore, Horgan As Chairman of the Board of FRB), McCullough, Marilyn J. Sweeney (as a Director of FRB), Fred M. Edwards (as a Director of FRB) and Richard Schreiber (as a Director of FRB), are collectively referred hereinafter as the "Director Defendants."   During the Class Period, FRB's Board of Directors was responsible for the oversight and monitoring of (a) the integrity of its financial statements and those of the Bank; (b) the Company's and the Bank's compliance with legal and regulatory requirements; (c) the

independent auditor's qualifications, independence and performance; and (d) the Company's and the Bank's internal accounting and financial controls.   The FRB Board had final decision-making authority regarding the public disclosure of the financial and operating condition of FRB and the Bank.   During the Class Period, each of the Directors knew, but did not cause FRB to disclose publicly, the material fact of the deteriorated mental competence of Defendant Jack A. Sweeney and its impact upon the Bank's loan portfolio as a result thereof but continued, nevertheless, permitting him to be paid more than $1 million in compensation in 2008 and additional but unknown amounts thereafter.[8] Further, Defendant Marilyn J. Sweeney (the wife of Defendant Jack A. Sweeney) was actually and, before that, a *de facto* Director of the Bank, who attended all Board meetings, maintained an office at the Bank and as a result of her contact with her husband and the other Defendants, knew but took no steps, to disclose publicly, the true condition of the Bank and FRB. As such, each of the Director Defendants is liable to Plaintiffs and others similarly situated for the dissemination of false and misleading financial statements, which they knew or should have known were falsely represented to the investing public. In addition to its responsibilities to FRB and the Bank, the FRB Board had fiduciary responsibilities to FRB stockholders, potential stockholders and the investment community. [9]

16.   Each of the Defendants specifically and regularly reviewed the Bank's allowance for loan losses and determined what further provisions (i.e. additions or subtractions) needed to be made, reviewed the Bank's capital adequacy, liquidity ratios, loan concentrations, loan quality and purported to review and approve the

---

[8] Defendant Jack A. Sweeney continued to attend Board meetings until January 2, 2009, when he resigned from the FRB Board.

[9] Defendant Marilyn J. Sweeney appears to have attended all meetings of the Board and FRB during the Class Period. Based on documents available to Plaintiffs, she formally became a Director of the Bank in 2008 and, on January 2, 2009, also became a Director of FRB.

Bank's loans based upon credit risk and loss exposure. Because of the Defendants' positions within the Company and/or the Bank, they each had access to adverse undisclosed material information about the true financial condition of FRB and the Bank and, most significantly, the adequacy of the Bank's capitalization and the fact that many of the Bank's loans, were of a high-risk nature and approved personally by Defendant Jack A. Sweeney when he was not competent to evaluate their appropriateness. They each were privy to such undisclosed information from internal corporate documents, communications among themselves and with other officers and employees of the Company and the Bank as well as attendance at, and documents received during, meetings of management, the Boards of Directors of FRB and the Bank. In the case of the Sweeney Defendants, they also possessed such knowledge through intra-familial discussions. Each of the Defendants knew or were deliberately reckless in not knowing of the adverse material facts which rendered the statements alleged herein false and misleading. Despite personal knowledge of the fundamentally deteriorated condition of the Bank and FRB throughout the Class Period, each Defendant was motivated to conceal such circumstances from the investing public while they concurrently were seeking an infusion of critically-needed capital.

17.    The Defendants, as officers and/or directors of the Company, had a duty to disseminate complete, accurate and truthful information about the financial condition, earnings and expenses and capitalization of FRB and the Bank.   The Defendants had a duty to promptly correct any public statements issued by FRB and/or the Bank that had become false and misleading.   The Defendants, together with their legal counsel, including Defendant Steven Sweeney, were involved in the drafting, producing, reviewing and/or disseminating the false and misleading statements alleged herein.

18.    Because of their positions, their ability to exercise actual operational

13

control, power and influence with respect to FRB's course of conduct, including the fraudulent schemes and acts described herein and their access to material inside information about FRB and the Bank, the Defendants were, at the time of the wrongs alleged herein, controlling persons of FRB within the meaning of Section 20(a) of the Exchange Act.

19.   It is appropriate to treat the Defendants as a group for pleading purposes and to presume that the false, misleading and/or incomplete information conveyed in the public filings of FRB and the Bank as alleged herein are the collective action of all the Defendants identified above. Upon information and belief, each of the Defendants, during the periods when each was an officer and/or Director of the Bank and/or FRB, personally was aware that the public statements made by, *inter alia*, Defendants Jack A. Sweeney and Gartshore with respect to the financial and operating condition of FRB and the Bank, that the filings of the Bank with its regulators and that the filings of FRB with the SEC were materially false and deceptive.

## CLASS ACTION ALLEGATIONS

20.   Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and entities who purchased or otherwise acquired FRB securities during the Class Period and were damaged thereby ("the Class"). Excluded from the Class are the Defendants herein, officers and directors of FRB and/or the Bank, members of their immediate families and the heirs, successors or assigns of any of the foregoing. Purchasers of FRB Shares, purchased directly or indirectly by and for FRB's 401(k), Employee Stock Ownership Plan ("ESOP") and other benefit plans, other than for the benefit of the foregoing individuals, are members of the Class.

21.   The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at

this time and can only be ascertained through appropriate discovery, they believe there are, at a minimum, more than 500 members of the Class. FRB common stock traded in an open and efficient market prior to the end of the Class Period.

22.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. The following are questions of law and fact common to the Class:

- whether the Defendants engaged in acts or conduct in violation of federal securities laws as alleged herein;

- whether the Defendants made intentional and/or reckless misrepresentations and/or omissions of material facts regarding FRB and/or the Bank to the investing public;

- whether such misrepresentations and/or omissions of material facts were essentially linked to the damages sustained by the Plaintiffs and the members of the Class;

- whether the Defendants acted knowingly or with deliberate recklessness in making false and misleading statements, in issuing false and misleading financial statements, news releases and other communications to the investing public about the financial and operating condition of FRB and the Bank, and in failing to disclose material facts concerning the Bank's imprudent lending practices and Defendants' continuing violations of bank regulator warnings and Cease and Desist Orders;

- whether the prices of FRB securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained foreseeable damages and, if so, the proper measure of such damages.

15

23.     Plaintiffs' claims are typical of those of the Class because Plaintiffs and the other members of the Class sustained damages arising out of the Defendants' wrongful conduct, in violation of federal law.

24.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions and securities litigation.  Plaintiffs have no interests antagonistic to, or in conflict with, those of the Class.

25.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all the members of the Class is impracticable.   Furthermore, because the damages suffered by most of the individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## BACKGROUND

26.     FRB was a financial services company that formerly conducted its business principally through the Bank, its wholly-owned subsidiary.  FRB, through the Bank, traditionally provided community banking services to individuals and companies in Southern California.   However, by the commencement of the Class Period, it had ventured far afield and out of its area of experience and competence. FRB attracted funds from the general public and institutions.   The single largest reported asset on FRB's balance sheets was Net Loans, representing the bulk of its reported assets throughout the Class Period.   Thus, the value of these assets was crucial to FRB's financial statements, and of the utmost materiality to investors. As real estate values declined, given the high-risk nature and poor quality of the Bank's outstanding loans by the beginning of the Class Period, the ability of borrowers to repay their loans were adversely and materially affected, as were possible recoveries

1    to the Bank when borrowers defaulted on their obligations.  By early 2006, residential

2    real estate showed increased signs of peaking in California.   This threatened the

3    valuation of the Bank's assets and, in particular, Net Loans.  Defendants concealed

4    from the Company's financial statements the impact of the changing real estate

5    market and the very specific problems faced by the Bank in order to keep FRB's

6    stock prices high.

7

8        27.    As the severity of the mounting bad loans (and likely losses therefrom)

9    increased dramatically through 2007 and into 2008, defendants Gartshore and

10   McCullough began to push the Bank into accepting approximately $206 million in

11   loans referred by loan brokers operating a mortgage "boiler room" located in

12   Newport Beach. Most of such loans represented either "bailouts" of other financial

13   institutions, were poorly documented in terms of the underlying reasons for the loans,

14   had insufficient or no collateral and/or were extremely high risk and/or outside the

15   geographic areas where the Bank had experience and local knowledge. These

16   questionable, but high interest rate loans, were concealed from most of the Bank's

17   senior officers and lending officers.

18

19       28.    Defendants Gartshore and McCullough repeatedly misrepresented to

20   securities analysts and senior personnel at the Bank that no such "brokered" loans

21   were being accepted or made. In early 2009, two of such personnel confronted

22   defendant Gartshore once they learned of the fact that the Bank was making such

23   loans. One of these long-term employees said to him: "Tony, you promised us that

24   you would never accept any of these brokered loans." His response was: " I can't

25   make any money unless I do them."

26

27       29.    Both because of the material and fundamental change in the Bank's

28

source of loans, originally internally generated, to an increasingly speculative one which further exacerbated the likelihood of massive losses, the defendants were obligated to disclose to FRB shareholders and the investing public what they were doing. At no time did the defendants make any such disclosure.

30.     Indeed, after the Bank was seized by its regulators and its assets sold off by the FDIC to First Citizens Bank, that bank was charged with recovering as much as possible on the loans it inherited. In one major group of such loans, there were little or no narrative description of the loans, the reasons why they were made or even an indication as to how they would be repaid.

## SUBSTANTIVE ALLEGATIONS

31.     During the Class Period, the Defendants caused to be issued a series of false and misleading statements regarding the true operating and financial condition of FRB and the Bank, in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5.  These violations primarily fell within several categories, discussed more fully below.  First, the Defendants caused to be issued false and misleading statements regarding the financial statements of FRB and the Bank.  Second, the Defendants caused to be issued false and misleading statements regarding the deteriorated operating condition and loan portfolio of FRB and the Bank. Third, Defendants Jack A. Sweeney, Thompson and Gartshore issued false SOX certifications regarding the adequacy of the Bank's internal controls and oversight risk management.  Fourth, the Defendants failed to make timely public disclosure of the fact that the Bank's regulators had warned the Bank and the Company on multiple

occasions that the Bank was not being operated properly, and issued Cease and Desist Orders, to which the Bank and FRB did not comply.

### DEFENDANTS' CONCEALMENT OF THE DIRE FINANCIAL CONDITION OF FRB AND THE BANK AND THEIR FAILURE TO MAKE TIMELY AND COMPLETE PUBLIC DISCLOSURE OF ACTIONS TAKEN BY REGULATORS

32.    For the year ended December 31, 2006, the Defendants caused the Bank to record an allowance for loan losses of $20,624,000 when, in fact, given the true state of its Net Loans, it should have recorded an allowance for loan losses of at least $45,624,000. If the Defendants had honestly disclosed the true condition of the Bank's already deteriorated (and deteriorating) loan portfolio as of the beginning of the Class Period, instead of FRB's reported net income of $38,336,000, it would have only reported approximately one-third of that amount; i.e. approximately $13 million in net income.

33.    Throughout 2007 when FRB reported net income of $33,610,000 for the year ended December 31, 2007, the Defendants caused the Company to contnue to report favorable earnings results, notwithstanding the fact that they knew that there were increasing and internally well-known material risks to the Company's loan portfolio, and that had they caused grossly insufficient reserves to be taken for known and/or likely losses from FRB and the Bank's high-risk loan portfolio, the Company should have reported substantial losses. The Defendants also knew that their wrongful conduct caused FRB's stock to trade at artificially inflated prices.

34.    On or about April 17, 2007, the Defendants caused the Company to announce purported quarterly net income of approximately $9 million. Had Defendants caused appropriate reserves to be taken for known and/or likely losses from FRB and the Bank's high-risk loan portfolio, it would have increased its allowance for loan losses from $20,694,000 to at least $55,694,000 and would have reported a net loss for the quarter of not less than $1 million. Additionally,

1    throughout the quarter, FRB's stock traded at artificially inflated prices as a result of

2    Defendants' wrongful conduct.

3       35.    At the same time as the false reporting of quarterly net profits,

4    Defendant Jack A. Sweeney falsely stated that "[i]t is gratifying to report another

5    strong and profitable quarter as we made further progress toward our key objectives

6    of sound growth, increased profitability and financial strength." He further boasted

7    falsely and without justification that "our team of experienced banking professionals

8    continues to secure quality lending opportunities, and in line with our conservative

9    philosophy, we are keeping prime emphasis on maintaining our excellent credit

10    quality." At the time of such statements, the Bank, and Defendant Jack A. Sweeney

11    in particular, had already embarked upon a reckless lending spree, and many of the

12    loans which were ultimately written off later or rendered substantially uncollectible

13    by the time of his statement, were already on the books and were known by the

14    Defendants to be of questionable quality. Indeed, the Bank's lending, by that point in

15    time, was anything but "conservative."

16       36.    The Defendants further represented falsely in the Company's April 2007

17    quarterly report that the Company had a "strong and liquid capital and liquid financial

18    position" and remained "optimistic" based on the Company's "continued

19    momentum":

20       We remain alert and vigilant, and are prepared to take the steps
necessary to meet whatever economic challenges may emerge. In this

21       regard, we benefit greatly from our strong capital and liquid financial

22       position, giving us the flexibility to react quickly to changing conditions.
We remain optimistic based on our continued momentum, our portfolio

23       of high-quality earning assets, our financial strength and our solid

24       market position. As always, our primary objective remains clear – to
maintain profitable growth on a prudent basis and, thereby, build further

25       value for our shareholders.

26

            ...

27       37.    Barely six days later, on April 23, 2007, the FDIC issued a "Report of

28

Examination" to the Boards of Directors of the Bank and FRB, in which it found serious internal control deficiencies among other issues raised. The FDIC Report, transmitted to each of the Director Defendants then in office, found the following unsafe and unsound banking practices and violations of law and/or regulation:

    (a)    in violation of section 326.8 of the FDIC's Rules and Regulations, 12 C.F.R. § 326.8, regarding a satisfactory Bank Secrecy Act ("BSA") and Anti-Money Laundering ("AML") compliance program with respect to Individual Retirement Accounts administered by third parties;

    (b)    operating in violation of section 353.3 of the FDIC's Rules and Regulations, 12 C.F.R. § 353.3, regarding Suspicious Activity Report ("SAR") procedures to identify, monitor, and report suspicious activities with respect to Individual Retirement Accounts administered by third parties;

    (c)    operating without adequate customer due diligence with respect to Individual Retirement Accounts administered by third parties;

    (d)    operating with a board of directors which has failed to provide adequate supervision over and direction to the active management of the Bank; and

    (e)    operating with inadequate internal routine and controls policies.

38.    Each of the Officer Defendants and at least some of the Director Defendants knew, prior to the Company's April 17, 2007 earnings statement, that the FDIC was preparing to issue its Report. Although they were aware of the nature of the FDIC's concerns, due to previously ongoing investigations of FRB and the Bank, they made no disclosure thereof in the April 17, 2007 press release or on any subsequent date in a timely manner.

39.    On or about July 18, 2007, the Defendants caused the Company to announce purported net income of $8.3 million for the quarter ending June 30, 2007.

In a press release issued with the Company's quarterly financial results, Defendant Jack A. Sweeney stated deceptively that "First Regional continues to achieve solid profitability despite a challenging environment...While we continue to outperform others in the industry, we are not immune from these pressures."  Each of the Defendants knew or should have known that the Bank was taking materially inadequate provisions for known or likely loan losses.  Had  Defendants caused appropriate reserves to be taken for known and/or likely losses from FRB and the Bank's high-risk loan portfolio, it would have increased its allowance for loan losses of at least $71,123,000 instead of the amount approved by the Director Defendants; i.e. $21,123,000. Thus, instead of the falsely reported profit of $8.3 million for the quarter, it would have reported a net loss for the quarter of not less than $ 6.7 million. FRB's stock traded at artificially inflated prices throughout the quarter as a result of Defendants' wrongful conduct.

40.     On or about October 23, 2007, the Defendants caused the Company to announce purported net income of $8.1 million for the quarter ending September 30, 2007.  In a press release, Defendant Jack A. Sweeney stated deceptively that "[i]n view of the current challenging environment for financial institutions, we believe that First Regional continues to demonstrate strong performance."  He further represented falsely that the Company "registered substantial profits and growth in our assets, deposits and net loans." Once again, each of the Defendants knew or should have known that the Bank's loan portfolio was deteriorating further and faster, and that the Bank's provisions for known or likely loan losses, as set forth in the Bank's balance sheet, was materially inadequate.  Had  Defendants caused appropriate reserves to be taken for known and/or likely losses from FRB and the Bank's high-risk loan portfolio, the Bank would have recorded  at least $96,993,000 in allowance for loan losses instead of the $21,993,000 actually provided. Had it done so, FRB would have reported a net loss for the quarter of not less than $16.9 million instead of the $8.1

1   million of falsely reported net income. FRB's stock traded at artificially inflated

2   prices throughout the quarter as a result of Defendants' wrongful conduct.

3       41.   On February 6, 2008, Defendants caused the Company to issue a press

4   release reporting its purported financial results for the year ending December 31,

5   2007. The Company reported purported net income of $33.6 million, and stated

6   falsely that it "continued [its] consistent record of profitability, including new year-

7   end highs in total assets, net loans and total deposits." Defendant Jack A. Sweeney

8   stated falsely that the Company's "prudent reserves and strong capital base give us

9   the financial strength to weather adverse conditions and respond to opportunities that

10  emerge." FRB's net income, as reported by the Defendants for 2007, as well as the

11  quarterly results previously announced during 2007, were grossly inflated due to the

12  Defendants' intentional or reckless failure to adequately reserve for the Bank's loan

13  losses and to mark down underperforming or impaired assets. The Company and the

14  Bank would later write down amounts that far exceeded all of its announced income

15  for 2007. Had Defendants caused appropriate reserves to be taken for known and/or

16  likely losses from FRB and the Bank's high-risk loan portfolio, instead of falsely

17  reporting net income as $33, 610,000, it would have reported a net loss for the year of

18  not less than $25 million. FRB's stock traded at artificially inflated prices throughout

19  the year as a result of Defendants' wrongful conduct.

20      42.  In the wake of the Defendants disregard of the recommendations of the

21  Bank's regulators, on March 3, 2008, the FDIC issued a Cease and Desist Order to

22  the Bank, a copy of which was provided to each of the Defendants, requiring FRB

23  and the Bank to cease and desist from the various unsafe and unsound banking

24  practices, and violations of law and/or regulation, set forth in the FDIC's Report of

25  Examination dated April 23, 2007, described above. Among other things, the March

26  3, 2008 Cease and Desist Order required that the Bank's Directors, including each of

27  the Director Defendants, to operate the Bank in a safe and sound manner; comply

28

with applicable laws and regulations; create and implement written lending and collection policies including specific guidelines for limiting credit concentrations; obtain adequate and current documentation for all loans in the Bank's loan portfolio; and restore all aspects of the Bank to a safe and sound condition, including asset quality, capital adequacy, earnings, management effectiveness, liquidity, and sensitivity to market risks. Upon information and belief, at least Defendant Gartshore, among others, was personally informed that the Bank was "out of control," that its provisions for loan losses were materially understated and, given the deteriorated state of its loan portfolio, it was badly in need of an infusion of new capital.

43.    Notwithstanding these warnings from the FDIC, the Defendants did not correct what were critical conditions and continued to make false and misleading statements about the Company's financial condition throughout 2008, even though the Bank's loan portfolio was becoming increasingly impaired, a fact personally know to each Defendant.  The Defendants also knew that their wrongful conduct caused FRB's stock to trade continuously at artificially inflated prices.

44.    In a press release containing the Company's purported financial results for the quarter ending March 31, 2008, issued on or about April 28, 2008, the Defendants caused the Company to announce purported net income of $4.8 million , when the Defendants knew the Company should have been reporting substantial losses.  Had Defendants caused appropriate reserves to be taken for known and/or likely losses from FRB and the Bank's high-risk loan portfolio, it would have recorded an allowance for loan losses of at least $208,580,000 as compared to the $33,580,000, an under-reserving of at least $175 million. Instead of the falsely reported net income of $4.8 million for the quarter, the Defendants should have reported that the Bank had sustained a net loss for the quarter of not less than $25 million.  FRB's stock traded at artificially inflated prices throughout the quarter as a result of Defendants' wrongful conduct.

45.    In the April 2008 press release, Defendant Gartshore represented falsely that "we are being even more selective on loan transactions, and will continue to make loan loss provisions as necessary based on our ongoing analysis of First Regional's loan portfolio performance and economic conditions in general." This representation was false, and known to be false, as the Bank's officers, under the direction of the Officer Defendants, were not sufficiently selective in making and documenting the Bank's loans, and had failed to reserve adequately for its potential and likely loan losses, as pointed out in the March 2008 Cease and Desist Order which the Defendants continued to fail to implement. The Company and the Bank would later write down amounts that far exceeded all of its announced income for the first quarter of 2008.    Additionally, Defendant Gartshore stated for public consumption, without any justification, that "we look to the future with a sense of confidence and determination," when there was, in fact, no basis for confidence or optimism.

46.    On July 24, 2008, the Defendants caused the Company to issue its purported financial results for the quarter ending June 30, 2008, reporting net losses of $18,513,000.  Although the Company reported net losses and did increase the Bank's loan loss reserves to 1.89% of outstanding loans (still well below the provisions for loss being made by comparable banks), had Defendants caused appropriate reserves to be taken for known and/or likely losses from FRB and the Bank's high-risk loan portfolio, they would have recorded an allowance for loan losses of at least $269,152,000 for the quarter instead of $44,152,000 and would have reported a net loss for the quarter of not less than $60 million.

47.    The Company's 1.89% loan loss reserves were, as the Defendants knew, still grossly inadequate to account for the substantial, and well-known to them, impairment of the Bank's loan portfolio, in light of the particular sub-standard nature of its loans, and the prevailing and well-known catastrophic macroeconomic