conditions, particularly in Southern California. The Defendants further knew of the material inadequacy of the Bank's loan loss reserve allowances due to a Joint FDIC and DFI Report issued to the Bank as of June 30, 2008, which specifically stated that the Bank was operating with inadequate loan valuation reserves and a large volume of poor quality loans.

48.    In the accompanying press release containing the financial results for the quarter ending June 30, 2008, the Defendants caused the Company to state falsely:

> Our second quarter loan loss provision followed an exhaustive review of our loan portfolio, and reflects our realistic assessment of the economic environment and its impact on collateral values and borrower performance. It should be emphasized that the loan loss provisions we have made *relate to only a small number of land and real estate development loans*; the *vast majority of our loan portfolio continues to be well-secured and to perform as agreed*. First Regional's approach has always been to confront challenges fully, directly, and realistically, and we believe we have accomplished this in the second quarter. Consistent with the conservative and prudent basis on which First Regional has always operated, and especially in light of current economic conditions, we remain highly selective on loan transactions. While we believe *we have dealt effectively with our loan problems*, the economic future remains unclear, and additional loan loss provisions will be made if called for by our ongoing analysis of First Regional's loan portfolio performance and economic conditions in general. (emphasis added)

49.    The representations that, *inter alia*, the Company had "dealt effectively with [its] loan problems" and that the "vast majority of its loan portfolio" was "well-secured" and "perform[ing] as agreed" were simply false and known to be false by each of the Defendants in light of the Joint FDIC and DFI Report as of June 30, 2008, which specifically stated that the Bank was operating with inadequate loan valuation reserve, a large volume of poor quality loans, inadequate capital, and inadequate liquidity provisions, and engaging in unsatisfactory lending and collection practices.

26

50.   The Defendants also misrepresented that they "anticipate[d a] quick return to profitability" and that the Bank remained "highly capitalized." This statement was known to the Defendants to be false as the FDIC and DFI Joint Report of June 30, 2008 specifically stated that the Bank, as each of the Defendants knew, was operating with inadequate capital to sustain itself.

51.   On October 30, 2008, the Company issued its purported financial results for the quarter ending September 30, 2008, reporting net income of $1.2 million. Had Defendants caused appropriate reserves to be taken for known and/or likely losses from FRB and the Bank's high-risk loan portfolio, it would have recorded an allowance for loan losses of at least $304,674,000 instead of the $54,674,000 actually provided by the Defendants. If they had acknowledged how badly the Bank's prospects for collectability of its loans were as of September 30, 2008, the Defendants would have reported a net loss for FRB for the quarter of not less than $15 million instead of the falsely reported net income of $1.2 million. FRB's stock traded at artificially inflated prices throughout the quarter as a result of the Defendants' wrongful conduct.   At the time of the reporting of FRB's quarterly financial results, the Defendants caused the Company to misrepresent that  "First Regional's approach has always been to confront challenges fully, directly, and realistically" and that the Defendants "perform ongoing analyses of our loan portfolio and economic conditions, and make loan loss provisions as necessary."  In reality, the Defendants had not adequately assessed the catastrophic impairment of the Bank's loan portfolio, had dramatically and intentionally under-reserved for under-performing and non-performing loans, and did not improve liquidity (by selling off loans or other assets), despite repeated warnings from the Bank's regulators.

52.   On February 17, 2009, the Directors of the Bank, including all of the Director Defendants, consented to a further Cease and Desist Order requiring the Bank to:

27

(a) Retain qualified management, and increase the active involvement of its board of directors in managing the Bank's activities to assume full responsibility for approving Bank policies and for supervising all Bank activities, including review and approval of income and expense reports, new, overdue, renewal, insider, charged-off and recovered loans, liquidity reports, investing activities, and operating policies;

(b) Increase its capital, and develop a comprehensive capital plan identifying sources and timing of additional capital;

(c) Increase Tier 1 capital by $12 million and increase leverage ratio to 10% by September 30, 2009;

(d) Create and implement a comprehensive policy for determining the adequacy of the Bank's allowances including a review of allowances at least once each quarter and remedy deficiencies in allowances in the quarter they are discovered;

(e) Eliminate from its books any assets classified "loss" and a portion of any assets classified "doubtful" that have not already been charged-off or collected, and develop a comprehensive plan to reduce classified assets based on a pre-determined schedule;

(f) Create and implement written lending and collection policies including requiring the Bank to obtain adequate documentation for all loans in the Bank's loan portfolio;

(g) Create and implement a plan to increase the diversification of the Bank's loan portfolio including time frames for reducing the Bank's current concentration in construction and land development loans;

(h) Create and implement a comprehensive profit plan to improve the Bank's earnings performance; and

(i) Update or revise the Bank's written policies in the areas of credit administration and liquidity management.

53. Although the Director Defendants provided written assurances to both the

1   FDIC and the DFI that the Bank would comply with the requirements of the foregoing

2   Cease and Desist Orders, and the guidance provided to them following the regulators'

3   examinations of the Bank, they merely paid "lip service" thereto. Further, their and the

4   Bank's practices were so well-entrenched, and the Company's financial condition was

5   so precarious that the Director Defendants could not extract the Bank from its

6   predicament, ultimately leading to the CFI's closing of the Bank and seizure of its

7   assets on January 29, 2010.

8       54.   On February 24, 2009, the Company disclosed belatedly that it had

9   entered into an agreement with the FDIC and DFI, consenting to the issuance of an

10  Order to Cease and Desist certain practices set forth therein and outlining certain

11  "areas the Bank agrees to address."   The Defendants caused the Company to

12  misrepresent that this development represented nothing more than an agreement that

13  merely "formalize[d] many of the initiatives which the Bank has already adopted, and

14  provide[d] useful milestones for measuring the Bank's progress as it moves forward."

15  Defendants caused the Company to further misrepresent that "First Regional Bank

16  continues to maintain "'well capitalized' ratios, the highest standards established by

17  banking regulators," when, in fact, the Defendants knew the Bank was insufficiently

18  capitalized to a material degree. In fact, the regulatory Order called specifically for

19  the Bank to increase its Tier 1 leverage ratio to 10% by September 30, 2009, which

20  meant, in practical terms, that FRB would have to urgently obtain an additional

21  infusion of cash to be invested in the Bank.

22

23      55.   On March 16, 2009, FRB filed with the SEC its Form 10-K Report for

24  the period ending December 31, 2008.   The Defendants were responsible for the

25  Company's announced losses of $10.2 million, and increased provisions for loan

26  losses with increasing loan loss ratio over that of prior years, as indicated in Exhibits

27  "B" and "C" hereto. FRB's losses for 2008 were still grossly understated and its loan

28  loss reserves were still grossly inadequate, in light of the catastrophic impairment of

the Company's loan portfolio that was well known to all of the Defendants due to the Cease and Desist Order of February 2009. Had Defendants caused appropriate reserves to be taken for known and/or likely losses from FRB and the Bank's high-risk loan portfolio, they would have reported a greater loss before provision for income taxes for the year of not less than an additional $150,000,000.

56.    On or about April 30, 2009, the Defendants caused the Company to report its purported financial results for the quarter ending March 31, 2009, reporting a net loss of $3.2 million.   Had Defendants caused appropriate reserves to be taken for known and/or likely losses from FRB and the Bank's high-risk loan portfolio, it would have provided for at least $353,264,000  instead of the $68,264,000 actually taken by them. Had they reserved adequately and appropriately for known and/or likely losses, they would have reported a greater net loss for the quarter of not less than $13 million.

57.    At the same time, Defendants caused FRB to misrepresent that its "risk of loss" was adequately protected by collateral and that it had properly reserved for the risk of future losses:

> Most of our nonperforming assets are secured by real estate, and thus our risk of loss is mitigated by the value of the underlying collateral even in the present soft market. As required by applicable accounting standards, we have already made loan loss provisions to reflect our updated estimates of such potential losses, and we will continue to make loan loss provisions as necessary based on our ongoing analysis of First Regional's loan portfolio performance and economic conditions in general.

58.    The foregoing statements were blatant misrepresentations, in that the Defendants knew, certainly after the February 2009 Cease and Desist Order, if not sooner, that the Bank had not reserved adequately for losses and, that due to the prevailing market conditions, the collateral securing the Bank's loans was wholly

inadequate to prevent substantial losses, when there was even collateral that had been provided. As indicated in Exhibit "A" hereto, material amounts of the Bank's loans were unsecured. Further, as the Defendants well knew, many of the Bank's loans were poorly documented and, even when there was collateral to some extent, due to documentary deficiencies such as those addressed by the Bank's regulators since 2006, collecting thereupon was difficult and occasionally impossible .

59.    In the Company's Form 10-Q Report on for the quarter ended March 31, 2009, filed on or about May 15, 2009,  Defendants caused the FRB to represent falsely that its quarterly loss "was substantially reduced from the immediately preceding fourth quarter of 2008," and that "reflect[ed] the company's progress in mitigating the credit problems arising from the current deep economic recession." The reality was that the Defendants knew or should have known that the Company had not come close to mitigating the Bank's credit problems arising from the recession and from their own imprudent lending and documentation practices. In fact, Defendants knew or should have known that the Bank's loan portfolio was catastrophically impaired, and that the Company and the Bank were severely undercapitalized and on the verge of collapse.

60.    As of June 30, 2009, Defendants knew or should have known that the Company and the Bank remained significantly undercapitalized and at risk of collapse and, yet, the Defendants knowingly failed to comply with the earlier FDIC Order requiring the Bank to increase its Tier 1 leverage ratio

61.    In recognition of the fact that the Defendants had been largely unresponsive to their Cease and Desist Orders and other, more informal, guidance, by July 13, 2009, the FDIC and DFI had commenced another regulatory examination of the Bank that would be completed in September 2009.  The investigation would ultimately reveal that FRB and the Bank remained severely undercapitalized, that the Defendants had failed to adequately reserve for the Bank's loan losses, and that

FRB's reported financial results and accompanying financial statements were, accordingly, materially false.

62.    Notwithstanding the fact that this regulatory examination of the Bank was then taking place, on July 30, 2009, the Defendants caused FRB to ile with the SEC Form 8-K reporting FRB's purported operating results and financial condition as of and for the three and six months ended June 30, 2009.   Despite their knowledge that these reported results would not withstand regulatory scrutiny, the Defendants reviewed and approved reporting net losses of $17,783,000 and $21,020,000 for the three and six months ended June 30, 2009; a purported book value per share of $10.96 as of such date; an allowance for loan losses of $42,101,000; and Net Loans of $2,156,575,000.

63.    Defendant Gartshore, with the collaboration of other Defendants, blamed the Company's operating losses for the first six months of 2009 primarily as follows: "Operating results continue to be adversely impacted by historic lows in interest rates resulting from the Federal Reserve's aggressive actions directed at reviving the economy during the past twelve months. These actions have significantly impacted the yield on First Regional's loan portfolio, which consists almost entirely of variable-rate notes that adjust immediately upon any change in interest rates." Defendant Gartshore was quoted as stating falsely: "**As reported earlier, most of our nonperforming assets are secured by real estate, meaning that our risk of loss is limited by the value of the underlying collateral even in the present soft market.**" (emphasis added)  Defendant Gartshore falsely represented and stated without any factual justification that "we are confident that [] totals [of underperforming assets] will decline as we complete the asset resolution transactions which we have in process."  He further represented unjustifiably that " we look to the future with continued confidence and resolve" and falsely that the Bank's "strong capital base provides the solid foundation which enables us to offer customers and

32

prospects creative solutions to their loan and deposit needs, and an unmatched level of personal service which has long been our hallmark."

64.    These statements were blatantly false when made, as Defendant Gartshore knew or should have known that the Bank's security was woefully inadequate to secure its outstanding loans, that much of hundreds of millions of dollars worth of such purported collateral, due to excessive loan-to-equity ratios and the decline in the value of the underlying properties, taken together with the absence of appropriate documentation which would have allowed the Bank to secure the collateral, put at risk at least half of the Bank's entire loan portfolio. Such risk was magnified by the unsecured nature of many of the Bank's loans, which fact Defendant Gartshore knew but intentionally did not disclose.

65.    The July 30, 2009 News Release continued to "sugar-coat" the Company's continuing and rapid decline in its operations.  Defendants caused the Company to make misleading statements about FRB's prospects, suggesting that it would overcome the ongoing difficult economic conditions when, in fact, Defendants knew or should have known that there was virtually no chance of such an occurrence, and that unless sufficient capital was raised quickly, the Bank would collapse and be seized by its regulators.  In the accompanying News Release, the Defendants stated that "we continue to make steady progress confronting our challenges."

66.    Concurrently, in the same News Release, FRB maintained the Defendants' long-proclaimed fiction that the Bank "exceeds all financial ratio requirements for 'Well Capitalized' status.[10] Defendants caused the Company to further falsely report that "[a]s required by applicable accounting standards, we have

---

[10] A bank is "well capitalized" if it has a total risk-based capital ratio of 10.0% or more, has a Tier 1 risk-based capital ratio of 6.0% or more, or has a leverage capital ratio of 5.0% or more. As a result of the material overstatement of the value of the Bank's loan portfolio, although it was presented by the Defendants as being well capitalized, it was not.

33

made loan loss provisions to reflect our latest estimates of such potential losses, so the anticipated impact of such losses is already reflected in our financial results."   As each of the Defendants knew or should have known, the Bank was continuing to under-reserve for bad and questionable loans which, while impacted by lower interest rates, in fact had badly deteriorated in collectability due to, *inter alia*, their excessively high loan-to-equity ratios, excessive concentration and inadequate documentation.

67.   On August 5, 2009, the SEC informed the Defendants and Company that it had very serious questions about FRB's financial reporting practices and the contents of certain previous filings by the Company with the SEC.   Although the comments were specifically directed to the Company's Form 10-K Report for the period ending December 31, 2008 and Form 10-Q Report for the period ending March 31, 2009, they apply, in substance, in equal force to all of the Company's financial reporting during the Class Period.   The SEC, among other things: (1) demanded that the Company "provide an expanded description of the specific actions [it was] taking to comply with the provisions of the" Cease and Desist Order issued by the FDIC and DFI, and to specifically (a) "disclose whether there were any changes made to [its] allowance for loan loss methodology, and (b) "disclose the extent of any financial statement impact of complying with any of the requirements of the order"; (c) questioned why non-performing loans were still represented to be accruing interest; (d) noted that the Company's loan loss reserves had not grown at a rate commensurate with the percentage of underperforming loans (citing the "continued deterioration" of the Company's loan portfolio), and requested an explanation; (e) demanded that the Company revise its future filings to "disclose the fact that the cease and desist order entered into in February require[d the Company] to maintain and bolster [its] capital due to the finding that [it was] operating with

insufficient capital given the level of risk present in [its] loan portfolio"; (f) instructed the Company to "revise future filings to provide a discussion of [its] underwriting policies and procedures for all major loan products in each lending category"; (g) demanded clarification as to how the Company defined "sub-prime" and to what extent its portfolio consisted of interest-only and/or other alternative mortgages; and (h) demanded an explanation as to why reserves for loan losses (on an annualized basis) were lower in the first quarter of 2009 than in 2008.

68.    Thereafter, on August 14, 2009, the Defendants caused FRB to file its quarterly report on SEC Form 10-Q setting forth the same financial results (as approved by the Defendants) contained in its SEC Form 8-K dated July 30, 2009. The Defendants falsely represented that, "In the opinion of the Company, the interim consolidated financial statements contain all adjustments of a normal recurring nature necessary to present fairly the financial position and results of operations for the interim periods." Moreover, Defendants Gartshore, McCullough and Thompson certified that the financial statements and other financial information included in the SEC Form 10-Q "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report."

69.    Subsequently, on November 17, 2009, as a result of the SEC's demands, and in a belated response to the SEC, the Defendants caused the Company to file a restated Form 10-Q-A Report with the SEC for the quarter ending September 30, 2009.  This Form 10-Q-A Report restated (i.e. acknowledged the falsity of) the Company's previous financial results set forth in its Form 10-Q Report for the period ending June 30, 2009.  The Restatement stated that "the Company's condensed and consolidated financial statements as of and for the three and six months ended June 30, 2009 should no longer be relied upon, and also determined to amend the Registrant's Quarterly Report on Form 10-Q for the period ended June 30, 2009 to

restate such condensed consolidated financial statements." The Restatement amended the Company's reported net loss for the three and six months ended June 30, 2009 from $17,783,000 and $21,020,000 to a staggering net loss of $110.8 million and $114.0 million, or in excess of 600% and 500% greater. The Defendants also acknowledged that they had understated the Company's allowance for loan losses by $19.3 million or approximately 46%, after recording $71.1 million in additional loan charge-offs. Specifically, the Company determined that "the allowance for loan losses as of June 30, 2009 should be increased by $69,889,000," and announced "an additional $50,587,000 in loan charge-offs, $1,279,000 in interest reversal on impaired loans, $1,161,000 million in losses on foreclosed properties that were deemed to have existed as of June 30, 2009 and a $20,670,000 cost of establishing a valuation allowance for deferred tax assets." Accordingly, the Company admitted for the first time that it and the Bank were dramatically undercapitalized, and that the Bank's required loan loss reserves had previously been understated by over $90 million as of June 30, 2009.

70. The charge-offs and increases to loan loss reserves announced in November 17, 2009 dwarfed the previously falsely reported net earnings for 2007 ($33.6 million), and far exceeded the previously announced and understated net losses for 2008 ($10.2 million). Although these massive charges were ascribed to correcting the Company's falsely prepared financial statements for the quarter ending June 30, 2009, most of these charges, and the necessity of doubling the Bank's loan loss reserves, did not suddenly became necessary in or around June 2009, but mostly originated prior to and also much earlier in the Class Period, as each of the Defendants knew or should have known. The enormous scope of these adjustments, which were still materially inadequate, made it perfectly clear that the Defendants had previously over-valued the assets of FRB and the Bank on their balance sheets by

a material extent and under-provided for loan losses during 2007, 2008 and the first half of 2009 as well.

71.     Under pressure from the SEC and banking regulators, the Defendants finally began to acknowledge how badly the financial condition of the Bank and FRB had deteriorated and finally were forced to provide some disclosures to the investing public. Nevertheless, they still failed to acknowledge what each of them knew; namely, the fact that the Bank and FRB were on the brink of collapse. Once again, they falsely represented that "most of our nonperforming assets are secured by real estate, and thus our risk of loss is mitigated by the value of the underlying collateral even in today's distressed market." In making such deceptive statement, Defendants knew, but did not disclose what they have known throughout the Class Period; namely, that such collateral was grossly insufficient to secure the Bank's loans and to protect it against loss, particularly in a deteriorating real estate market, which had been prevalent throughout the Class Period.

72.     On Friday, January 29, 2010, the California Commissioner of Financial Institutions closed the Bank and appointed the FDIC as its receiver.   With the assistance of the FDIC, substantially all of the assets and liabilities of the Bank were seized and assumed by First Citizens Bank of Raleigh, North Carolina.   Following this, FRB's stock declined to $0.01 per share – virtually a total loss for investors.

### DEFENDANTS' FAILURE TO COMPLY WITH APPLICABLE ACCOUNTING AND DISCLOSURE RULES

73.     Throughout the Class Period, FRB's financial statements were required to be prepared in conformity with GAAP, as set forth in, *inter alia,* the FDIC's Policy Statement issued December 13, 2006, shortly before the commencement of the Class Period. GAAP are those standards recognized by the accounting profession as the

conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. GAAP are derived from a variety of sources, including promulgations of the Financial Accounting Standards Board ("FASB") and its predecessor, the Accounting Principles Board ("APB"), and the American Institute of Certified Public Accountants ("AICPA"). Other sources include the general body of accounting literature consisting of textbooks, articles, papers, etc.

74.    According to SEC regulations, public companies such as FRB must prepare their financial statements in conformity with GAAP. The SEC has delegated the authority to govern the accounting for financial transactions underlying the preparation of financial statements to the FASB. SEC Rule 4-01(a) of SEC Regulation S-X, 17 C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC, such as those of FRB, that are not presented in conformity with GAAP, will be presumed to be misleading or inaccurate, despite footnotes or other disclosures.

75.    The specific GAAP Standards that the Defendants violated with respect to FRB's accounting during the Class Period are set forth in the relevant sections below. By failing to comply with GAAP, the financial statements of FRB and the Bank were and are presumptively misleading.

76.    In addition, the AICPA has issued industry-specific Audit & Accounting Guides to provide guidance in preparing financial statements in accordance with GAAP. The Audit of Accounting Guide entitled *Depository and Lending Institutions: Banks and Savings Institutions, Credit Unions, Finance Companies, and Mortgage Companies,* issued in November 2007, applied to FRB and the Bank throughout the Class Period. The AICPA also issues Audit Risk Alerts particularized by industry, including those addressed to financial institutions. The Audit Risk Alerts are intended for use by financial institutions, such as FRB and the Bank, to address areas of concern and to identify the significant business risks that may result in the material

38

misstatement of financial statements. The AICPA guidance that the Defendants violated during the Class Period is set forth in the relevant sections below.

77.   As indicated above, the SEC, the FDIC and other banking regulators required FRB's financial statements issued during the Class Period to be prepared in accordance with the following fundamental accounting principles issued by the FASB. Each of the Defendants knew or was reckless in not knowing how and why such financial statements were materially deficient throughout the Class Period. This is particularly true for Defendants Edwards, Schreiber and Sherman, who were members of the Audit Committee of FRB's Board of Directors and each of them, according to its Charter dated March 20, 2007, were charged with responsibility for, *inter alia*, "Monitor[ing] the integrity of the Company's financial reporting process and systems of internal controls regarding finance, accounting and legal compliance." These responsibilities included "Assess[ing] the adequacy of the Company's policies and compliance with respect to….Loan Review." In purportedly carrying out such responsibilities, Defendants Edwards, Schreiber and Sherman knew or should have known that not only were FRB's financial statements and public disclosures with respect to them were materially deficient but that they were not prepared in accordance with GAAP.

78.   Statement of Financial Concepts No.1, ¶34 states the principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users of the financial reports for making rational investment, credit and similar decisions. In fact, the Defendants intentionally concealed from the investing public the most material types of information relevant to a financial institution's health and safety; namely, among others, the quality of the Bank's loan portfolio, the manner in which the Bank's loans were being made and/or approved by Defendant Jack A. Sweeney while he was mentally impaired and whether its financial statements honestly portrayed its deteriorated circumstances, as

all Defendants knew or should have known that it did not.

79.    Statement of Financial Concepts No.1, ¶40 states the principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources and the effects of transactions, events and circumstances that change resources and claims to those resources. Defendants Gartshore and Jack A. Sweeney, misrepresented repeatedly, throughout most of the Class Period, that the Bank was "well capitalized" and had "prudent reserves and strong capital base giv[ing it] the financial strength to weather adverse conditions and respond to opportunities that emerge" when, in fact, such claims were knowingly false. Indeed, each of the Defendants was personally aware that the resources (i.e. capital) of FRB and the Bank were insufficient to carry on the banking business that they had built and, absent a massive investment of new cash, the Bank was likely to collapse.

80.    Statement of Financial Concepts No.1, ¶42 states the principle that financial reporting should provide information about an enterprise's past financial performance during a period because investors and creditors often use information about the past to help in assessing the prospects of an enterprise.   In fact, the Defendants concealed the fact that numerous speculative, unsecured and otherwise high-risk and money-losing loans made and/or personally approved by Defendant Jack A. Sweeney constituted a material portion of the Bank's total loan portfolio, contrary to the statements made to the effect that the Bank's loans were, as represented, conservatively made. Further, each of the Defendants was aware, but did not disclose, that before and throughout the Class Period, even as to many otherwise reasonable loans, the Bank had not properly documented its files so as to permit it to obtain through foreclosure or by other means access to the underlying collateral.

81.    Statement of Financial Concepts No.1 ¶50 states the principle that financial reporting should provide information about how management of an

enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. In fact, the Defendants concealed throughout the Class Period that many of the Bank's loans were made and/or approved by Defendant Jack A. Sweeney without regard to the underlying merits of the loan, the existence or adequacy of collateral or the extent to which the Bank could recoup its investment therein.

82.     Statement of Financial Concepts No.1 ¶54 states the principle that financial reporting should include explanations and interpretations to help users understand the financial information provided. The usefulness of financial information as an aid to investors, creditors, and others in forming expectations about a business enterprise may be enhanced by management's explanations of the information. In the context of the massive under-reserving for known or likely loan losses by the Bank, the Defendants were obligated to, but did not disclose, that the Bank's provision for loan losses was inconsistent with the poor quality and high-risk nature of its loans and the absence or inadequacy of collateral and supporting documentation.

83.     The financial statements' Item 7 of Form 10-K and Item 2 of Form 10-Q, in the Management Discussion & Analysis ("MD&A") section of Financial Condition and Results of Operations, required issuers, such as FRB, to furnish information required by Item 303 of Regulation S-K (17 C.F.R. §229.303). On May 18, 1989, the SEC issued an interpretive release, Securities Act release No. 6835, 54 Fed. Reg. 22427 (May 18, 1989), which stated in part:

> The MD&A requirements are intended to provide, in one section of a filing, material historical and prospective textual disclosure enabling investors and other users to assess the financial condition and results of operations of the registrant, with particular emphasis on the registrant's prospects for the future. As the Concept Release states:

41

The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company. The Item asks management to discuss the dynamics of the business and to analyze the financials.

(Footnotes omitted.)

Securities Act Release No. 6349, 23 S.E.C Docket 962 (Sept. 28, 1981) provides that:

It is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company.

In fact, the MD&A discussions provided by the Defendants in connection with FRB's financial statements were anything but candid and provided Plaintiffs and members of the Class no means by which they could make, based upon the inadequate and deceptive financial data provided by the Defendants, any useful " short and long-term analysis of the business of the company." Under SEC regulations, the management of a public company such as FRB has a duty "to make full and prompt announcements of material facts regarding the company's financial condition."[11]

84.    Throughout the Class Period, Defendants violated the basic precepts noted above by (a) deliberately or recklessly misrepresenting in the MD&A sections of the FRB filings with the SEC the true financial and operating condition of the Bank and FRB, and concealing the fact that the Bank's condition had deteriorated to the brink of collapse; (b) concealing the material shortcomings in the Bank's management and controls; and (c) failing to make timely disclosure of the regulators'

---

[11] Timely Disclosure of Material Corporate Developments, Exchange Act Release No. 34-8995, 3 Fed. Sec. L. Rep. (CCH) ¶23,120A, at 17,095, 17 C.F.R. §241.8995, 1970 WL 10576 (Oct. 15, 1970).

warnings with respect to such deficiencies and the regulators' requirements of remedial steps that the Bank and its Directors (including the Director Defendants) had been required to take, but were not adequately taking. The Defendants also failed to explain in the MD&A sections of FRB's annual and quarterly SEC filings that they had caused FRB's financial statements, as publicly disseminated, to not be in compliance with GAAP.

85.    Statement of Financial Concepts No.2, ¶¶58-59 states the principle that financial reporting should be reliable in that financial information represents what it purports to represent. The principle that information should be reliable as well as relevant is a notion that is central to accounting. In fact, each of the Defendants knew or should have known that the publicly disseminated financial statements of FRB and the Bank were unreliable because they materially overstated the entities' earnings, assets and net worth and, in particular, because the Defendants had not required the Bank to make timely, appropriate and necessary provisions for loan losses.

86.    Statement of Financial Concepts No.2, ¶79 states the principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions. In fact, the Defendants withheld from the investing public the true state of the Bank's loan portfolio, the circumstances under which many of the loans were made and/or approved and the extent that the funds loaned by the Bank were likely to be recovered.

87.    Statement of Financial Concepts No. 5, ¶83 states the principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. In fact, throughout the Class Period, the Defendants were anything but "conservative" in their reaction to the Bank's high-risk loan portfolio and gross capital inadequacy. Had the Defendants owned up to the Bank's true circumstances by the beginning of the

Class Period, the Plaintiffs and the investing public would have known that, absent a substantial infusion of new capital, the Bank was likely to fail.

88.     In summary, reports filed by the Defendants with the SEC or otherwise disseminated to the investing public on behalf of FRB and the Bank should have provided to Plaintiffs and other investors timely, accurate, relevant and reliable information upon which they could base their investment decisions. Throughout the Class period, the Defendants failed to do so.

89.     While the Defendants became acutely aware by early 2008, through the FDIC's Cease and Desist Order, if not much earlier, that the Bank was an operational "basket case", it was not until after substantial regulatory intervention from the FDIC, DFI and SEC that they took any action to restate FRB's reported financial results. Even when they did so, they attempted to characterize their actions as charges taken solely in a single quarter in 2009, when they should have caused FRB to fully restate its financial results for the entire Class Period, so as to properly reflect FRB's and the Bank's true financial and operating condition during at least the previous two years. Pursuant to GAAP, as set forth in APB Opinion No. 20,[12] restatements are required to correct material accounting errors that existed at the time the financial statements were issued and are permitted for the purpose of correcting improper accounting only when it results in material misstatements.   Had the Defendants caused such a restatement to have taken place, they would have admitted (and informed the investing public) that each document issued by FRB or the Bank publishing the original financial statements for the restated periods contained untrue statements and/or omissions of material fact. The Defendants failed to cause such a restatement to take place, thereby continuing their deception of the investing public throughout

---

[12] As of December 2005, APB Opinion No. 20 was superseded by SFAS No. 154, "Accounting Changes and Error Corrections a replacement of APB Opinion No. 20 and FASB Statement No. 3," which carried forward without change the guidance contained in APB Opinion No. 20 for reporting the correction of an error in previously issued financial statements.

1   the Class Period.

2        90.   Due to all these accounting improprieties set forth above, the

3   Defendants, throughout the Class Period, presented FRB's financial results and

4   statements in a manner which violated GAAP, and thus were materially false and

5   misleading.

## DEFENDANTS INTENTIONALLY MADE INADEQUATE PROVISIONS FOR THE BANK'S LOAN LOSSES

91.   In order that a bank's financial statements honestly and fairly present the true earnings, assets and net worth of an institution and its holding company, if applicable, its senior officers and directors must comply with, in addition to the requirements of the federal securities laws and applicable state law, rules, regulations and directives of federal banking regulators such as the FDIC, the Office of the Controller of the Currency ("OCC") and the Federal Reserve System. Among such requirements is that the financial institution appropriately and adequately reserve for potential and likely loan losses, variously referred to as "provisions for loan losses," "reserves for loan losses" and "allowances for loan losses."

92.   Shortly prior to the commencement of the Class Period, on December 13 2006, the FDIC distributed to the Bank and FRB a Policy Statement with respect to allowances for loan and lease losses, with the "suggestion" that such Statement be distributed to, among others, each of the members of their Boards of Directors, and their Chief Executive Officers, Chief Financial Officers and Chief Lending Officers.[13]

93.   The foregoing Policy Statement[14] stated, in relevant part, that the

---

[13] Defendant Marilyn J. Sweeney was not a Director of FRB at such time but succeeded to her husband's position as a Director of the Bank in January 2008, when the Policy Statement was, presumably provided to her as part of her "orientation." She became a Director of FRB approximately a year later.

[14] In addition to the cover letter from the FDIC, the Policy Statement includes an

banking agencies and SEC agreed on the following important aspects of loan loss allowance practices:

"Arriving at an appropriate allowance involves a high degree of management judgment and results in a range of estimated losses;

Prudent, conservative, but not excessive, loan loss allowances that fall within an acceptable range of estimated losses are appropriate. In accordance with GAAP, an institution should record its best estimate within the range of credit losses, including when management's best estimate is at the high end of the range;

Determining the allowance for loan losses is inevitably imprecise, and an appropriate allowance falls within a range of estimated losses;

An "unallocated" loan loss allowance is appropriate when it reflects an estimate of probable losses, determined in accordance with GAAP, and is properly supported;

Allowance estimates should be based on a comprehensive, well-documented, and consistently applied analysis of the loan portfolio; and

The loan loss allowance should take into consideration all available information existing as of the financial statement date, including environmental facts such as industry, geographical, economic, and political factors."

94.     The FDIC, among other banking regulators, informed the Defendants that the:

"Allowance for Loan and Lease Losses ("ALLL") represents one of the most significant estimates in an institution's financial statements and regulatory reports. Because of its significant, each institution has a responsibility for developing, maintaining, and documenting a comprehensive, systematic, and consistently applied process for determining the amounts of the ALLL and the provision for loan and lease losses (PLLL). To fulfill this responsibility, each institution should ensure controls are in place to consistently determine the ALLL in accordance with GAAP, the institution's stated policies and procedures, management's best judgment and relevant supervisory guidance.

As of the end of each quarter, or more frequently if warranted, each institution must analyze the collectability of its loans and leases held for investment (hereafter referred to as "loans") and maintain an

---

Interagency Policy Statement and a set of questions and answers.

ALLL at a level that is appropriate and determined in accordance with
GAAP. An appropriate ALLL covers estimated credit losses on
individually evaluated loans that are determined to be impaired as well
as estimated credit losses inherent in the remainder of the loan and lease
portfolio.

95.     Notwithstanding the subjective leeway given to the Bank and FRB in
determining appropriate provisions for the Bank's loan losses, the provisions made
and/or approved by the Defendants throughout the Class Period did not even remotely
reflect the risk that the Bank faced that its outstanding loans would not be repaid.
Indeed, the Defendants' provision for the Bank's loan losses did not reflect an
analysis of individual loans but was merely set at a small percentage of the loans
outstanding, contrary to the much higher percentages adopted by comparable banks
during the Class Period.

96.     FRB's accounting for its allowances for loan losses, was governed by
SFAS No.5, *Accounting for Contingencies* which requires a lender, such as the Bank,
to account for losses inherent in its loan portfolio whether or not the lender can
identify a specific delinquent or impaired loan. As stated in SFAS No.5, because the
conditions under which a receivable (including a loan receivable) exists usually
involves some degree of uncertainty as to its collectability, the provisions of SFAS
No.5 apply. Under SFAS No.5, the Bank was required to have timely and adequate
reserves for: (1) estimated losses for loans specifically identified as being impaired;
(2) estimated losses for loans or groups of loans with specific characteristics that
indicated probable losses; and (3) estimated losses inherent in the remainder of the
portfolio based on, among other things, current economic events and circumstances,
borrower credit risk and loan concentrations. Throughout the Class Period, the Bank
either had no such estimates or the few estimates that it did have were baseless under
the circumstances.

97.     SFAS No. 114, Accounting by Creditors for Impairment of a Loan, is

47

applicable to all loans and to all creditors, uncollateralized as well as collateralized, except large groups of smaller balance homogeneous loans that are collectively evaluated for impairment. SFAS No. 114 requires that impaired loans[15] be measured based on the present value of expected future cash flows discounted at the loan's effective interest rate, or at the loan's observable market price of the fair value of the collateral if the loan is collateral dependent. Under SFAS No. 114, the Bank was required to identify impaired loans on a timely basis and to measure properly their impairment. Throughout the Class Period, the Defendants knew but did not disclose that the Bank had failed to mark its impaired loans down to their recoverable value, if any.

98.    In addition to the requirements of SFAS No.5, and SFAS No.114, the Bank also was required to comply with SEC Staff Accounting Bulletin No. 102, *Selected Loan Loss Allowance Methodology and Documentation Issues* ("SAB 102"), issued in July 2001. SAB 102 provides that registrants such as FRB must have a systematic methodology for establishing loan loss reserves that complies with GAAP. Pursuant to SAB 102, a registrant's loan loss allowance methodology should, among other things, consider all known relevant internal and external factors that may affect loan collectability, and consider the particular risks inherent in different kinds of lending. SAB 102 provides the following:

> In developing loss measurements, registrants should consider the impact of current environmental factors and then document which factors were used in the analysis and how these factors affected loss measurements. Factors that should be considered in developing loss measurements include the following:
>
> • Levels of and trends in delinquencies and impaired loans;

---

[15] A loan is impaired if it is probable that a creditor, such as the Bank, will be unable to collect all amounts due according to the contractual terms of the loan agreement.

- Levels of and trends in charge-offs and recoveries;
- Trends in volume and terms of loans;
- Effect of any changes in risk selection and underwriting standards, and other changes in lending policies, procedures, and practices;
- Experience, ability and depth of lending management and other relevant staff;
- National and local economic trends and conditions;
- Industry conditions; and
- Effects of changes in credit concentrations

99.    At no time during the Class Period did the Defendants' loan loss allowance methodology consider all known relevant internal and external factors that may affect loan collectability; the Defendants simply applied a nominal and outdated percentage to total loans outstanding and disregarded the internal and external factors that reflected the collectability of the Bank's loans.

100.    In summary, GAAP and SEC regulations, as well as the guidelines set forth in the FDIC's Policy Statement of December 13, 2006 referred to above, required FRB and the Bank to establish, on a systematic and rational basis, an allowance for loan losses in an amount sufficient to report its loan portfolio at net realizable value, and to properly match reported interest income on the loans with the associated provision for loan losses. The establishment of an allowance for loan losses at the Bank and FRB should have been, but was not, based on, among other things, loan characteristics, historical loan trends, current economic conditions, concentration of borrowers, credit review, borrower credit risk, charge-offs and recoveries, loan status, and the adequacy of internal controls in place at the Bank and FRB over its borrowing practices and loan portfolio.

101.    The Defendants caused FRB to set forth in its SEC filings during the Class Period the following false and misleading statements with respect to its and the Bank's accounting policies and practices for the allowance for loan losses:

The allowance for loan losses is intended to reflect the known and unknown risks which are inherent in a loan portfolio. The adequacy of the allowance for loan losses is continually evaluated in light of many factors, including loan loss experience and current economic conditions. The allowance for loan losses is increased by provision for loan losses, and is decreased by net charge-offs. **Management believes the allowance for loan losses as of December 31, 2008 is adequate in relation to both existing and potential risks in the loan portfolio.**

The Bank has historically evaluated the adequacy of its allowance for loan losses on an overall basis rather than by specific categories of loans. In determining the adequacy of the allowance for loan losses, management considers such factors as historical loan loss experience, known problem loans, evaluations made by bank regulatory authorities, assessment of economic conditions and other appropriate data to identify the risks in the loan portfolio.

The first major element includes a detailed analysis of the loan portfolio in two phases. The first phase is conducted in accordance with SFAS No. 114, "Accounting by Creditors for the Impairment of a Loan", as amended by SFAS No. 118, "Accounting by Creditors for Impairment of a Loan-Income Recognition and Disclosures". Individual loans are reviewed to identify loans for impairment. A loan is impaired when principal and interest are deemed uncollectable in accordance with the original contractual terms of the loan. Impairment is measured as either the expected future cash flows discounted at each loan's effective interest rate, the fair value of the loan's collateral if the loan is collateral dependent, or an observable market price of the loan (if one exists). **Upon measuring the impairment, the Bank will ensure an appropriate level of allowance is present or established.**

Central to the first phase and the Bank's credit risk management is its loan risk rating system. The originating credit officer assigns borrowers an initial risk rating, which is based primarily on a thorough analysis of each borrower's financial capacity in conjunction with industry and economic trends. Approvals are made based upon the amount of inherent credit risk specific to the transaction and are reviewed for appropriateness by senior line and credit administration personnel. Credits are monitored by line and credit administration personnel for

50