deterioration in a borrower's financial condition, which would impact the ability of the borrower to perform under the contract. Credits undergo a quarterly loan review and a periodic review by the regulators. Risk ratings are adjusted as necessary.

Based on the risk rating system specific allowances are established in cases where management has identified significant conditions or circumstances related to a credit that management believes indicates the probability that a loss has been incurred. Management performs a detailed analysis of these loans, including, but not limited to, cash flows, appraisals of the collateral, conditions of the marketplace for liquidating the collateral and assessment of the guarantors. Management then determines the inherent loss potential and allocates a portion of the allowance for losses as a specific allowance for each of these credits.

The second phase is conducted by evaluating or segmenting the remainder of the loan portfolio into groups or pools of loans with similar characteristics in accordance with SFAS No.5, "Accounting for Contingencies". In this second phase, groups or pools of homogeneous loans are reviewed to determine a portfolio allowance. Additionally groups of non-homogeneous loans, such as construction loans, are also reviewed to determine a portfolio allowance. The risk assessment process in this case emphasizes trends in the different portfolios for delinquency, loss, and other-behavioral characteristics of the subject portfolios.

The second major element in the Bank's methodology for assessing the appropriateness of the allowance consists of management's considerations of all known relevant internal and external factors that may affect a loan's collectability. This includes management's estimates of the amounts necessary for concentrations, economic uncertainties, the volatility of the market value of collateral.

102.   In contrast to its representations as set forth above, which appear to be "boilerplate" taken from other banks' disclosure documents and GAAP requirements, the Bank followed few of the steps it was purportedly taking to honestly value its loan portfolio.  Even to the limited extent that FRB was complying with GAAP as set forth in SFAS No. 5 and 114, in accounting for its allowance for loan losses and its

51

provision for loan losses, FRB and the Bank, under the direction of the Defendants, materially understated its allowance for loan losses and its provision for loan losses throughout the Class Period.

103.   In the context of economic and real estate market trends in California, Nevada and Arizona, where the Bank had made the majority of its land and construction loans, the Defendants failed to cause the Bank to timely and adequately reserve for loan losses during 2007, 2008 and 2009. Real estate market trends in each of these areas peaked in December 2006 and then throughout 2007 and 2008 real estate sales prices (and, thus, the prospect for loan repayment) declined by over 50% until leveling off in early 2009. The Defendants, intent on presenting a false and misleading picture of the Bank's financial health, failed to begin to record the necessary provisions for its loan losses until late 2009, if at all, and then only after substantial pressure from the SEC (which forced the restatement of FRB's financial statements as of June 30, 2009) and the Bank's regulators which became increasingly concerned about the evaporation of the Bank's capital and the ris of collapse.

104.   In its Annual Report for 2007, the Company reported total loans of $2.05 billion, and allowances for loan losses of $22.7 million, or approximately 1.11% of its loan portfolio.   The Company did not increase its loan loss reserve ratio over the prior year (ending December 31, 2006), in which it had maintained a substantially identical ratio of 1.12%, notwithstanding the fact that it was well known to the Defendants, and the general public, that default rates were substantially increasing, particularly in the Company's geographic area of operations.

105.   Throughout the Class Period, each of the Defendants, particularly in the context of the poor quality of the Bank's loan portfolio, and in light of regulatory action and Cease and Desist Orders, knew or should have known that the Bank's provision for loan losses during each fiscal quarter was materially inadequate. As reflected in the schedule compiled for Plaintiffs (Exhibit "B" hereto), the Bank's

"Provision for Loan Losses" was at the rate of 1.12% of outstanding loans at the start of the Class Period, remained below 2% through September 30, 2008, went above 2% for two quarters, dropped to 1.91% as of June 30, 2009 and only increased to 3.56% as of September 30, 2009 and then, only after great pressure from the Bank's regulators, and still in violation of the Cease and Desist Order which required an increase to 10%.

106.   Further, during the Class Period, each of the Defendants personally was aware of or had available  data from numerous comparable, relatively local, business-oriented banks including Citizens Business Bank, Westamerica Bank and City National Bank, each of which was lending primarily to businesses (as was the Bank) and each of them, during the same period, reported allowances for loan losses to non-performing assets of 43% to 132% as of September 30, 2009 as compared with the 8.6% reported by the Bank. Thus, putting aside the extremely poor quality of the Bank's loan portfolio, which was continuously concealed from the public, the Defendants, with no basis in fact, portrayed the Bank as far healthier than comparable business-oriented banks when they knew or should have known, was factually unjustified.

107.   The Defendants also caused FRB and the Bank to fail to timely and adequately identify nonperforming loans, write down loans and OREO (other real estate owned, typically taken back from borrowers) to their net realizable value, perform adequate risk assessment of the Bank's loan portfolio, assess current economic trends and conditions, and evaluate the collateral of loans for impairment.[16]

---

[16] Throughout the Class Period, Defendants overstated the realizeable value of the Bank's REO by material amounts not presently known by Plaintiffs. The Defendants knew but did not disclose that, because the underlying loans had been based, in part, on inflated appraisals and excessive loan to equity ratios (sometimes exceeding 100%), there was little chance that the Bank would be able to recover the values at which such REO was booked. The Bank retained such REO on its books rather than sell it at market value and be required to record the losses that were justified.

For example, it was not until the quarter ended June 30, 2009 that the Defendants caused FRB and the Bank to record the following impairment charges, among others, that should have been recorded by at least June 2008:

> (i) Write down of condominium OREO/construction loan for a project in San Diego County that had been on non-accrual status for at least 12 months by approximately $14.4 million, or by 70%.
>
> (ii) Write down of residential land located in Riverside County that had been on non-accrual status for at least 12 months by approximately $7.1 million, or by 78%.
>
> (iii) Write down of residential land located in Washington State that was OREO for at least 12 months by approximately $2.0 million, or by 64%

108.   In the Company's Form 10-Q-A filed on November 17, 2009, the Defendants admitted they had caused FRB and the Bank to understate the Company's required loan loss reserves by over $90 million as of June 30, 2009.  As set forth in SFAS No. 154, *Accounting Changes and Error Corrections,* a restatement of previously issued financial statements is an acknowledgement that those financial statements were materially misstated at the date of issuance, and that the facts giving rise to the restatement existed at the date the financial statements were prepared. Accordingly, the Defendants knew or should have known that the Company's provision for loan losses, allowance for loan losses and deferred tax asset were materially misstated at the time they issued the financial results as of and for the period ended June 30, 2009.  The Defendants also had knowledge or should have known that the Company had a material amount of additional impaired loans that were either required to be charged off or reserved for, in light of the Company's restatement, whereby FRB disclosed for the first time that the Company's impaired loan portfolio exceeded $400 million, including OREO versus non-performing assets of $283 million originally disclosed, and the Company's non-accrual loans net of

1  charge-offs totaled $324,282,000 at June 30, 2009 versus the $243,230,000 disclosed

2  in the originally issued SEC filing on Form 10-Q.

3      109.   Accordingly, throughout the Class Period, each of the Defendants

4  flagrantly disregarded the FDIC's foregoing Policy Statement as well as applicable

5  federal securities laws and GAAP by intentionally and dramatically under-reserving

6  for the Bank's loan losses including, in particular, not evaluating each of its loans

7  individually nor applying reserves for likely and potential loan losses, resulting in a

8  false portrayal of the financial condition of FRB and the Bank.

9

10      **THE EXPANSION OF THE BANK AND**

11      **ITS IMPRUDENT LENDING PRACTICES**

12      110.   In the years 2002, through the beginning of the Class Period, the Bank

13  had grown very rapidly beyond its core functions. In the process, its assets grew to

14  more than $2 billion and its lending and other banking activities skyrocketed.

15  However, as determined by the Bank's regulators, such growth was not accompanied

16  by "management with appropriate qualifications and experience commensurate with

17  their responsibilities within the Bank." In that regard, the Bank was recklessly

18  lending money in too concentrated a manner to too few borrowers in a too

19  concentrated industry, primarily commercial real estate in Southern California, some

20  of which was generated through improper arrangements with loan originators.

21      111.   Concurrently, and for the most part, prior to the commencement of the

22  Class Period, under the direct approval of Defendant Jack A. Sweeney, the Bank

23  began making high-risk and speculative raw land and other loans, many of which

24  ultimately had to be written off as uncollectible or with only a marginal return of the

25  amounts due. Additionally, many high-risk loans, including loans to borrowers

26  friendly to one or more of the Defendants, were made on an unsecured basis (i.e. with

27  no collateral available to protect the Bank from loss).

28      112.   The Defendants caused the Company to represent in its Form 10-K

55

Annual Report filed with the SEC on March 16, 2009 that "The Bank conducts a business-oriented wholesale banking operation, with services tailored to the needs of businesses and professionals in its service area [i.e. Los Angeles, Ventura and Orange Counties]." In doing so, the Defendants failed to disclose that the Bank's lending activities had spread well beyond the area where its lending officers had experience and/or were able to monitor the loans made due to the borrowers' distance from the Bank's service area.

113.   As reflected in the Loan Analysis prepared for Plaintiffs, attached hereto as Exhibit "A" and not disclosed publicly by the Defendants, many loans were well outside the Bank's geographic area and included multi-million dollar loans for projects in the states of Alabama, Florida, Texas, Colorado, Washington, Arizona, Utah, New Hampshire and Nevada,  as well as in San Diego, San Bernardino, Santa Barbara and Riverside Counties.[17]   Many such loans were not sufficiently analyzed by the Bank's lending officers, let alone capable of being evaluated by Defendant Jack A. Sweeney. The Bank's lending, as noted by its regulators, was carried out with inadequate documentation and loan files necessary to protect the Bank and, generally, the absence of reasonable controls and risk management, all of which was known by each of the Defendants.

114.   Throughout the Class Period, the Defendants caused the Company to conceal from the public information as to the concentration of risk, credit risk and uncertainties inherent within the Bank's loan portfolio. Later in the Class Period, because of the reliance by the Bank on loans originated by mortgage brokers in Newport Beach and elsewhere, as bad as the quality of its loans were previously, they

---

[17] Although substantial writedowns of many of such loans and provisions for loan losses were taken by September 30, 2009, the true value of the Bank's loan portfolio as of the date of its closing by its regulators in January 2010 was and remains concealed. Upon information and belief, the successor to the Bank, First Citizens Bank, is believed to have acknowledged more than $50 million of additional loan losses on the loans it took over, such losses ultimately absorbed by the Federal Deposit Insurance Corporation ("FDIC").

56

deteriorated further and faster, all of which was hidden from the investing public.  In addition to and caused in part by the poor quality of the Bank's loan portfolio, its regulators were pressuring the Defendants to inject more capital into the Bank, which requests were mostly ignored. Indeed, the Defendants released unjustified reports of earnings or relatively modest losses and repeatedly made claims as to the Bank's capital sufficiency, almost until it was seized by regulators. Although it was known by each of the Defendants that the Bank required a massive infusion of capital and had been so informed by its regulators in 2007 and repeatedly thereafter, the Defendants made no serious efforts to obtain such capital until some time in 2009. At such time, Defendants Gartshore and McCullough entered into discussions with a San Francisco investor who was considering an investment of $110 million in FRB, which would be "downstreamed" to the Bank. They repeatedly told members of the public and the Bank's staff that such an infusion was imminent but concealed two critical facts: (a) that they were being informed by the Bank's regulators that such an infusion was substantially less than what was necessary for the Bank to survive, which was estimated to be in excess of $300 million and (b) once due diligence was completed by the proposed investor, it would become apparent that the Bank's financial statements were false and misleading and that its allowance for loan losses was materially deficient.

## OTHER CONCEALED WRONGDOING

115. By the commencement of the Class Period, consistent with the Defendants' quest for expansion and "market share," the Bank had taken on substantial fiduciary responsibilities through its Trust Administrative Services ("TAS") Division and through the handling of IRA accounts administered by third parties, none of which activities the Bank was able to handle competently or

prudently given the lending orientation of the Defendants and their unwillingness to properly support non-lending activities. Further, either as a result of the lack of oversight by the Director Defendants, the lack of controls or otherwise, the Bank became a vehicle for money laundering and otherwise facilitated criminal activity. Upon information and belief, there is an ongoing criminal investigation with respect to such conduct but little information about it has been available publicly.

116.   Throughout virtually the entirety of the Class Period, during the times that they held their respective positions with FRB and/or the Bank, the Defendants had knowledge of the foregoing circumstances while concurrently proclaiming the health of the financial and operating condition of the Bank and the Company, the Bank's regulators were pointing out to the Defendants the material shortcomings of the Bank including, specifically, with respect to its non-lending activities.

## FALSE SOX CERTIFICATIONS

117.   The Company and the Bank were required to comply with §13(b)(2)-(7) of the Exchange Act, which required them to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflected the transactions and disposition of their assets, the principal assets being loans receivable. The Defendants were required to devise and maintain internal accounting controls that were sufficient to provide reasonable assurance that, among other things, transactions were recorded as necessary to permit the preparation of financial statements in conformity with GAAP and to maintain accountability of assets. Throughout the Class Period, the Defendants knew that FRB and the Bank were not in compliance with §13(b)(2)-(7) of the Exchange Act and that the financial statements of FRB and the Bank were not prepared in conformity with GAAP.  The Defendants caused the Bank and FRB to make false and misleading statements regarding the absence of effective internal controls.

118.   In their Form 10-Q certifications issued during the Class Period,

Defendants Jack A. Sweeney, Thompson and Gartshore each variously certified that FRB had in place functioning disclosure controls and procedures to ensure that material information relating to it and the Bank was accurate, that they had disclosed to FRB's auditors and the Audit Committee of FRB's Board all significant deficiencies in the design or operation of internal controls which could adversely affect FRB's ability to record, process, summarize and report financial data and that they had identified for FRB's auditors any material weaknesses in internal controls and any fraud, whether or not material, that involved management or other employees who had a significant role in the internal controls or FRB and/or the Bank.

119.   Such certifications were wholly unjustified and falsely made by such Defendants.[18]   No proper evaluations were ever conducted or reports made by the certifying officers for the purpose of identifying and eliminating the Company's and the Bank's internal control problems.   Indeed, throughout the Class Period, all of the Director Defendants knew that the internal controls at FRB and the Bank were grossly inadequate, a fact pointed out to the Board of the Bank and other of the Defendants as early as the FDIC's examination of the Bank in early 2007.

120.   Similar false certifications were made by such Defendants in the Forms 10-K filed with the SEC during the Class Period. Defendants misrepresented, in FRB's 10-K filed with the SEC and distributed to FRB shareholders, that the Company's underwriting practices were prudent and sufficient to minimize the risk of loss to FRB:

---

[18] Disclosure Controls are controls and procedures designed to reasonably assure that information required to be disclosed in reports filed under the Exchange Act, is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms.   Disclosure Controls are also designed to reasonably assure that such information is accumulated and communicated to management to allow timely decisions regarding required disclosure.

> "We have adopted underwriting and credit monitoring procedures and credit policies, including the establishment and review of the loan loss reserve, that management believes are appropriate to minimize this risk by assessing the likelihood of nonperformance, tracking loan performance and diversifying our credit portfolio."

121.   The reality was, as such Defendants were aware, that the Bank's underwriting practices were woefully insufficient to minimize the risk of loss, and the Defendants would cause FRB, belatedly, in 2009, to take write-downs and increase the Bank's loan loss reserves in amounts that would dwarf the false profits announced for 2007.

122.   Subsequently, in its filing in SEC Form 10-Q/A for June 30, 2009, the Defendants caused FRB to acknowledge for the first time that:

> "[FRB's] disclosure controls and procedures were not effective as of June 30, 2009, to ensure that information required to be disclosed in the reports that Registrant files and submits under the Exchange Act are recorded, processed, summarized and reported as and when required due to a material weakness in our internal control over financial reporting.

## NO SAFE HARBOR

123.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  None of the specific statements or the practices underlying them as alleged herein are forward looking. Indeed, the failure of the Defendants to value the Bank's loan portfolio accurately was a function of the circumstances as they existed at the times the applicable financial statements were rendered. Many of the specific statements alleged herein and in the Defendants' public filings and pronouncements were not identified as "forward-looking statements" when made but spoke solely to purportedly then-current facts.  To the extent there were any forward-looking statements made by the Defendants, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively,

to the extent that the statutory safe harbor does apply to any forward-looking statement, these statements are actionable because, at the time any forward-looking statement was made, the particular speaker knew that the particular forward-looking statement was false and/or that the forward-looking statement was authorized and/or approved by an executive officer of FRB and/or the Bank who knew that those statements were false when made.

## CLAIMS FOR RELIEF

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

124.  Plaintiffs repeat and restate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

125.  Defendants engaged and participated in a scheme, plan and continuous course of conduct to misrepresent and conceal the true operating and financial condition of FRB and the Bank from approximately January 1, 2007 and continuing throughout the Class Period.  Such scheme was intended to and did operate as a fraud and deceit on Plaintiffs and members of the Class, in an effort to create and maintain artificially high market prices for FRB securities, and causing them to purchase FRB securities at artificially inflated market prices.

126.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, individually and jointly, made untrue statements of material fact and/or failed to disclose material information in their possession regarding (a) the Company's and the Bank's financial earnings, assets, net worth, capital ratios, and loan losses; (b) their compliance with their own internal policies and procedures; (c) their compliance with the guidance and conditions placed on the Bank's operations as a result of banking regulators' actions and the Cease and Desist Orders referred to

61

above; (d) imprudent lending practices and improper loan documentation; and (e) inadequacy of internal controls and oversight risk management at FRB and the Bank.

127.   In addition to the duties of full disclosure imposed on Defendants as a result of their making affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §210.1-01, *et seq.*) and Regulation S-K (17 C.F.R. §229.10, *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's financial condition, and management integrity so that the market prices of the Company's securities would be based on truthful, complete and accurate information.

128.   As detailed herein, Defendants each knowingly or with deliberate recklessness committed manipulative or deceptive acts in furtherance of their fraudulent scheme including (a) causing and/or permitting the dissemination of false and misleading news releases and other communications to the investing public; (b) preparing, approving and signing SEC filings of financial statements that overstated and misrepresented the operating and financial condition of FRB and the Bank; (c) preparing, approving and signing SEC filings that overstated and misrepresented the assets, earnings, capital ratio and net worth of FRB and the Bank, and understated their exposure to losses on the Bank's outstanding loans, which they later acknowledged in their November 2009 Restatement admitting that the Bank understated its allowance for loan losses by over $90 million; (d) failing to take steps to correct the lack of sound internal controls and oversight risk management, and the deficiencies and material weaknesses therein;  and (e) failing to make timely and adequate disclosure of the banking regulators' warnings and Cease and Desist Orders and the likely consequences thereof given the circumstances of FRB and the Bank.

129.   Each of the Defendants was a direct, necessary and substantial

1    participant in the common course of conduct alleged herein.

2       130.   Defendants' scheme operated as a fraud or deceit on Plaintiffs and the

3    members of the Class because the false and misleading statements concerning the

4    financial and operating condition of FRB and the Bank plus the non-disclosures of

5    material facts concerning the the Bank's imprudent lending practices and the

6    Defendants' violations of bank regulators' warnings and Cease and Desist Orders,

7    SEC policies and accounting regulations, caused and maintained the artificial

8    inflation in the market price of FRB securities prices throughout the Class Period and

9    until the truth was slowly revealed to the market.

10      131.   In ignorance of the fact that market prices of the FRB securities were

11   artificially inflated and relying, directly or indirectly, on the false and misleading

12   statements made by Defendants or upon the integrity of the market in which the

13   securities traded and/or on the absence of material adverse information, Plaintiffs and

14   the other members of the Class acquired FRB securities during the Class Period at

15   artificially high prices and were damaged thereby.

16      132.   At the time of said misrepresentations and omissions, Plaintiffs and the

17   other members of the Class were ignorant of their falsity and had no reason to believe

18   that the Defendants' public representations regarding FRB and the Bank were not

19   true.  Had Plaintiffs and the other members of the Class known of the true operating

20   and financial condition of the Company and of its other problems as referred to

21   herein, Plaintiffs and the other members of the Class would not have purchased or

22   otherwise acquired FRB securities or, if they had purchased and/or otherwise

23   acquired such securities during the Class Period, they would not have done so at the

24   artificially inflated prices that they paid.

25      133.   As the truth about the extent and severity of the deterioration of the

26   financial and operating condition of FRB and the Bank started to be released and

27   become apparent to the market, the prices of FRB securities plummeted.  This price

28

1  decline occurred as the markets continued to digest the impact and meaning of

2  Defendants' fraudulent schemes on FRB and the Bank. All or a significant portion of

3  the decrease in the market prices of FRB securities stock was due to the disclosure,

4  revelation and/or leakage of information inconsistent with Defendants' prior financial

5  disclosures and other public filings and releases.

6      134. The totality of the circumstances around the decline in the trading prices

7  of FRB securities combine to negate any inference that the economic loss suffered by

8  Plaintiffs and the other members of the Class was caused by changed market

9  conditions, macroeconomic or industry factors (i.e. the sub-prime debacle and the

10  related impact upon the real estate sector) or FRB-specific facts unrelated to

11  Defendants' fraudulent conduct as described above.

12      135. As a direct and proximate result of Defendants' fraudulent scheme to

13  artificially inflate and maintain the market prices of FRB securities, Plaintiffs and the

14  other members of the Class suffered economic losses in connection with their

15  respective purchases and sales of the Company's securities during the Class Period.

16      136. The resulting decline in the market prices of FRB securities was

17  foreseeable at the time of Defendants' misrepresentations and omissions. Indeed,

18  despite being aware of the consequences of their fraudulent conduct, Defendants

19  nevertheless knowingly engaged in the alleged misconduct, which, when the truth

20  finally emerged and the Bank was seized by its regulators, caused the FRB securities'

21  market values to collapse and become near worthless.

22      137. Plaintiffs will rely, at least in part, upon the presumption of reliance

23  established by the fraud-on-the-market doctrine. At all relevant times, the market for

24  FRB's publicly traded securities was an efficient market for the following reasons,

25  among others:

26          (a)    Until it was suspended from trading thereupon (and trading moved

27                 to the OTC Bulletin Board), the Company's common stock met

28

the requirements for public listing and was listed and traded on the NASDAQ, a highly efficient market.

(b)     As a regulated issuer, the Company filed reports with the SEC.

(c)     The Company regularly issued press releases, which were carried by national news wires.  Each of these releases was publicly available and entered the public marketplace.

138.  As a result, the market for the Company's publicly traded securities promptly digested current information with respect to FRB from all publicly available sources and reflected such information in the price of the Company's securities. Under these circumstances, all purchasers of the FRB's publicly traded securities during the Class Period suffered similar injury through their purchase thereof at artificially inflated prices.

139.  By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

140.  Plaintiffs repeat and restate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

141.  The Defendants acted as controlling persons of FRB within the meaning of §20(a) of the Exchange Act.  By reason of their high-level positions with the Company, their ownership of FRB stock, as a group more than 40% of FRB's shares, their participation in the drafting, approving, and filing of false financial statements and other deceptive documents with the SEC and their dissemination to the investing public, and their participation in the fraudulent schemes and acts described herein, these Defendants had the power and authority to control and cause FRB to engage in the wrongful conduct complained of herein.  By reason of such conduct, the

Defendants named herein are liable to Plaintiffs and the members of the Class pursuant to §20(a) of the Exchange Act.

142.   As set forth above, Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.   By virtue of their positions as controlling persons of FRB, the Defendants are liable to Plaintiffs and the members of the Class for their damages pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.   Determining that this action is a proper class action, certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and appointing their counsel as Class Counsel;

B.   Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against Defendants for all damages sustained as a result of Defendants' wrongdoing in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

C.   Awarding Plaintiffs and the other members of the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.   Such other and further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand trial by jury of all issues that may be so tried.

DATED: October 28, 2010

CUNEO GILBERT & LADUCA LLP

Jon Tostrud (SB No. 199502)
1901 Avenue of the Stars, 2nd Floor
Los Angeles, California 90067
Telephone: (310) 461-1620
tostrud@yahoo.com

OF COUNSEL:

Richard D. Greenfield
GREENFIELD & GOODMAN, LLC
250 Hudson Street, 8th Floor
New York, N.Y. 10013
(917) 495-4446

Ilene Freier Brookler (SB No. SB269422)
GREENFIELD & GOODMAN, LLC
7162 Beverly Blvd.
Los Angeles, CA 90036
(323) 230-5732

Jonathan W. Cuneo
Matthew E. Miller,
CUNEO GILBERT & LaDUCA, LLP
507 C Street, N.E.
Washington, DC 20002
(202) 789-3960

COUNSEL FOR PLAINTIFFS AND THE CLASS

67

# EXHIBIT A

EXHIBIT A
First Regional Bancorp
SEC Form 8-K Disclosure of Non-performing Loans

| Description | Loan Status | Loan Type | Period Ended Loan Amount Disclosed | | | |
|---|---|---|---|---|---|---|
| | | | June 30, 2009 | March 31, 2009 | December 31, 2008 | September 30, 2008 |
| 105 Acres of Residential Land in Riverside County | Nonaccrual | Land | $ 786,900 | $ 3,734,400 | $ 3,734,400 | $ 3,734,400 |
| 18 Acres of Residential Land in Riverside County | Nonaccrual | Land | $ 1,162,050 | $ 5,290,400 | $ 5,290,400 | $ 5,290,400 |
| Residential land for 34 units in Los Angeles County | Nonaccrual | Land | $ 3,118,920 | $ 3,445,000 | $ 3,345,000 | $ 3,345,000 |
| 162 Acres of Residential Land in Riverside County | Nonaccrual | Land | $ - | $ - | | $ 12,025,000 |
| Condominium project in Spring Valley, San Diego County | Nonaccrual | Construction | $ 6,299,697 | $ 20,744,204 | $ 20,744,204 | $ 20,744,204 |
| Condominium conversion in San Diego County | Nonaccrual/OREO | Construction | $ - | $ - | $ 8,081,850 | $ 8,081,850 |
| 23 Acres of residential land Silverdale, WA | OREO | | $ 1,098,000 | $ 3,050,000 | $ 3,050,000 | $ 3,050,000 |
| Apartment building in San Diego | OREO | | $ | $ 3,647,800 | $ 3,647,800 | $ 3,647,800 |
| Luxury residence in Tarzana | Nonaccrual/OREO | Construction | $ 3,930,467 | $ 3,930,467 | $ 3,930,467 | $ 3,930,467 |
| Loan to Individual | Nonaccrual | Unsecured | $ 1,990,000 | $ 1,990,000 | $ 1,990,000 | $ 2,000,000 |
| Residence in Los Angeles | Nonaccrual | Construction | $ - | $ - | | $ 1,384,051 |
| Condominium project in Bakersfield | Nonaccrual | | $ 3,085,214 | $ 3,118,500 | $ 3,118,500 | |
| Apartment bldg in Santa Barbara | Nanaccrual | Construction | $ 23,479,400 | $ 23,599,400 | $ 23,679,400 | |
| 9 acres of residential land in PV | 90+ /Nonaccrual | Land | $ 16,516,297 | $ 16,575,000 | $ 16,575,000 | $ 16,575,000 |
| Luxury residence in Newport Beach | Nonaccrual | Residential | $ - | $ - | $ 7,096,050 | |
| 29 Acre Commercial Property in Murray, Utah | Nonaccrual | CRE Loan | $ 9,180,000 | $ 9,180,000 | $ 9,180,000 | |
| 82000 S.F. of residential land in Los Angeles County | 90+ | | $ 8,512,500 | $ 8,512,500 | $ 8,512,500 | |
| 29000 S.F. of residential land in Los Angeles County | 90+ | | $ 3,562,024 | $ 3,562,024 | $ 3,562,024 | |
| 18000 S.F. of residential land in Los Angeles County | 90+ | | $ - | $ 2,125,000 | $ 2,125,000 | |
| Retail Centers in Maricopa County, Arizona | Nonaccrual | CRE Loans | $ - | $ 4,790,975 | $ 4,790,975 | |
| 11.62 acres of residential land in San Bernardino County | Nonaccrual/OREO | | $ 1,316,000 | $ 1,741,265 | $ 1,741,265 | |
| 13.74 acres of industrial land in Whatcom County, WA | Nonaccrual | Land | $ 1,100,000 | $ 1,100,000 | $ 1,100,000 | |
| Loan to individual | Nonaccrual | Unsecured | $ 1,968,037 | $ 1,968,037 | $ 1,968,037 | |
| Loan to Company | Nonaccrual | Unsecured | $ 1,609,617 | $ 1,609,617 | $ 1,609,617 | |
| Loan to Company | Nonaccrual | Unsecured | $ - | $ 1,500,000 | $ 1,500,000 | |
| 110000 S.F. warehouse in Whatcom County, WA | Nonaccrual | CRE | $ 1,284,636 | $ 1,284,636 | $ 1,284,636 | |
| Apartment Bldg in Los Angeles Cty | 90+ | CRE | $ - | $ - | $ 4,340,000 | |

**EXHIBIT A (continued)**
**First Regional Bancorp**
**SEC Form 8-K Disclosure of Non-performing Loans**

| Description | Loan Status | Loan Type | June 30, 2009 | March 31, 2009 | December 31, 2008 | September 30, 2008 |
|---|---|---|---|---|---|---|
| | | | | Period Ended Loan Amount Disclosed | | |
| 1.95 acres of residential land in San Bernardino County | Nonaccrual | Land | $ 814,703 | $ 845,000 | $ 845,000 | |
| 3 SFRs in Santa Barbara County | Nonaccrual | Construction | $ 2,211,572 | $ 2,233,572 | $ 2,244,655 | |
| Loan to individual | Nonaccrual | Unsecured | $ - | $ - | $ 193,480 | |
| Loan to Company | Nonaccrual | Unsecured | $ - | $ 24,220,912 | | |
| 29000 S.F. of residential land in NH | Nonaccrual | Land | $ - | $ 3,450,000 | | |
| 100,000 S.F. of residential land in Valley Village | Nonaccrual | Land | $ 9,375,000 | $ 9,375,000 | | |
| 62,000 S.F. of residential land in Valley Village | Nonaccrual | Land | $ 7,068,259 | $ 7,068,259 | | |
| Condinium project in Sparks, NV | Nonaccrual | Construction | $ 14,282,842 | $ 14,282,842 | | |
| 180 Unit apt bldg in North Hollywood | Nonaccrual | Construction | $ 9,193,419 | $ 9,193,419 | | |
| 26 unit cond project in Sherman Oaks | Nonaccrual | Construction | | $ 8,521,286 | | |
| Condomium project in Oceanside | Nonaccrual | Construction | $ 12,442,772 | $ 12,442,772 | | |
| 24 acres of commercial and residential land in Ontario | Nonaccrual | Land Dev | $ 4,852,852 | $ 4,852,852 | | |
| 5.5 acres in Henderson, Ca | Nonaccrual | Land | $ 2,898,600 | $ 2,898,600 | | |
| 22 unit condo project in Los Angeles | Nonaccrual | Construction | $ 2,593,713 | $ 4,165,924 | | |
| Restaurant in Summerland, Ca | Nonaccrual | CRE | $ 3,508,093 | $ 3,508,093 | | |
| 29 unit condo proj in Beverly Hills | 90+ | Construction | $ 14,935,906 | $ 14,476,201 | | |
| 6 Unit Apartment in Valley Village (3) | Nonaccrual | Land | $ 3,651,750 | $ 3,651,750 | | |
| 7 Unit Condo Project in LA | 90+ | Construction | $ 3,469,308 | $ 3,469,308 | | |
| 128 Unit Apt in Daphne, Alabama | Nonaccrual/OREO | CRE | $ 5,311,000 | $ 1,086,950 | | |
| Luxury residence in Palm Springs | Nonaccrual | Construction | $ 2,369,550 | $ 2,377,750 | | |
| 16000 sq ft residential land in SM | Nonaccrual | land | $ 1,642,000 | $ 1,642,000 | | |
| Various loans | Nonaccrual | Land/CRE | $ 4,658,610 | $ 2,826,903 | | |
| 14000 sq ft residential land in LA | Nonaccrual | Land | $ 1,565,000 | $ 1,565,000 | | |
| 22 Unit condo proj in Thousand Oaks | Nonaccrual | Construction | $ 8,149,789 | | | |
| 272 unit apt in Fern park, FL | Nonaccrual | CRE | $ 13,772,079 | | | |
| 42 Unit condo proj in LA | Nonaccrual | Construction | $ 17,898,574 | | | |
| 27 unit condo proj in LA | Nonaccrual | Construction | $ 13,904,421 | | | |
| Condo Proj in LA | Nonaccrual | Construction | $ 7,090,000 | | | |
| 15000 sq ft bldg in LA | Ninaccrual | CRE | $ 6,160,000 | | | |
| 5.2 acres of land in Las Vegas | Nonaccrual | Land | $ 5,068,000 | | | |
| Luxury residence in Irvine | Nonaccrual | Construction | $ 5,399,685 | | | |
| 18 unit condo proj in So Pasadena | Nonaccrual | Construction | $ 5,874,484 | | | |
| 56 acres in Cedar Park, TX | Nonaccrual | Land | $ 5,634,677 | | | |

EXHIBIT A (continued)
First Regional Bancorp
SEC Form 8-K Disclosure of Non-performing Loans

| Description | Loan Status | Loan Type | | Period Ended Loan Amount Disclosed | | | |
| | | | | June 30, 2009 | March 31, 2009 | December 31, 2008 | September 30, 2008 |
|---|---|---|---|---|---|---|---|
| 96 unit mobile home park, San Diego | Nonaccrual | CRE | $ | 3,186,170 | | | |
| 56 room hotel in Santa barbara | Nonaccrual | CRE | $ | 3,975,000 | | | |
| 320 acres land in Bullhead City, AZ | 90+ | Land | $ | 4,779,492 | | | |
| 97 unit apt bldg in Federal heights, CO | 90+ | CRE | $ | 4,205,850 | | | |
| Medical Office bldg Newport Beach | 90+ | CRE | $ | 4,251,115 | | | |
| 31000 sq ft lot in Brentwood, CA | 90+ | Land | $ | 3,400,000 | | | |
| 15000 sq ft lot in Santa Monica | Nonaccrual | Land | $ | 1,265,841 | | | |
| 16000 sq ft lot in Santa Monica | Nonaccrual | Land | $ | 1,257,564 | | | |
| 4 unit apt bldg in LA | Nonaccrual | CRE | $ | 1,520,000 | | | |
| 15000 sq ft lot in West Hollywood | Nonaccrual | Construction | $ | 1,439,797 | | | |
| Subtotal | | | $ | 315,157,234 | $ 264,693,521 | $ 149,320,073 | $ 83,847,893 |
| Less: Writedowns - prior | | | | | $ (23,790,271) | $ (26,790,838) | (33,990,238) |
| Specific reserves | | | $ | (46,531,351) | $ (41,946,213) | | |
| Current Writedowns | | | $ | (550,748) | $ (25,000) | $ (1,533,544) | (140,800) |
| Reported Performing/Delinquent Assets | | | $ | 268,075,135 | $ 198,932,037 | $ 120,995,691 | 49,716,855 |

# EXHIBIT B

**EXHIBIT B**
Trend in Allowance for Loan Losses

## First Regional Bancorp

| Loan Reserve: | December 31, 2006 | March 31, 2007 | June 30, 2007 | September 30, 2007 | December 31, 2007 |
|---|---|---|---|---|---|
| Balance- beginning of the period | $ 17,577 | $ 20,624 | $ 20,624 | $ 20,624 | $ 20,624 |
| Provision for loan losses | 4,328 | - | 300 | 1,200 | 2,622 |
| Loans charged off | (1,028) | (9) | (50) | (50) | (741) |
| Allowance for unfunded loan commitments and lines of credit | 353 | | 135 | 125 | (172) |
| Recoveries on loans previously charged off | 100 | 79 | 94 | 94 | 94 |
| Balance- end of the period | $ 20,624 | $ 20,694 | $ 21,123 | $ 21,993 | $ 22,771 |
| Percent of Loan Portfolio | 1.12% | 1.12% | 1.10% | 1.11% | 1.11% |

| Loan Reserve: | March 31, 2008 | June 30, 2008 | September 30, 2008 | December 31, 2008 | March 31, 2009 | June 30, 2009 | September 30, 2009 |
|---|---|---|---|---|---|---|---|
| Balance- beginning of the period | $ 22,771 | $ 22,771 | $ 22,771 | $ 22,771 | $ 61,336 | $ 61,336 | $ 61,336 |
| Provision for loan losses | 10,790 | 55,533 | 65,951 | 93,367 | 7,500 | 38,616 | 121,967 |
| Loans charged off | - | (34,244) | (34,244) | (55,156) | (672) | (58,152) | (112,836) |
| Allowance for unfunded loan commitments and lines of credit | 19 | 74 | 178 | (334) | 96 | 221 | 115 |
| Recoveries on loans previously charged off | | 18 | 18 | 20 | 4 | 80 | 216 |
| Balance- end of the period | $ 33,580 | $ 44,152 | $ 54,674 | $ 61,336 | $ 68,264 | $ 42,101 | $ 70,798 |
| Percent of Loan Portfolio | 1.52% | 1.89% | 2.37% | 2.64% | 2.96% | 2.91% | 3.56% |

1

## CERTIFICATE OF SERVICE

2

3        I hereby certify that on October 28, 2010, I caused to be filed by first class mail upon the

4    following list of counsel of record the foregoing Amended Complaint.

5                                    /s/   Jon A. Tostrud
                                    JON A. TOSTRUD
6

7        **Charles E Weir**
         McDermott Will & Emery LLP
8        2049 Century Park East
         38th Floor
9        Los Angeles, CA 90067-3208
         310-277-4110
10       Fax: 310-277-4730
         Email: cweir@mwe.com
11       *LEAD ATTORNEY*
         *ATTORNEY TO BE NOTICED*
12
         **Thomas A Ryan**
13       McDermott Will and Emery
         2049 Century Park East 34th Floor
14       Los Angeles, CA 90067-3208
         310-277-4110
15       Email: tryan@mwe.com
         *ATTORNEY TO BE NOTICED*
16
         **Julian Lucien Andre**
17       McDermott Will and Emery LLP
         2049 Century Park East Suite 3800
18       Los Angeles, CA 90067
         310-277-4110
19       Email: jandre@mwe.com
         *ATTORNEY TO BE NOTICED*
20

21

22

23

24

25

26

27

28