FILED

1  GREENFIELD & GOODMAN, LLC
   Richard D. Greenfield, *pro hac vice*
2  Ilene Freier Brookler (SB No. 269422)
   250 Hudson Street-8th Floor
3  New York, NY 10013
   Telephone: (917) 495-4446
4  whitehatrdg@earthlink.net
   ibrookler@gmail.com
5
   CUNEO GILBERT & LADUCA LLP
6  Sandra W. Cuneo (SB No. 110388)
   330 South Barrington Avenue, #109
7  Telephone: Los Angeles, California 90049
   (424) 832-3450
8  scuneo@cuneolaw.com

9
   (Additional Counsel on Signature Page)
10

11              **UNITED STATES DISTRICT COURT**
12
13             **CENTRAL DISTRICT OF CALIFORNIA**

14 **BUTTONWOOD TREE VALUE**
15 **PARTNERS, LP** and **JOHN SORRELLS**
   on Behalf of Themselves and  all Others          **Civil Action No.**
16 Similarly Situated,                               **CV 10-537 CJC MLG**

17              Plaintiffs,

18      vs.

19 **JACK A. SWEENEY,**                              **THIRD AMENDED**
   **STEVEN J. SWEENEY,**                            **COMPLAINT**
20 **MARILYN J. SWEENEY,**
   **GARY M. HORGAN,**                               (REDACTED VERSION)
21 **H. ANTHONY GARTSHORE,**                         **JURY TRIAL DEMANDED**
   **ELIZABETH THOMPSON,**
22 **FRED M. EDWARDS,**
   **THOMAS E. McCULLOUGH,**
23 **RICHARD SCHREIBER,**
   **LAWRENCE J. SHERMAN, and**
24 **DELOITTE & TOUCHE, LLP,**

25              Defendants.

26      Buttonwood Tree Value Partners, LP ("Buttonwood") and John Sorrells

27 (collectively "Plaintiffs"), on behalf of themselves and all others similarly situated,

28 by their undersigned counsel, allege the following based upon the investigation of

counsel, except as to the allegations specifically pertaining to their own acts, which are based upon personal knowledge. The investigation of counsel included, among other things, a review of the public filings of First Regional Bancorp ("FRB" or the "Company") with the United States Securities and Exchange Commission ("SEC"), a September 2010 Material Loss Review Report (the "OIG Report") prepared by the Office of Inspector General ("OIG") of the Federal Deposit Insurance Corporation ("FDIC"), filings with federal and state banking regulators, press releases issued by the Company, media and news reports about the Company, publicly available trading data for FRB's securities, minutes of the Boards of Directors of FRB and its wholly-owned subsidiary, First Regional Bancorp (the "Bank"), and interviews with former employees of the Bank. Plaintiffs have, as well, retained a forensic accountant as a consultant to evaluate the compliance of the Bank and FRB with Generally Accepted Accounting Provisions ("GAAP") and Defendant Deloitte & Touche, LLP ("Deloitte") with Generally Accepted Auditing Standards ("GAAS") in connection with the preparation of their financial statements filed with the SEC, provided to banking regulators and disseminated to the investing public. Plaintiffs have also had the benefit of limited discovery taken in this action from parties and non-parties. Certain of the foregoing discovery have been designated "Confidential" by Defendants or by non-parties and, as such, this Complaint is filed under seal.

## NATURE OF THE ACTION

1.      This is a class action brought by Plaintiffs on behalf of a class consisting of all persons who purchased securities of FRB stock during the period of January 30, 2007 to January 29, 2010, inclusive (the "Class Period"[1]). Those named as Defendants in this action were all officers and/or directors of FRB and/or of the Bank, its subsidiary, during at least part of the Class Period, other than

---

[1] The exact parameters of the Class Period will be determined upon the conclusion of discovery with respect thereto.

1  Defendant Deloitte, which was the purportedly independent auditor of FRB's year-
2  end financial statements, and played a material role in the preparation and
3  dissemination of other than year-end statements.

4      2.    This action involves a fraudulent scheme perpetrated by the
5  Defendants to deceive the investing public by making materially false and
6  misleading statements regarding the true financial and operating condition of FRB
7  and the Bank, and by intentionally concealing material facts concerning FRB and
8  the Bank's violations of, *inter alia,* SEC policies, accounting regulations and FDIC
9  rules and regulations, banking regulator warnings and Cease and Desist Orders,
10  lack of compliance with the Bank's internal policies and procedures, and imprudent
11  lending practices throughout the Class Period. Moreover, Deloitte added its
12  imprimatur to FRB's year-end financial statements when it knew that they were
13  false and misleading. Indeed, based upon Deloitte's explicit knowledge of the
14  actual financial and operating condition of FRB and the Bank, it had actual
15  knowledge from "red flags" (as identified below) and specific facts at its disposal
16  demonstrating unequivocally that FRB's year-end financial statements were not
17  prepared in accordance with GAAP and that its audits of such statements were not
18  conducted in accordance with GAAS as it had repeatedly represented.

19      3.    Such plan and scheme, carried on by the Individual Defendants while
20  they held their respective positions with FRB and/or the Bank and while Deloitte
21  was purportedly auditing the Company's year-end financial statements, was
22  effectuated for the purposes of, *inter alia*, retaining the Individual Defendants'
23  substantial compensation packages and keeping FRB and the Bank "afloat" while
24  they sought infusions of capital which, had the truth been disclosed, would have
25  been nearly impossible to obtain or, if available at all, would have been available
26  only after substantial dilution of the Individual Defendants' personal equity
27  interests in the Company. Similarly, Deloitte, with full knowledge of the Individual
28  Defendants' wrongdoing, acquiesced therein and, nevertheless, in order to retain

1 their continued patronage and substantial fees for purported audits, generated
2 "clean," unqualified opinions that the year-end financial statements of FRB and the
3 Bank were prepared in accordance with GAAP and that such statements were
4 audited in conformity with GAAS when Deloitte knew such representations were
5 false and would deceive the investing public.

6     4.    FRB committed massive fraud resulting in the issuance of Forms
7 10-K for the year-ended 2006, 2007, and 2008, as well as Forms 8-K and 10-Q
8 throughout the Class Period, containing material misstatements.  Among other
9 things, as Deloitte well knew and intentionally concealed, FRB understated the
10 Company's Allowance for Loan and Lease Losses ("ALLL") by at least $90
11 million, failed to report over $50 million in loan charge-offs, and mischaracterized
12 non-performing and impaired loans.  Deloitte failed to implement audit procedures
13 in accordance with GAAS designed to provide reasonable assurance of detecting
14 the illegal acts at FRB that had a direct and material effect on the determination of
15 the amounts provided in FRB's and the Bank's financial statements.  Deloitte
16 audited the annual financial statements for the years ended 2006, 2007, and 2008,
17 and, in each instance, issued an unqualified audit opinion on these financial
18 statements, which it knew to be false and deceptive to investors.  Indeed, given all
19 of the "red flags" available to Deloitte, it should not only have not issued
20 unqualified (i.e. "clean") opinions, but it should have issued "qualified" or
21 "adverse" opinions for the years ended 2006 and 2007 and a "going concern"
22 opinion for the year ended 2008, all of which would have put potential investors on
23 notice of the badly deteriorated financial condition of FRB and that its financial
24 statements should not be relied upon.  Deloitte also reviewed the financial
25 statements in all of the Forms 10-Q and 8-K issued throughout the Class Period,
26 examined the ALLL on a quarterly basis from before 2006 through 2009, and
27 approved FRB's reported earnings, knowing they were absolutely false and could
28 not be justified under any circumstances.  In fact, Deloitte's audit partner ███

████ was actively consulted regarding FRB's quarterly financial statements, and, although Deloitte issued no formal opinions thereupon, it was instrumental in FRB's issuance and dissemination of such materially false financial statements.

5.     The extensive fraud described throughout this Complaint caused and maintained the artificial inflation in FRB's securities prices throughout the Class Period.   By the end of the Class Period, FRB's securities prices had declined precipitously, eventually becoming near-worthless. Plaintiffs and others who purchased FRB securities during the Class Period were injured in an amount which cannot presently be determined.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78aa, and 28 U.S.C. §1331.   The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, Rule 10b-5 promulgated by the SEC, 17 C.F.R. §240.10b-5.

7.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) and (c).   FRB's principal executive offices are located in this District, the Bank was located in this District, all Defendants transacted business in this District, and most of the acts and transactions constituting the violations of law alleged herein, including the preparation, issuance and dissemination of materially false and misleading statements to the investing public, occurred in this District.

8.     In connection with the acts, conduct and other wrongs alleged herein, each of the Defendants, directly and/or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and national securities markets.

## THE PARTIES

**The Plaintiffs**

9.     Plaintiff Buttonwood is an investment partnership that purchased approximately 90,000 shares of FRB common stock between May 28, 2008 and February 6, 2009, as set forth in the Certification filed with the original Complaint, and suffered damages as a result of the wrongful acts of the Defendants alleged herein. Plaintiff Buttonwood's Certification is incorporated herein by reference.

10.     Plaintiff John Sorrells is an individual who purchased 28,000 shares, as set forth in the Certification filed with the original Complaint, except that his purchases were made on May 30, 2008 and continued through February 6, 2009, and he suffered damages as a result of the wrongful acts of the Defendants alleged herein. Plaintiff Sorrells' Certification is incorporated herein by reference.

**The Defendants**

11.     Defendants Jack A. Sweeney (as Chairman of the Board and Chief Executive Officer of FRB), Lawrence Sherman (as Vice Chairman of the Board of FRB), H. Anthony Gartshore (as President and Chief Executive Officer of the Bank), Steven J. Sweeney (as General Counsel and Executive Vice President of the Bank), Gary M. Horgan (as Chairman of the Board), Elizabeth H. Thompson (as Chief Financial Officer),and Thomas E. McCullough (as a Director, Executive Vice-President, Chief Operating Officer and Secretary), are collectively referred to hereinafter as the "Officer Defendants." By virtue of their high-level positions with the Company and/or the Bank, each of the Officer Defendants directly participated in the management thereof, was directly involved in the day-to-day operations of the Company and the Bank at the highest levels and was privy to confidential proprietary information concerning FRB and the Bank and their business, operations, growth, financial statements and financial condition. In connection with such conduct, they were aided and abetted by Dorothea Montoya (as Senior Vice President and Chief Compliance Officer of the Bank) and F. David Hare (as Executive Vice-President of the Bank), former Defendants, who have entered into

agreements with Plaintiffs tolling applicable statutes of limitation running to Plaintiffs and the members of the Class.

12.   As senior officers of FRB and/or the Bank, each of the Officer Defendants had extensive duties to ensure the accuracy and completeness of financial information disseminated to investors:

(a)   As noted in American Institute of Certified Public Accountants ("AICPA") auditing standard, Section 110.03, a public company's management is responsible for preparing financial statements in accordance with GAAP:

> The financial statements are management's responsibility.... Management is responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management.  The auditor's knowledge of these matters and internal controls is limited to that acquired through the audit. Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

(b)   In Accounting Series Release 173 (July 2, 1975), the SEC reiterated the duty of management to present a true representation of a company's operations:

> [I]t is important that the overall impression created by the financial statements be consistent with the business realities of the company's financial position and operations.

(c)   Pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") and SEC rules promulgated thereunder, the chief executive officer and chief financial officer of reporting corporations such as FRB are required to certify as to the accuracy and completeness of a company's financial statements. As such, Defendants Jack A. Sweeney, Gartshore, McCullough and Thompson are liable to Plaintiffs and others similarly situated as a result of their false certifications as described herein.

13.     Defendants Jack A. Sweeney, Thompson, and Gartshore each variously certified falsely their Form 10-Q certifications issued during the Class Period.   Specifically, they certified falsely that FRB had in place functioning disclosure controls and procedures to ensure that material  information relating to it and the Bank was accurate, that  they had disclosed to FRB's auditors and the Audit Committee of FRB's Board all significant deficiencies in the design or operation of internal controls which could adversely affect FRB's ability to record, process, summarize and report financial data and that they had identified for Deloitte any material weaknesses in internal controls and any fraud, whether or not material, that involved management or other employees who had a significant role in the internal controls or FRB and/or the Bank.   In fact, no proper evaluations were ever conducted or reports made by the certifying officers for the purpose of identifying and eliminating the Company's and the Bank's internal control problems. Throughout the Class Period, all of the Director Defendants knew that the internal controls at FRB and the Bank were grossly inadequate, a fact pointed out to the Board of the Bank and by Deloitte as early as the FDIC's examination of the Bank in early 2007.

14.     Similar false certifications were variously made by Defendants Jack A. Sweeney, Thompson and Gartshore in the Forms 10-K filed with the SEC during the Class Period. These Defendants misrepresented, in FRB's 10-K filed with the SEC and distributed to FRB shareholders, that the Company's underwriting practices were prudent and sufficient to minimize the risk of loss to FRB:

> "We have adopted underwriting and credit monitoring procedures and credit policies, including the establishment and review of the loan loss reserve, that management believes are appropriate to minimize this risk by assessing the likelihood of nonperformance, tracking loan performance and diversifying our credit portfolio."

The reality was, as such Defendants were aware, that the Bank's underwriting practices were woefully insufficient to minimize the risk of loss, and the Director Defendants would cause FRB, belatedly, in 2009, to take write-downs and increase

the Bank's loan loss reserves in amounts that would dwarf the false profits announced for 2007.  In its filing on SEC Form 10-Q/A for June 30, 2009, the Director Defendants caused FRB to acknowledge for the first time that:

> "[FRB's] disclosure controls and procedures were not effective as of June 30, 2009, to ensure that information required to be disclosed in the reports that Registrant files and submits under the Exchange Act are recorded, processed, summarized and reported as and when required due to a material weakness in our internal control over financial reporting.

15.     Upon information and belief, Defendant Steven Sweeney, as Executive Vice President and General Counsel to the Bank and FRB, attended all Board meetings and was intimately knowledgeable with respect to the lack of competence of his father as Chief Executive Officer and *de facto* head of the Bank's Loan Committee. He also was aware from prior to the commencement of the Class Period that the Bank's loan files in general, and the documentation supporting outstanding loans were materially deficient, were in disarray and likely to have a material adverse impact upon the Bank's ability to recover collateral and/or otherwise collect amounts outstanding.

16.     Defendants Jack A. Sweeney, Sherman, Gartshore, Horgan (as Chairman of the Board of FRB), McCullough, Marilyn J. Sweeney (as a Director of FRB), Fred M. Edwards (as a Director of FRB) and Richard Schreiber (as a Director of FRB), are collectively referred hereinafter as the "Director Defendants." During some or all of the Class Period, each of them served as a Director of the Company and was intimately knowledgeable with respect to its financial and operating condition and was privy to information not disclosed to the public or regulatory agencies. During the Class Period, FRB's Board of Directors was responsible for the oversight and monitoring of (a) the integrity of its financial statements and those of the Bank; (b) the Company's and the Bank's compliance with legal and regulatory requirements; (c) Deloitte's qualifications, independence and performance; and (d) the Company's and the Bank's internal accounting and

financial controls.   Once it had Deloitte's imprimatur as to FRB's year-end
financial statements, the FRB Board had final decision-making authority regarding
the public disclosure of the financial and operating condition of FRB and the Bank
in SEC Form's 10-K and in other publicly disseminated documents.  In addition to
its responsibilities to FRB and the Bank, the FRB Board had fiduciary
responsibilities to FRB stockholders, potential stockholders and the investment
community.[2] Defendants Edwards, Schreiber and Sherman, as members of the
Audit Committee, were specifically responsible for assuring the integrity of the
Bank's financial reporting process and systems of internal controls, including
assessing the adequacy of its loan review.  During the Class Period, each of the
Director Defendants knew, but did not cause FRB to disclose publicly, the material
fact of the deteriorated mental competence of Defendant Jack A. Sweeney and its
impact upon the Bank's loan portfolio as a result thereof, and also permitted him to
be paid more than $1 million in compensation in 2008 and additional but unknown
amounts thereafter.[3] Further, Defendant Marilyn J. Sweeney (the wife of Defendant
Jack A. Sweeney) was actually and, before that, a *de facto* Director of the Bank,
who attended all Board meetings, maintained an office at the Bank and as a result
of her contact with her husband and the other Defendants, knew but took no steps,
to disclose publicly, the true condition of the Bank and FRB. As such, each of the
Director Defendants is liable to Plaintiffs and others similarly situated for the
dissemination of false and misleading financial statements, which they knew or
should have known were falsely represented to the investing public and not
prepared in accordance with GAAP.

---

[2] Defendant Marilyn J. Sweeney appears to have attended all meetings of the Board
and FRB during the Class Period. Based on documents available to Plaintiffs, she
formally became a Director of the Bank in 2008 and, on January 2, 2009, also
became a Director of FRB.

[3] Defendant Jack A. Sweeney continued to attend Board meetings until January 2,
2009, when he resigned from the FRB Board.

17.     Each of the Individual Defendants specifically and regularly reviewed the Bank's allowance for loan losses and determined what further provisions (i.e. additions or subtractions) needed to be made, reviewed the Bank's capital adequacy, liquidity ratios, loan concentrations, loan quality and purported to review and approve the Bank's loans based upon credit risk and loss exposure. Because of the Individual Defendants' positions within the Company and/or the Bank, they each had access to adverse undisclosed material information about the true financial condition of FRB and the Bank and, most significantly, the adequacy of the Bank's capitalization and the fact that many of the Bank's loans, were of a high-risk nature and approved personally by Defendant Jack A. Sweeney when he was not competent to evaluate their appropriateness. By reason of their attendance at meetings of the Boards of Directors of FRB and the Bank and/or the Bank's Senior Loan Committee, they each were privy to such undisclosed information from internal corporate documents, communications among themselves and with other officers and employees of the Company and the Bank as well as attendance at, and documents received during, meetings of management, the Boards of Directors of FRB and the Bank. In the case of the Sweeney Defendants, they also possessed such knowledge through intra-familial discussions.   Each of the Individual Defendants knew or was deliberately reckless in not knowing of the adverse material facts which rendered the statements alleged herein false and misleading. Despite personal knowledge of the fundamentally deteriorated condition of the Bank and FRB throughout the Class Period, each of the Individual Defendants was motivated to conceal such circumstances from the investing public while they concurrently were seeking an infusion of critically-needed capital.

18.     The Individual Defendants, as officers and/or directors of the Company and/or the Bank, had a duty to disseminate complete, accurate and truthful information about the financial condition, earnings and expenses and capitalization of FRB and the Bank.   The Individual Defendants had a duty to

1    correct promptly any public statements issued by FRB and/or the Bank that had
2    become false and misleading. The Individual Defendants, together with their legal
3    counsel, including Defendant Steven Sweeney, were involved in the drafting,
4    producing, reviewing and/or disseminating the false and misleading statements
5    alleged herein.    Defendants Horgan, Edwards, Schreiber, and Sherman executed
6    Forms 10-K in 2007, 2008, and 2009, and they, as well as Defendant Marilyn
7    Sweeney, executed Form 10-K in 2009, thereby specifically approving the false
8    statements contained therein. As indicated above, Defendant Deloitte signed off on
9    the financial statements in those Forms 10-K, expressly approving their contents,
10   knowing that such representations were false and wholly unjustified.

11       19.    Because of their positions, their ability to exercise actual operational
12   control, power and influence with respect to FRB's course of conduct, including the
13   fraudulent schemes and acts described herein and their access to material inside
14   information about FRB and the Bank, the Individual Defendants were, at the time
15   of the wrongs alleged herein, controlling persons of FRB within the meaning of
16   Section 20(a) of the Exchange Act.

17       20.    It is appropriate to treat the Individual Defendants as a group for
18   pleading purposes and to presume that the false, misleading and/or incomplete
19   information conveyed in the public filings of FRB and the Bank as alleged herein
20   are the collective action of all the Individual Defendants identified herein. Upon
21   information and belief, each of the Individual Defendants, during the periods when
22   each was an officer and/or Director of the Bank and/or FRB, personally was aware
23   that the public statements made by, *inter alia*, Defendants Jack A. Sweeney and
24   Gartshore with respect to the financial and operating condition of FRB and the
25   Bank, that the filings of the Bank with its regulators and that the filings of FRB
26   with the SEC were materially false and deceptive.

27       21.    Defendant Deloitte is a Delaware limited liability partnership that
28   serviced the FRB account through its Los Angeles, California office. Deloitte is

12

1   registered with the Public Company Accounting Oversight Board ("PCAOB"),

2   pursuant to Section 102 of the Sarbanes-Oxley Act of 2002, to prepare and issue

3   audit reports on U.S. public companies.  As the world's largest professional

4   services/auditing company, Deloitte provides, *inter alia*, auditing, management

5   consulting, tax and other related services, typically on a fee basis. At all material

6   times, Deloitte acted as the purportedly Independent Registered Public Accounting

7   Firm (or, as commonly known, "auditor") of FRB and the Bank's financial

8   statements.  Deloitte issued unqualified audit opinions on FRB's December 31,

9   2006 financial statements in its report dated March 16, 2007, the December 31,

10  2007 financial statements in its report dated March 17, 2008, and the December 31,

11  2008 financial statements in its report dated March 16, 2009.

12          22.    Deloitte, with annual revenues of approximately $11 billion, has

13  developed an expertise in the auditing of financial institutions over many years.

14  Deloitte has developed proprietary means of carrying out audits of companies such

15  as FRB, reporting on financial statements, and dealing with audit committees of

16  boards of directors.  In the case of FRB and the Bank, Deloitte knew, based upon its

17  vast experience in auditing the financial statements of banks and other financial

18  institutions, that FRB's Audit Committee and senior officers generally were well

19  "over their heads" in terms of dealing with the circumstances surrounding FRB and

20  the Bank from at least 2005 onwards. In this connection, pursuant to the

21  responsibilities Deloitte had undertaken contractually and otherwise, its partners

22  responsible for the FRB audits knew that the financial statements of FRB and the

23  Bank were not prepared in conformity with GAAP and, indeed, concealed their true

24  financial condition from the investing public. If Deloitte had "blown the whistle"

25  once it first came to realize that FRB's financial statements were not being prepared

26  in conformity with GAAP in 2006 or earlier (as it had, in fact, learned) and had

27  refused to prepare and allow the public dissemination of its "clean opinions" (i.e.

28  Deloitte's reports upon the annual financial statements of FRB that were made

1   without qualification), the Individual Defendants would not have been able to

2   perpetrate the fraud that they did, both before and during the Class Period.

3         23.    For the years ended December 31, 2007 and 2008, Deloitte was paid

4   by FRB a total of $882,000 and $812,000, respectively, for audit and other services.

5   To retain such fee income and their personal compensation, which was based, in

6   part, on the fees paid by FRB, Deloitte partners effectively "sold out" and actively

7   participated in the fraud described herein. Such active participation included, *inter*

8   *alia*, the preparation and public dissemination of opinion letters included in FRB

9   10-K reports to the SEC and annual reports to FRB shareholders which represented

10   falsely that FRB's financial statements were prepared in accordance with GAAP

11   when Deloitte knew specifically that they were not and that it had audited FRB's

12   year-end financial statements in conformity with GAAS when, as set forth below, it

13   had intentionally not done so. For each such opinion letter prepared and

14   disseminated by Deloitte during the Class Period, to reflect the actual financial and

15   operating condition of FRB and the Bank, its opinions should have been "qualified"

16   or "adverse" opinions for fiscal years 2006 and 2007 and a "going concern"

17   statement for 2008 (i.e. that one or both of FRB and the Bank were at risk of

18   failing). Deloitte, notwithstanding its obligations to FRB, its shareholders and the

19   investing public, intentionally did not do so knowing all the while that such failure

20   was a fraud and an explicit breach of GAAS.

21         24.    On October 17, 2011, after the seizure of the Bank and the collapse of

22   FRB, the PCAOB unsealed previously confidential criticisms of Deloitte from a

23   report that was prepared in 2008. In particular, the PCAOB report criticized

24   Deloitte's auditing practices stating, for example, that "important issues may exist"

25   regarding Deloitte's audit procedures and suggesting that they have not been

26   skeptical or thorough enough and that, in connection therewith, readily accepted

27   outside specialists' work (such as real estate appraisers) when Deloitte should not

28   have done so, issues that permeated Deloitte's audits of FRB financial statements

1  during the Class Period. As referred to herein, Deloitte was all too willing to accept

2  what the Board and Audit Committee of FRB wanted in terms of FRB's financial

3  statements, a practice the PCAOB similarly criticized.

4      25.    Although it is clear that there was shared responsibility among all the

5  Defendants for the debacle that ensued, Deloitte, as the most experienced and

6  knowledgeable about the problems that existed at FRB and the Bank, should have

7  served (as it was obligated to FRB and its shareholders to do) as the "backstop" and

8  highest and best means of protecting the investing public. Deloitte utterly failed in

9  carrying out such contractual and professional responsibilities, causing massive

10  damages to FRB, its shareholders and the investing public, including Plaintiffs.

11  ## CLASS ACTION ALLEGATIONS

12      26.    Plaintiffs bring this action as a class action pursuant to Rule 23(a) and

13  (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all

14  persons and entities who purchased or otherwise acquired FRB securities during the

15  Class Period and were damaged thereby ("the Class"). Excluded from the Class are

16  the Defendants herein, officers and directors of FRB and/or the Bank, members of

17  their immediate families, the partners of Deloitte and the heirs, successors or

18  assigns of any of the foregoing. Purchasers of FRB shares, purchased directly or

19  indirectly by and for FRB's 401(k), Employee Stock Ownership Plan ("ESOP") and

20  other benefit plans, other than for the benefit of the foregoing individuals, are

21  members of the Class.

22      27.    The members of the Class are so numerous that joinder of all members

23  is impracticable.   While the exact number of Class members is unknown to

24  Plaintiffs at this time and can only be ascertained through appropriate discovery,

25  they believe there are, at a minimum, more than 500 members of the Class. FRB

26  common stock traded in an open and efficient market prior to the end of the Class

27  Period.

28

28. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. The following are questions of law and fact common to the Class:

- whether the Defendants engaged in acts or conduct in violation of federal securities laws as alleged herein;

- whether the Defendants made intentional and/or reckless misrepresentations and/or omissions of material facts regarding FRB and/or the Bank to the investing public;

- whether such misrepresentations and/or omissions of material facts were essentially linked to the damages sustained by the Plaintiffs and members of the Class;

- whether the Defendants acted knowingly or with deliberate recklessness in making false and misleading statements, in issuing false and misleading financial statements, news releases and/or other communications to the investing public about the financial and operating condition of FRB and the Bank, and in failing to disclose material facts concerning the Bank's imprudent lending practices and the Individual Defendants' continuing violations of bank regulator warnings and Cease and Desist Orders;

- whether the prices of FRB securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained foreseeable damages and, if so, the proper measure of such damages.

29. Plaintiffs' claims are typical of those of the Class because Plaintiffs and the other members of the Class sustained damages arising out of the Defendants' wrongful conduct, in violation of federal law.

30. Plaintiffs will, as they have to date, fairly and adequately protect the

interests of the members of the Class and have retained counsel competent and experienced in class actions and securities litigation. Plaintiffs have no interests antagonistic to, or in conflict with, those of the Class.

31. A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all the members of the Class is impracticable. Furthermore, because the damages suffered by most of the individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

32. FRB was a financial services company that formerly conducted its business principally through the Bank, its wholly-owned subsidiary. FRB, through the Bank, traditionally provided community banking services to individuals and companies in Southern California, using core funding sources (e.g., traditional deposit accounts by loyal customers).

33. The single largest reported asset category on FRB's balance sheets was "Net Loans," representing the bulk of its reported assets throughout the Class Period. FRB's assets were concentrated in commercial real estate ("CRE") with a significant portion of those loans in the acquisition, development and construction ("ADC") portfolio. Thus, the value of these assets was crucial to FRB's financial statements, and of the utmost materiality to investors.

34. During the Class Period, the Individual Defendants caused to be issued a series of false and misleading statements regarding the true operating and financial condition of FRB and the Bank, in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5. These violations primarily fell within several categories, discussed more fully below. First, the Individual Defendants caused to be issued false and misleading statements regarding the financial statements of FRB

1  and the Bank, which year-end financial statements were "blessed" by Deloitte when

2  it knew that it had no legal or professional justification for doing so and that its

3  certifications and the underlying FRB financial statements would deceive members

4  of the investing public.  Second, the Individual Defendants caused to be issued false

5  and misleading statements regarding the deteriorated operating condition and loan

6  portfolio of FRB and the Bank. Third, Defendants Jack A. Sweeney, Thompson,

7  McCullough and Gartshore issued false SOX certifications regarding the adequacy

8  of FRB's internal controls and oversight risk management.  Fourth, the Individual

9  Defendants failed to make timely public disclosure of the fact that the Bank's

10  regulators had warned at least the Director Defendants and the Company on

11  multiple occasions that the Bank was not being operated properly, and issued Cease

12  and Desist Orders, to which the Bank and FRB did not comply.

13  **Exponential Growth, and Regulatory Concern, Prior to the Class Period**

14      35.    In the years from 2002 through the beginning of the Class Period, the

15  Bank had grown very rapidly beyond its core functions. In the process, its assets

16  grew to more than $2 billion and its lending and other banking activities

17  skyrocketed. The following chart demonstrates the alleged rapid increases in

18  FRB's alleged profitability, as it was purportedly transformed from a sleepy local

19  bank (and a $3 per share stock) with approximately $2 million in net income as of

20  2001, to an institution with purported annual net income of $38.6 million, and a $34

21  stock,  at the beginning of the Class Period:

22

23

| Year ending | YE closing stock price | Announced Net Income |
|---|---|---|
| 12/31/1998 | $2.33-$3.38 | $1,709,000 |
| 12/31/1999 | $2.04-3.08 | $1,726,000 |
| 12/31/2000 | $2.16-2.79 | $2,400,000 |
| 12/31/2001 | $3.83 | $2,426,000 |
| 12/31/2002 | $5.21 | $3,037,000 |
| 12/31/2003 | $9.77 | $4,615,000 |
| 12/31/2004 | $18.00 | $11,084,000 |
| 12/31/2005 | $22.56 | $26,525,000 |
| 12/31/2006 | $34.09 | $38,336,000 |

|            |         |              |
|------------|---------|--------------|
| 12/31/2007 | $18.89  | $33,600,000  |
| 12/31/2008 | $3.24   | -$10,600,000 |

36.     However, as determined by the Bank's regulators, such growth was not accompanied by "management with appropriate qualifications and experience commensurate with their responsibilities within the Bank." Concerns identified by examiners before and throughout the Class Period included poor risk management practices, high concentrations in commercial real estate, land and construction loans, and asset growth funded by brokered deposits.

37.     At a California Department of Financial Institutions ("DFI") examination in 2004, examiners indicated that a First Regional senior official stated that management did not plan to implement limits on concentrations as the examination was recommending, and would only take steps to comply with the recommendation to monitor the geographic dispersion of real estate collateral.

38.     As early as March 2005, regulators noted that "the Bank's appraisal reviewer did not have prior experience or formal training in evaluating appraisals", and was unable to answer questions about specific appraisals.  As later reported in the OIG Report, "[a]s early as 2005, examiners noted concerns regarding the Bank's underwriting and collateral review practices."

39.     Examiners at the March 2005 joint examination noted that the Bank's appraisal reviewer did not have prior experience or formal training in evaluating appraisals. Examiners noted that during a discussion between the examiner and the appraisal reviewer in regard to a specific appraisal, the appraisal reviewer was unable to answer the examiner's questions.

40.     The FDIC repeatedly identified and criticized the Bank's excessive CRE and ADC lending concentrations from before and throughout the Class Period, all of which was well known to Deloitte.  At the March 2005 joint examination, the Bank's concentration in CRE equaled 855 percent of Tier 1 Capital plus the ALLL. The examination also noted significant borrower concentrations. For example, there

19

were two concentrations related to limited liability companies that were created and
managed by two different borrowers. Each affiliated relationship exceeded 100
percent of Tier 1 Capital plus the ALLL. Despite recommendations in prior ROEs,
the Bank had not established limits for its real estate concentrations of credit. The
Asset Quality component was rated a "2" at the March 2005 joint examination and
downgraded to a "3" at the next examination in 2006 due to the Bank's risky
lending concentrations and inadequate underwriting practices, all of which were
known to Deloitte.

41.   Based on the March 2005 examination, the FDIC and the DFI issued
an MOU that was signed on September 29, 2005.  The MOU required the Bank to,
*inter alia*, develop and implement written lending and collections policies,
including an independent appraisal review process; and perform risk segmentation
analysis of the concentration of credits.

42.   At the March 2006 examination, the Bank's overconcentration in CRE
and ADC was again noted by examiners.   Specifically, examiners at the March
2006 examination noted that prior concerns regarding high concentration levels and
inadequate monitoring of those concentrations were magnified as concentration
levels increased even further without commensurate improvements in monitoring
systems or the establishment of adequate controls or limits. Examiners also noted
that the Bank's total assets had more than tripled in a 3-year period. The growth had
been almost exclusively centered in CRE loans, and in particular, multi-family
residential loans, and the inadequate diversification in the loan portfolio posed
increased risk to the Bank.

43.   The March 2006 regulatory examination warned the Director
Defendants about underwriting weaknesses in two individual borrowers, who
exceeded the Bank's legal lending limit.   Examiners at the March 2006
examination noted that due to underwriting weaknesses in several of the credits in
the large borrower relationships, the principal could easily walk away from any of

1  the projects without much loss should the real estate market suffer a downturn.
2  Despite this warning known to Deloitte, and the Bank's policy, the Bank continued
3  to lend to these borrowers and/or approve such lending.

4  **The FY 2006 Audit and Financial Reports**

5      44.    As real estate values declined, given the high-risk nature and poor
6  quality of the Bank's outstanding loans by the beginning of the Class Period, the
7  ability of borrowers to repay their loans was adversely and materially affected, as
8  were possible recoveries to the Bank when borrowers defaulted on their obligations.
9  By early 2006, residential real estate showed increased signs of peaking in
10  California. This threatened the valuation of the Bank's assets and, in particular, Net
11  Loans.   By the year-end 2006, the Individual Defendants, with the specific
12  knowledge of Deloitte, concealed from financial statements of FRB and the Bank
13  the impact of the badly deteriorated real estate market and the very specific
14  problems faced by the Bank in order to keep FRB's stock prices high and retain
15  their positions and attendant benefits with FRB and/or the Bank. Such deception
16  prevailed throughout the Class Period until such shares were almost worthless.

17      45.    On January 30, 2007, FRB issued a press release announcing its
18  financial results for the year ended December 31, 2006. The results were also
19  contained in a report on Form 10-K filed by FRB with the SEC on or about March
20  16, 2007. The results were audited by Deloitte. The Company announced a
21  purported net income of $38,336,000 – the largest annual net income the Company
22  had ever announced, or would ever announce. The Individual Defendants caused
23  the Bank to record an allowance for loan losses of $20,624,000. Deloitte issued an
24  unqualified or "clean" opinion, stating that "We have …audited, in accordance with
25  the standards of the Public Company Accounting Oversight Board (United States),
26  the consolidated financial statements as of and for the year ended December 31,
27  2006, of the Company and our report dated March 16, 2007, expressed an
28  unqualified opinion on those financial statements." Deloitte further represented as

21

follows:

> In our opinion, management's assessment that the Company maintained effective internal control over financial reporting as of December 31, 2006, is fairly stated, in all material respects, based on the criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2006, based on the criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

Deloitte's unqualified opinion was an indication that it concluded that the Company's financial statements accurately portrayed its financial results and condition.

46.    Defendants' representation that the Company had earned net income of $38.6 million was false and misleading because the Company recorded an allowance for loan losses of only $20,624,000, when, in fact, given the true state of its Net Loans (which condition was well-known to Deloitte), it should have recorded an ALLL of at least $45,624,000. If the Individual Defendants had honestly disclosed the true condition of the Bank's already deteriorated (and deteriorating) loan portfolio as of the beginning of the Class Period, instead of FRB's reported net income of $38,336,000, it would have only reported, at best, approximately one-third of that amount; i.e. approximately $13 million in net income. Notwithstanding the subjective leeway given to the Bank and FRB in determining appropriate provisions for the Bank's loan losses, as Deloitte was well aware and concealed, the provisions made and/or approved by the Director Defendants throughout the Class Period did not even remotely reflect the risk that the Bank faced that its outstanding loans would not be repaid

47.    Several material facts were known to Deloitte, which nevertheless issued a "clean" opinion as to FRB's reported earnings, assets and net worth, which it knew to be overstated. The following facts, all known to Deloitte at the time of its audit, rendered the Company's reported net income inaccurate:

(1) In general, the Director Defendants established FRB's loan reserves

1   based on the classification of the loan within its portfolio -- commercial loans

2   graded 1 (most creditworthy) and conventional real estate loans graded 1 had a

3   reserve of 1%, while construction loans graded 1 had a reserve of 1.25%. These

4   percentages, approved by Deloitte, were much lower than those adopted by

5   comparable banks (i.e. banks having a significant amount of their loan portfolio

6   concentrated in Southern California real estate) during the Class Period.

7       (2)  FRB failed to establish, other than *de minimis*, any specific reserves for

8   individual loans until 2008 when it was set at $42 million. For 2006 and 2007,

9   Deloitte tested the classification of loans, found them inadequate, but then simply

10   relied on the percentages established by the Bank's officers for each loan grade.

11   Deloitte, due to its pervasive presence as an auditor of financial institutions

12   throughout the United States, was well aware of the decline in economic conditions

13   in California and elsewhere, specifically within the real estate and housing markets

14   from 2006 through 2009. Deloitte had direct access to the experiences of other

15   financial institutions it was auditing and also knew that FRB's peers were

16   increasing reserves for problem loans within their portfolios, and considering

17   factors such as, experience and ability of lending management, national and local

18   economic trends and conditions, competition, legal and regulatory requirements,

19   industry conditions and concentration of credit risk. No reasonable auditor during

20   this period would have done otherwise, but to ensure that FRB's ALLL addressed

21   all the risks identified by regulators and examiners, as well as those known to

22   Deloitte. Deloitte recklessly failed to consider the risks inherent in FRB's loan

23   portfolio and instead, allowed management, with which Deloitte partners had

24   developed close personal relationships, to establish its ALLL based upon a simple

25   percentage of loans knowing that FRB's loan classifications were materially flawed

26   and understated, as determined by their own test work. Deloitte's failure to require

27   FRB to make provision for the Bank's loan losses reflecting an analysis of

28   individual loans constitutes an accounting judgment that no reasonable accountant

1   would have made under the circumstances and amounts to an intentional

2   acquiescence in the Individual Defendants' fraud.

3        (3) Deloitte, in its Report to FRB's Audit Committee dated March 8, 2007

4   acknowledged that fact. Deloitte determined during its 2006 audit that FRB's

5   internal controls and policies over its determination of ALLL and FRB's financial

6   close and reporting process contained significant material deficiencies.   As

7   acknowledged by Deloitte in its Report to FRB's Audit Committee, these

8   significant deficiencies caused more than a remote likelihood that a misstatement of

9   FRB's annual or interim financial statements that is more than inconsequential

10  would not be prevented or detected. FRB's significant deficiencies at December 31,

11  2006, included, "reserves for impaired credits has not been calculated consistent

12  with the provisions of SFAS No. 114; certain credit files did not contain current

13  appraisal or financial data as applicable; several of the loans reviewed exhibited

14  underwriting weaknesses; management had not designed a control to ensure proper

15  valuation of impaired loans; certain controls were not operating effectively such

16  that current financial information was not obtained on a timely basis for impaired

17  credits or potentially impaired credits; and a deficiency in the design of certain

18  financial close and reporting process controls, in that management has not

19  implemented sufficient controls over the process to ensure adequate documentation

20  of the process and procedures, as well as documentation of appropriate preparation

21  and review." [Emphasis Added]

22       (4) Deloitte knew that FRB and the Bank, in establishing ALLL for

23  December 31, 2006, had failed to include any reserves for (1) the economic trends

24  in the geographic markets of its loan portfolio, (2) the changes in risk selection and

25  underwriting standards due to loans being made for properties outside of Southern

26  California and/or high risk loans, such as land loans; (3) credit concentrations, and

27  (4) industry conditions.  Deloitte also knew that FRB acknowledged that "one area

28  of potential concern [adequacy of the loan loss reserve] remains that of real estate

1    values. Some media outlets have reported significant declines in real estate values,
2    but in many cases it appears that these declines reflect lower single family residence
3    prices in other geographical areas. More importantly, it does not appear that any of
4    the segments in which the Bank is active have undergone any significant reduction
5    in rental rates, occupancy, or property values."[4] However, there is no
6    documentation in the Deloitte work papers, as required by PCAOB Auditing
7    Standard No.3, that Deloitte performed any assessment or analysis of FRB's ALLL
8    based on economic conditions, changes in FRB's practices or changes in the loan
9    review process.

10          (5) Deloitte acknowledged in its 2006 audit working papers that FRB's
11   lending practices had already been criticized by the Bank's Regulators (the FDIC
12   and DFI) as follows:

- "The prudent development and implementation of risk identification practices is considered less than satisfactory.
- Concentrations within the loan portfolio, specifically those to individual borrowers, as well as credit administration deficiencies reflect an increase in credit risk."

To have knowledge of the above significant risks (red flags) without significantly altering or expanding audit procedures is a clear violation of GAAS.

          (6) During the 2006 audit, Deloitte tested 25 loans within FRB's loan portfolio to determine solely if their classification within the Bank's grading system of 1 to 5 was reasonable. Due to the significant concentration of the Bank's loans to two borrowers, Deloitte tested six loans to those two borrowers to assess risk ratings of the loans. In its testing of these six loans, Deloitte observed that "it should be noted that several of the loans reviewed exhibited underwriting weaknesses that if not for a strong borrowing relationship the weaknesses would

---

[4]    Both the Loan Review Committee memorandums dated November 13, 2006 and February 15, 2007 contain this exact same verbiage. These memorandums appear to be based on boilerplate language from FRB.

heighten the credit concern." In particular, Deloitte acknowledged that, for ████████████████ on a $26.7 million construction loan for a 304 unit apartment complex in Las Vegas, Nevada, outside the Bank's traditional lending area, the loan to purchase price was 96.12%, the property had a vacancy level exceeding 30%, the loan has only a "partial guarantee of the top 10% of the balance," and the underwriting was done based on "assumed market rates." For the ████████████████ loan of $14.48 million, Deloitte's work papers acknowledge that the debt service to cash flow was less than 1.0 to 1.0 and no guarantee of the debt existed for this loan. Accordingly, FRB's aggressive lending practices concentrated in real estate to few borrowers and increase in its construction loan portfolio (high risk loans) by $153 million from December 2005 was well known to Deloitte in 2006 and disregarded in attesting to FRB's loan loss reserves at December 31, 2006.

(7) For the 2006 audit, Deloitte also relied on the loan review reports from Owings & Associates in assessing the propriety of FRB's ALLL, without documenting that it had performed any procedures in accordance with SAS No.73 as to its reliance on Owings & Associates or specialists. Deloitte was required by PCAOB Auditing Standards No.3 to document such procedures in its work papers and since they were not in Deloitte's work papers, it follows that Deloitte ignored SAS No.73. Moreover, Deloitte's work papers contain numerous summarized real estate appraisals upon which it relied without documenting any compliance by Deloitte with the requirements of SAS No.73.[5]

(8) Deloitte knew from FRB's financial reports that during the last six months of 2006, FRB increased its ALLL by less than $300,000 while its loan portfolio increased by $52 million. Concurrently, in 2006, real estate values began

---

[5] In fact, many of the appraisals in the Bank's loan files were, at best, superficial, not professionally valid and prepared simply so there would be an "appraisal" in the loan file, all of which was known or should have been known by Deloitte and the Individual Defendants.

1  an unprecedented decline.  For 2006, FRB recorded a lower provision for loan

2  losses than in either 2004 or 2005 during relatively "boom years" when the

3  prospects for repayment of loans were far better than they were by 2006.  At

4  December 31, 2006, FRB's reserve was $20,624,000, only 1.1% of its loan

5  portfolio, while that of its peers, such as Vineyard Bank, was significantly higher at

6  2.48%.

7       (9) During the performance of its audit procedures as of and for the year

8  ended December 31, 2006, Deloitte knew that:

9

10  ▪ FRB's lending practices of land development and/or construction and

11     unsecured commercial loans were extremely high risk.

12  ▪ FRB's lending practices of loans outside of Southern California, including

13     but not limited to, loans made on properties located in Nevada, Arizona,

14     Florida and Washington were real estate markets in which the Bank's

15     lending officers had little or no first-hand knowledge or experience with,

16     increasing loan risk.

17  ▪ As of December 31, 2006, real estate values had peaked (May 2006 – Las

18     Vegas; June 2006 - Riverside; March 2006 – Arizona; May 2006 – Los

19     Angeles; and September 2005 – San Diego).

20  Accordingly, Deloitte knew that as of December 31, 2006, FRB's loan portfolio

21  had already experienced a decline in value of approximately 2% to 7%, without

22  even considering other facts such as excess concentration of loans to a few

23  borrowers, the particularly speculative nature of the underlying development

24  projects, poor loan underwriting, and the excessive loan-to-value in virtually all the

25  Bank's ADC loans.

26       (10) As of March 16, 2007, the date Deloitte issued its clean opinion as to

27  FRB's December 31, 2006 financial statements, knowing that FRB had a

28  significant deficiency over financial reporting to its Allowance for Loan Losses,

and that Deloitte had ignored the significant risks inherent in FRB's loan portfolio, Deloitte's communication with FRB's Audit Committee dated March 16, 2007, stated that,

> The Company has two significant borrowing relationships that management has risk rated "Pass" based, among other things, on asset performance and financial capacity of the principals. Several of the loans reviewed exhibited underwriting weaknesses that if not for a strong borrowing relationship the weaknesses would heighten the credit concern. The Company's documentation for two relationships could be enhanced by performing an overall analysis of cash flow and collateral coverage across these relationships.

> Certain credit files did not contain current appraisal or financial data as applicable.

> The significant deficiency resulted from both a deficiency in design and operation, in that management had not designed a control to ensure proper valuation of impaired loans. Additionally, certain controls, which were appropriately designed, were not operating effectively such that current financial information was not obtained on a timely basis for impaired credits or potentially impaired credits.

(11) The reporting of a significant deficiency to the Audit Committee highlighted Deloitte's knowledge of the lack of sound financial reporting at FRB but did not relieve it of its duty to perform independent audit procedures as required by GAAS and its engagement letters. Rather, this knowledge required Deloitte to do much more than it did. Deloitte completely ignored the "red flags" and risk factors present at FRB and the Bank as of December 31, 2006 as set forth herein. Deloitte had no basis either in fact or auditing practice to justify its "clean" opinion as to FRB's December 31, 2006 year-end financial statement, and should have, at least, proffered a "qualified" or "adverse" opinion. Such failure was intentionally fraud and an explicit breach of GAAS.

(12) Deloitte was aware that the Bank had been warned by its regulators many times prior to, and during, the Class Period, that it had an ineffective Board of Directors and weak management.

(13) Another "red flag" that was completely and purposefully ignored by Deloitte in the work performed on the ALLL as part of its audits of the Bank's

financial statements was the Bank's significant concentrations of loans in CRE and ADC loans.  In 2006, the Bank's ADC loan concentration as a percentage of total **reported** capital was approximately 150%, compared to its peer group average of approximately 100%.[6]  However, at no time did it expand its auditing procedures, and proposed no adjustment to the ALLL as a result of this adverse condition, despite knowing that the ALLL was grossly understated.

48.     Given Deloitte's explicit knowledge that FRB 's 2006 year-end financial statement failed to conform to GAAP, it should have issued a "qualified" or "adverse" opinion.  Such failure was a violation of its obligations under GAAS, and, in and of itself, falsely conveyed to the public that FRB's internal controls were satisfactory.

### Events Following the FY 2006 Earnings Report

49.     Beginning in 2007, there was a dramatic shift in the Bank's funding strategy.  The Bank could not fund its growth through traditional core deposits and chose to continue to lend and fund construction projects with brokered deposits.  In that regard, despite the fact that it was imprudent to do so, the Bank's Board directed management to seek out "brokered deposits," deposits through certificates of deposit, typically "sold" to potential depositors outside the Bank's traditional operating area. These "brokered deposits" typically were at higher than local rates and were intended to lure the depositors to place their money with the Bank. Because such "brokered deposits" were highly interest-rate sensitive (i.e. such depositors typically sought out ever higher interest rates and moved freely from one financial institution to another) and volatile, they were not only expensive, but left the Bank at risk that the depositors would suddenly "jump" and place their funds elsewhere.

---

[6] Had the Individual Defendants honestly reported that the Bank's capital was badly depleted and that, by taking unrealistically low provision for loan losses, the ADC concentration percentage would have been multiplied many times by the commencement of the Class Period.

50.     The Bank's brokered deposits increased from $3 million in December 2007 to $700 million in March 2009.  As the severity of the mounting bad loans (and likely losses therefrom) increased dramatically through 2007 and into 2008, Defendants Gartshore and McCullough began to push the Bank into accepting approximately $206 million in loans referred by loan brokers operating a mortgage "boiler room" located in Newport Beach. Most of such loans represented either "bailouts" of other financial institutions, were poorly documented in terms of the underlying reasons for the loans, had insufficient or no collateral and/or were extremely high risk and/or outside the geographic areas where the Bank and its loan officers had experience and local knowledge. Many of the worst of the Bank's ultimately uncollectible loans were generated by its senior loan officers, Carolyn Zaro Nicholson and Ralph Downing, who directed them to the Bank despite the fact that, in the exercise of their fiduciary duties owed to it, they should not have done so.

51.     Throughout 2007 (after which  FRB falsely reported net income of $33,610,000 for the year), the Individual Defendants caused the Company to continue to report favorable earnings results, notwithstanding the fact that they knew that there were increasing and internally well-known material risks to the Bank's loan portfolio, and that had they caused grossly insufficient reserves to be taken for known and/or likely losses from the Bank's high-risk loan portfolio, the Company should have reported substantial losses. All of such material facts were known by Deloitte, which nevertheless issued a "clean" opinion as to FRB's reported earnings, assets and net worth, which it knew to be overstated. Given Deloitte's explicit knowledge that FRB 's 2007 year-end financial statement failed to conform to GAAP, it should have issued a "qualified" or "adverse" opinion. Such failure was a violation of its obligations under GAAS. The Individual Defendants also knew that their wrongful conduct caused FRB's stock to trade at artificially inflated prices, as did Deloitte, which acquiesced and directly